```
 1                     IN THE UNITED STATES DISTRICT COURT
                        FOR THE EASTERN DISTRICT OF TEXAS
 2                            TEXARKANA DIVISION


 3

     HITACHI MAXELL, LTD.              )
 4                                              DOCKET NO. 5:16cv178
         -vs-                          )
 5                                              Texarkana, Texas
     HUAWEI DEVICE USA INC.,           )  2:01 p.m.
 6   ET AL                                 September 27, 2017


 7

                  TRANSCRIPT OF HEARING ON MOTION TO DISMISS
 8           BEFORE THE HONORABLE ROBERT W. SCHROEDER III,
                         UNITED STATES DISTRICT JUDGE
 9

10                        A P P E A R A N C E S

11
     FOR THE PLAINTIFF:
12
     MR. JAMIE B. BEABER
13   MAYER BROWN LLP
     350 South Grand Ave., 25th Floor
14   Los Angeles, CA 90071-1503

15   MR. JAMES A. FUSSELL III (TRIPP)
     MAYER BROWN LLP
16   1999 K Street, NW
     Washington, DC 20006-1101
17
     MR. GEOFFREY P. CULBERTSON
18   PATTON TIDWELL & CULBERTSON, LLP
     4605 Texas Blvd.
19   P.O. Box 5398
     Texarkana, TX 75505-5398
20

21   COURT REPORTER:          MS. SHEA SLOAN, CSR, RPR
                               OFFICIAL COURT REPORTER
22                             211 W. Ferguson
                               Tyler, TX 75702
23                             shea_sloan@txed.uscourts.gov

24   Proceedings taken by Machine Stenotype; transcript was
     produced by a Computer.
25
```

```
 1    FOR THE DEFENDANTS:

 2
      MR. STANLEY YOUNG
 3    MR. ANUPAM SHARMA
      COVINGTON & BURLING LLP
 4    333 Twin Dolphin Dr.
      Ste. 700
 5    Redwood Shores, CA 94065-1418

 6
      MR. GREGORY S. NIEBERG
 7    COVINGTON & BURLING LLP
      The New York Times Building
 8    620 Eighth Avenue
      New York, NY 10018-1405

 9

10
      MS. JENNIFER PARKER AINSWORTH
11    WILSON ROBERTSON & CORNELIUS
      900 ESE Loop 323
12    Ste. 400
      P.O. Box 7339
13    Tyler, TX 75711-7339

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S
 2              THE COURT:  Please be seated.
 3              Mrs. Schroeder, if you would, call the case for us.
 4              THE CLERK:  Cause No. 5:16cv178, Hitachi Maxwell,
 5   Ltd. vs. Huawei Device USA Inc., et al.
 6              THE COURT:  Announcements for the record.
 7              MR. CULBERTSON:  Your Honor, Geoff Culbertson.  I'm
 8   here today with Tripp Fussell and Jamie Beaber from Mayer
 9   Brown in Washington DC.  And we are ready.
10              THE COURT:  Very well.  Thank you, Mr. Culbertson.
11   Welcome.
12              Ms. Ainsworth.
13              MS. AINSWORTH:  Good afternoon, Your Honor.
14   Jennifer Ainsworth, Stanley Young, Anupam Sharma, and Greg
15   Nieberg for the Huawei Defendants.  And we are ready to
16   proceed.
17              THE COURT:  Good.  Very well.  Thank you, Ms.
18   Ainsworth.
19              We are here on Huawei's motion to dismiss related
20   to the '139 and '292 patent, and I think the parties are in
21   general agreement that an hour per side will be an adequate
22   amount of time to cover all of the issues we need to cover.
23              So, perhaps, we will take a break before rebuttal,
24   so Huawei may proceed.
25              MS. AINSWORTH:  Your Honor, if I may approach.
```

1          THE COURT:  Yes.

2          (Slides distributed.)

3          MR. YOUNG:  Thank you very much, Your Honor.  Good

4     afternoon.  Stanley Young for the Defendants Huawei.

5          We have a case here that is very much like ones

6     that the Court has considered over the last year -- or the

7     last six months actually, involving the Alice Step 1 and

8     Step 2 analysis under Section 101.

9          Both of the patents in this case involve the

10     gathering and calculating and grouping and otherwise dealing

11     with processing information.  That is an abstract idea under

12     the Federal Circuit decisions Electric Power, Digitech, and

13     others.

14          Those ideas are applied in these patents in a

15     specific technological context, but that does not make them

16     patentable subject matter.

17          Under Alice Step 2, there is no inventive concept.

18     As we will see, the patents and their claims recite

19     conventional cellular handsets, GPS devices, central

20     processing units, and other standard computer components that

21     are used in a conventional way.  There is no unconventional

22     use of those components and, therefore, no inventive concept.

23          The inventive concept that the Plaintiff seeks to

24     point to is simply the abstract idea.  They say that it is an

25     arrangement of those components in a way that is

1    unconventional; but the components themselves and the way

2    they are used, the way they receive signals that they have

3    always received, is not inventive and is totally

4    conventional.

5           It is a fundamental practice of human endeavor to

6    gather and process information.  A fundamental principle of

7    the 101 Alice line of cases is that you don't want to preempt

8    people from adopting technological improvements in those

9    areas.

10          Both of these patents don't introduce -- neither of

11   these patents introduces any technological improvement.  They

12   are simply boxes that describe functions and goals.  And

13   under that, the principle that has been set forth in the

14   cases in this area that makes them unpatentable subject

15   matter.

16          We will go through the patents.  I will talk a

17   little bit about the law in greater detail, and then go

18   through each patent to see how that law results in the

19   invalidity or the unpatented unpatentability of these

20   patents.

21          The '292 patent basically involves combining two

22   data sources.  As outlined in red on the figure in front of

23   you, Your Honor, the 200, 201, and 204 elements gather

24   GPS-related information on position and the reliability of

25   that position information.

1       300, 302, and 305 gather cellular-related position

2   information and information on the reliability of that

3   cellular position information.

4       That information then gets fed into 400, which is

5   the GPS/cellular positioning results combining unit.

6       Figure 2 of the patent just is a flow chart of

7   those same operations.  There is receipt and calculation of

8   the information from the cellular and GPS receivers that gets

9   put into step 606, which is combining those pieces of

10  information in accordance with their weight, which leads to

11  an output.

12      Now, the patent explicitly says that there is no

13  order required in these operations.  So these could be done

14  in some different order than what is shown in Figure 2.

15      There are two claims in the patent that reflect

16  exactly the steps that are shown in these diagrams.  You have

17  the receiver, position calculation, and reliability

18  calculation means elements in Claim 1 for GPS outlined in

19  pink there.

20      Then in yellow you have very similar analogous

21  means elements for the cellular information.  That gets fed

22  into the GPS/cellular combining means, which is in the blue

23  there on the right.

24      Claim 2, unlike Claim 1, is a method claim.

25  Claim 1 is a means-plus-function element.  Claim 2 is a

 1    method claim.  But the scope is pretty much exactly the same

 2    except for one minor difference relating to simultaneity of

 3    calculation at the end.  But you will see there the

 4    functions -- the steps, rather, that are cited in Claim 2

 5    precisely map on to the alleged structural elements of

 6    Claim 1.

 7            The '139 patent involves a similar processing of

 8    information relating to base stations.  Here in what is

 9    shaded in gray -- and we will provide you, Your Honor, with

10    these hard copies of this presentation -- in 101 of Figure 1,

11    you have the classification of base stations into multiple

12    groups.  In Figure 3A those are called G1, G2, and G3.

13            Then you have obtaining communication quality

14    indices from each of the base stations.  That is simply some

15    indication of the quality of the communication.

16            In Figure 3A the example is receive power, so how

17    much power is being received in connection with that base

18    station.  And you have that in yellow.

19            Then you calculate characterizing quantities of the

20    communication quality for each group.  That is step 103 in

21    Figure 1 as shown in pink in that figure and in the figures

22    3A, B, and C.

23            There you have a group score that is calculated for

24    each of the groups.  So for group G1, for example, you take

25    the received power R1 and R2 and you calculate a group score,

1    which is designated as S1.

2          As shown in Figures 3B and C, you could calculate

3    that group score either by adding the scores of the

4    individual base stations or averaging the scores of the

5    individual base stations.  But the key is you simply have a

6    group score that is taken from the individual base station

7    scores.

8          The next step in blue, 104 and 105, is specifying

9    one group in accordance with those group scores.

10          So just to take an example, you could pick the

11   group with the highest group score.  And then in 105 of

12   Figure 1 you specify one base station in that group.

13          Claim 1 maps on to that diagram.  The first step is

14   obtaining the information about the individual base stations.

15   Step 2 is calculating the group scores.  And step 3 is taking

16   one of the base stations from one of the groups that you have

17   selected, based on those characterizing quantities.

18          There are some apparatus claims as well.  Claim 11

19   recites the same steps in the context of a control unit.

20   There is also a storage unit there that is also not

21   convention -- is also conventional.

22          There is some dependent claims that specify the

23   particular communication quality index to be used.  Excuse

24   me.  So you have receive power, which is what is in Figure 3.

25   You have communication bit rate.  You have SNR value, which

1    is signal to noise ratio, which measures the noise and

2    quality of the signal.

3         Then you have more generic metrics of wireless

4    communication that are referred to in other claims.  And you

5    have a prior art positioning method which doesn't add

6    anything either.  That is just using the signals and the time

7    between sending and receipt, which is sort of like, you know,

8    people have done that for ages.  It is like radar, and that

9    doesn't add anything to the claims either.

10        So the question is, given this set of disclosures

11   of the claims, what should be the outcome under Alice in

12   Section 101?  I think the Court is very familiar with the

13   two-step Alice process, abstract idea and inventive concept.

14   And I will discuss each of those here.

15        The key here is the fact that manipulation of

16   data -- excuse me -- is not a patentable concept.  It is an

17   abstract idea.  The Electric Power case is a very good one,

18   and I will give you some detail on that in a bit.  But really

19   these claims just deal with and are completely directed to

20   organizing, displaying, and manipulating data.

21        Now, in their briefing, Plaintiff says that we have

22   characterized that in different ways.  I don't think so.  If

23   you look at all of the ways we have characterized it, it is

24   the same thing as what we are saying now, it's organizing,

25   displaying, and manipulating data.

1            Step 2 of Alice requires something significantly

2    more than the abstract idea.   In order to show entitlement to

3    a patent, the patent owner must demonstrate that the claims

4    feature something beyond routine and conventional activities.

5            And it can't just be insignificant extra-solution

6    activity.   It has to be something that allows the Court to be

7    comfortable that the abstract idea is not being preempted.

8    Simply placing the abstract idea and using it in a particular

9    technological environment, limiting it to cell phones say,

10    does not suffice to make an abstract idea patentable.

11            In particular in this case we have generic computer

12    elements such as CPUs, storage memories, and other elements

13    such as GPS receivers, cellular receivers that are being used

14    in their conventional, traditional, generic way.   And that

15    does not create patentable subject matter.

16            Plaintiff has submitted some expert declarations.

17    For the reasons that we cited in our brief, we believe the

18    Court should ignore those.

19            THE COURT:   Wait.   Can you remind me exactly what

20    specific reasons you gave in your brief for ignoring those?

21    I mean, why is expert testimony inappropriate to support an

22    argument like this?

23            MR. YOUNG:   The patents can be read.   They are part

24    of the pleading.   Generally, on a motion for judgment on the

25    pleadings or a motion to dismiss, the Court need not consider

1   extrinsic evidence.  Those expert declarations are

2   interpretations.  They are extrinsic evidence.  So I believe

3   the Court can and should ignore them.

4           Should the Court choose to consider them, we

5   certainly dispute the merits of them.  They don't really talk

6   about the unconventionality of the components that are in the

7   case.  They focus on the alleged unconventionality of the

8   abstract ideas that are stated in both of these patents.  So

9   both procedurally and substantively they should not be

10  considered.

11          Going to the '292 patent and, again, here are the

12  claims.  The abstract idea is combining the two data sources

13  that is manipulating the data based on their reliability.

14          And here I think it is quite useful to compare the

15  claims of the '292 to the claim in the Electric Power case.

16          Excuse me, Your Honor.

17          As you will see, the Electric Power case involved a

18  claim that called for receiving data.  And this is about an

19  electric power grid.  This is true technology, and involved a

20  lot of detail about how electric power grids work, and it

21  involved a lot of data from an electric power grid.

22          Detecting and analyzing events in real time from

23  that data, accumulating and updating the measurements from

24  that data, and then deriving a composite indicator of

25  reliability based on that data, that is very similar to the

1    claim of the '292 patent.  And I believe that the result for

2    the '292 patent should be the same.

3          The Digitech case is also very similar.  The claim

4    in that case was for generating a device profile, which calls

5    for generating sets of data and then combining those sets of

6    data into a device profile.  That is exactly the kind of data

7    manipulation and combination that we have in the '292

8    patent.

9          As Digitech said back in 2014, simply taking two

10   data sets and combining them into a single data set, is not

11   patentable.  It is simply calculating; and even if it is for

12   a specific purpose, even if it is for a beneficial purpose,

13   that by itself does not make the patent eligible under

14   Section 101.

15         With respect to some other case law here, as you

16   can see from the Electric Power case, even if it is a

17   desirable outcome, the fact that it uses simple combination

18   of data and components that are generic, does not make it

19   patentable.

20         Just like what the -- happened in TLI

21   Communications, the patent, as you can see from the figures,

22   does not provide any technical details for the functions that

23   are claimed.

24         Going to Step 2 of Alice, the combination that we

25   have seen, the claims that we have seen, do not involve any

1    inventive concepts.  We have cellular communications, cell

2    phones just receiving signals, and we have GPS components

3    that are doing the same thing.  They calculate positions just

4    as this Court found in the Rothschild case.

5           The background section of the '292 patent

6    emphasizes the non -- that -- the lack of something

7    unconventional in these claims.  It talks about how in the

8    past, and this is the background of the convention -- of the

9    patent, rather, in Column 1 starting at Line 13, how mobile

10    handsets have used GPS and how cellular networks have been

11    used in connection with GPS.

12           The patent itself further details how the claims do

13    not add inventive concepts.  You will see there in the middle

14    of the first paragraph that is starting at Column 2, Line 38,

15    that it relies on elements that are well-known.  And it

16    certainly is not limited to any new or unconventional

17    elements or arrangement of elements.  And it seeks to sweep

18    in parts and orientations that are conventional.

19           Going to the GPS status sources.  The description

20    in Column 2 starting at Line 51 talks about GPS parts of this

21    claim in a way that is no different from the way that GPS

22    equipment has been used.

23           As this Court found in the Rothschild case, a GPS

24    device performing such generic tasks does not create

25    patentable subject matter.

1        Going to the cellular side, it is really the same

2   thing.  Down at the bottom of Column 2 and top of Column 3,

3   the discussion there is of a receiver and a mobile handset

4   receiving and calculating its positions using cellular

5   signals.  There is nothing unconventional there.

6        When you get to the combining element, Figure 3 of

7   the patent discloses a use of a weighted average formula.

8   And there you simply take the location for GPS and the

9   location for the cell network, which consists of X and Y

10  coordinates, you multiply them by the weights, respectively,

11  of the GPS and cellular, that is the $W_{gps}$ and $W_{cell}$, and you

12  created a weighted average of the coordinates, and that is

13  just manipulating data.  And it is not manipulating data in

14  any new way.  People have been using weighted averages for a

15  variety of purposes forever.

16       So those concrete, tangible components, while they

17  are concrete, are not new.  They are totally conventional.

18  They are well-understood, standard in the industry, and

19  therefore, this is not patentable.

20       This Court itself in cases like Uniloc vs. Amazon

21  has emphasized that the traditional arrangement of computer

22  components distinguishes this case from others where

23  patentable subject matter has been found.

24       The file history emphasizes this point as well.

25  The Patent Office had found that the Watters patent had

1  anticipated the claims as originally submitted, and it was

2  only the addition of the simultaneity elements which led to

3  the patent being issued.  We believe that was an error; and

4  that the patent, obviously, is not distinct from the prior

5  art.  But that is what the Patent Office said.

6        The issue of claim construction has been argued,

7  that the Court should defer until after claim construction

8  its decision on that motion.  We believe that to be wrong.

9  Since the briefing in the case, the parties have submitted a

10 joint claim construction and prehearing statement.  And the

11 claim construction positions set forth in that document

12 actually support our motion.

13       Here are several of Plaintiff's alleged -- or

14 proposed claim constructions for elements of Claim 1.

15       And what they claim there as the structure -- and

16 under 112(6) the structure helps define the claim, there are

17 processors such as CPUs that are used to accomplish the goals

18 that are set forth in the patent.

19       A CPU is a general computer component.  It can do

20 different things if it is programmed, obviously.  But it is

21 really a general generic component that does not lend

22 inventive concept to an abstract idea.  The case law is very

23 clear that you can't just say, well, let's take a computer

24 and have it do these things and have that be a patentable

25 subject matter.  That is just not the case.

1           The other thing is that these claim constructions

2   don't present any issues that would change the result on the

3   Alice issue one way or the other.

4           The simultaneity element similarly does not cause

5   the Court to have to defer its decision on this issue.  Both

6   of the parties agree that that term should be given its plain

7   and ordinary meaning, so there is nothing really that turns

8   on simultaneity.

9           Moving now to the '139 patent, here again, we have

10  another set of claims that simply collects, calculates, and

11  issues an output based on that calculation of data.

12          That is not sufficiently technological.  It is not

13  like Enfish where the computer's operation itself is being

14  improved.  There are no structural components other than

15  processors and general networks and storage units that are

16  recited in the claims that make this a patentable subject

17  matter.

18          Actually, both in the '139 and the '292, there is

19  no particular way of programming or designing the software to

20  accomplish this claimed functionality.  And, therefore, for

21  that reason, as well as this Court noted in Uniloc vs. AVG,

22  these claims do not cite patentable subject matter.

23          I think a key disclosure of the '139 patent appears

24  at the top of Column 6, which states, quote:  The wireless

25  communication function and the base station selection

algorithm are implemented by executing the software stored in
the RAM by the CPU.  RAM is completely conventional memory.
The CPU is a completely generic computer component.  They may
in any case that we might look at, be programmed to do
different things; but that does not make an abstract idea
patentable.

There is nothing unusual in the arrangement of the
RAM or the CPU.  There is nothing claimed about how they are
somehow situated differently.  The only claim here is that
they do different things in accordance with this allegedly
novel abstract idea.  And that does not make that abstract
idea patentable.

So the claims here just talk about, again, the
collection, analysis, and display of available information.
They don't specify a particular way of doing that.  The
elements recited are generic; receiving, identifying,
processing, combining information.  And those recitations do
not create anything that can be patented.

There are some additional claims, Claims 7, 8, and
9, for example, that specify the particular category of
information that is used to select a base station within a
particular group.

But as this case, this Court noted, again, in one
of the Uniloc cases, Uniloc vs. Amazon, a claim that limits
the calculation to a particular kind of data does not suffice

1   to raise an abstract idea to the level of something that is

2   patentable.

3   You can have an abstract idea and then recite

4   independent claims, well, it is used on that kind of

5   information, that kind of information, but it is all data.

6   Under Electric Power and Digitech, it is all data.   And

7   regardless of what kind of data is specified to be

8   manipulated or used, that does not rise to the level of

9   patentability.

10   A couple of claims relate to a terminal positioning

11   method which uses the abstract idea.   That is an

12   insignificant post-solution activity.   Again, it is like

13   radar.   It is using a signal and when it is sent and when it

14   is received and the time that it takes to implement an

15   abstract idea; and that, again, is completely conventional

16   and does not rise to the level of a patentable claim.

17   Claim construction, here again, for the '139

18   patent, does not make a difference.   The parties have

19   actually agreed on the index of communication quality.   That

20   is what is characterized as an individual base station.   The

21   differences between the party on the characterizing

22   quantities element, which we regard as the group score

23   element, and that is what is shown in the figure, also really

24   doesn't make a difference here.

25   Under either construction what is being manipulated

1    simply is data, data that is taken from a bunch of components

2    of a group in order to create a characterizing quantity for

3    the group as a whole.  That, under the cases we have cited,

4    does not create any patentable subject matter.

5           For those reasons, Your Honor, we believe that

6    Counts II and IV of this complaint should be dismissed.  I am

7    happy to answer any questions or reserve the remainder of my

8    time for rebuttal.

9           THE COURT:  Yeah, thank you, Mr. Young.  I know you

10   are addressing the '139 there; and on the claim construction

11   issue, I would like to ask you with respect to it, as well as

12   the '292 patent, you know, I frequently have movants in 101

13   motions say:  You know, just assume, for the purposes of

14   argument, the non-movant's or the Plaintiff's proposed claim

15   construction, and we still win on 101.

16          So I am wondering -- I'm curious, is that a

17   position that you are willing to take here?  I am not

18   familiar -- other than what you have just described this

19   afternoon, I am not fully familiar with, you know, the

20   constructions that the parties have exchanged.  I know we

21   have a Markman that is set in a couple of months.  But what

22   are your thoughts about that?

23          MR. YOUNG:  We would certainly be willing to accept

24   the Plaintiff's claim construction solely for the purposes of

25   decision on this case.  As I said, it makes no difference.

1     And the only way we can argue that is to say if you assume

2     they are right on that, we win.  And we do believe we do win.

3              Just going back to the '292 constructions, just to

4     focus on that for a moment, accepting the Plaintiff's

5     constructions, which we do believe to be wrong, but assuming

6     we accept them for this motion, actually assists us on this

7     motion.

8              And for -- the reason for that is, that for several

9     of the elements, as you can see with respect to the GPS

10    reliability calculation means and then the combining means,

11    they say that the disclosure includes a CPU.  That is a

12    general central processing unit.  It could be programmed in

13    many different ways.

14             The fact that they say that that is a disclosed

15    structure with respect to these claim elements, indicates

16    that under their own claim construction these are completely

17    conventional elements and should not be patentable because

18    you can't say, do it on a computer and have it be patentable.

19             Now, we do happen to disagree that a CPU is

20    disclosed.  With the diagrams and the discussion of the -- in

21    the specification, in our view, do not disclose a CPU.  So we

22    think that they are wrong in that.  But assuming that they

23    are right, I believe that actually supports our 101 motion.

24             THE COURT:  Okay.  Then this question is also sort

25    of related to claim construction, and I guess given that

1    answer, it is somewhat of an academic question.  But there is

2    a standard that the Plaintiff's claim, I think, in their

3    surreply that, you know, whether claim construction could

4    affect the analysis is kind of the dispositive issue.  Do you

5    agree with that, or do you think the standard is higher?

6             MR. YOUNG:  I think they need to demonstrate

7    something about the claim construction that could make a

8    difference.  Now, granted, I do want time to rebut because we

9    haven't had any briefing since the claim constructions; but

10   at least my view of the claim constructions, is that they

11   don't show anything that could possibly make a difference

12   with respect to this Alice issue.

13            THE COURT:  Okay.  And then, finally, they contend

14   that I think in the early 2000s the mobile handsets and

15   receiver means were not generic.  Would you address that?

16            MR. YOUNG:  I don't think that is true.  You know,

17   they actually in their briefing talk about how they did these

18   patents or their predecessors did these patents prior to the

19   iPhone.  That isn't relevant in this case, and I don't

20   believe it is true.

21            The '292 specification, for example, explicitly

22   states the state of the art with respect to cellular

23   components and GPS components, and I think that the -- for

24   example, going back to Column 2 and Column 5 starting at

25   lines -- actually Column 1 starting at Line 13, it talks

1    explicitly in the patent about -- and this is the background

2    of the patent -- about GPS systems, how they have been used

3    in practical applications such as car navigation.  And they

4    talk about how in conjunction with a method using GPS, a

5    cellular telephone network is used to notify a handset of

6    auxiliary information for receiving radio waves for GPS.

7           So the elements that are described in the '292

8    patent, the cellular and GPS elements are not new and were

9    conventional.

10          THE COURT:  Thank you, Mr. Young.

11          MR. YOUNG:  Thank you, Your Honor.

12          MR. FUSSELL:  Good afternoon, Your Honor.

13          THE COURT:  Good afternoon.

14          MR. FUSSELL:  I'm just going to switch this over

15   here.

16          May it please the Court.  Tripp Fussell on behalf

17   of the Plaintiffs Hitachi Maxwell.  Your Honor, what I would

18   like to start off by pointing out here is that, as the

19   Plaintiff -- as the Defendants' own argument has pointed out,

20   this -- this is -- this issue here presented by the

21   Defendants is premature.

22          Essentially, what I heard the Defendants say and

23   what they have argued in their briefs is that this is just a

24   combination of conventional components in each of the patents

25   that don't perform any new, non-conventional element.

1          But the issue of whether or not a combination of

2    conventional elements is patentable or not, is an issue of

3    validity, you know, which we point out in our reply.

4          Essentially, what the Defendants argue in here is a

5    question of obviousness.  You know, it was obvious to combine

6    all of these conventional components to perform the function

7    that we have claimed.  But that is an issue for novelty, not

8    an issue of eligibility.

9          In addition -- and the Court pointed out this as

10   well, is the issues of claim construction.  Claim

11   construction, you know, under Markman defines the scope of

12   the claims, what the inventors claimed as their invention.

13         So it is -- it is -- it is imperative to know what

14   the scope of the claims are before we can say whether or not

15   they are eligible for patentability, so we think it is

16   premature from the standpoint of the Court should've

17   construed the claims in advance.

18         Now, to the point of whether they will accept our

19   construction or not, you know, we think under our

20   construction it actually points out, you know, even makes our

21   case stronger that the claims are eligible for patentability.

22   We will make that point here as well.

23         What I would like to start off with is kind of

24   backing up.  You know, they describe the -- what the patent

25   is and what it is directed to, and I think we pretty much

1    agree for the most part that it is directed to a method or

2    apparatus for determining of the '292, that is, the position

3    of the mobile device using GPS and cellular signals.

4         The invention calculates the location of the GPS

5    and cellular signals.  It estimates the reliability of each

6    of those signals, and then it combines those to determine

7    location of the device.

8         Now, I remind the Court that this was in 2001.

9    This was before everybody was walking around with a device in

10   their hand that did all of this information.  This was eight

11   years before the first iPhone came out that even had GPS

12   capabilities.

13        The inventors here foresaw the issues that they

14   were -- people were going to eventually incorporate this

15   location information and need that information to determine

16   their location; but they saw the problems with that, with

17   using GPS alone.

18        For example, Your Honor, with the traditional like

19   just the Garmin or TomTom device back in the day you might,

20   you know, be out in the open and be able to get, you know,

21   six satellite signals, and it can pinpoint your position down

22   to the foot, you know.  And you might be in a position where

23   with a cellular device you are in, you know, an urban area

24   where you can get numerous cell towers and triangulate your

25   position based on a plethora of cell towers to pinpoint your

1    location.

2           But in certain situations, and inventors saw this,

3    you know, you may not be able to get a GPS satellite signal

4    or maybe you can only get one GPS satellite signal; and,

5    therefore, you know, you get two satellite signals, for

6    example, that can't pinpoint your location, and that device

7    is telling you you are 200 feet away or you are on top of a

8    mountain.  We all remember that from back in the day.

9           Or maybe you are inside of a building where you

10   can't receive signals at all, and you can't get any GPS data,

11   how does it determine your location?

12          Well, looking to cellular to correct that problem,

13   you can actually triangulate your position based on cellular

14   towers.  But let's say you are out in a very rural area where

15   you only have a single cell tower and there is no -- or you

16   have no service whatsoever, if you are relying on that alone,

17   you can see that you are not able to determine your position

18   at all.

19          They saw these problems back in 2001 before anybody

20   was actually using these -- years and years before anybody

21   was actually using these in a mobile device that everybody

22   carried around with them, they foresaw these issues.  And

23   they decided that, you know, look, if we take GPS and we take

24   cellular, we not only take that information and combine it to

25   determine the position; but we first check the reliability of

1    that information.

2          Maybe that GPS signal that I am getting is only

3    based on one satellite.  It is not very reliable.  But the

4    cellular data that I am getting does have multiple cell

5    towers, and it is more reliable, and I shouldn't discredit or

6    reduce the reliability of that GPS signal when I combine the

7    two to actually determine the location of the device.

8          And they do this simultaneously.  It is not getting

9    one set of data and the other set of data and then later

10   combining those in some fashion.  It is doing this all

11   miraculously right there on your device right in one

12   instance.

13         If we look to the claims of the '292 patent, it

14   talks about a GPS receiver means, a GPS position calculation

15   means, a GPS reliability calculation means, cellular receiver

16   means, cellular position calculation means, cellular

17   reliability calculation means -- excuse me -- and a

18   GPS/cellular position result combination means.

19         Now, if we look to the Figure 1, you can see that

20   this is how the information was brought in.  Through a single

21   antenna or through an antenna means, the 100, the device

22   receives cellular or GPS information.

23         The GPS information enters into a GPS receiver

24   block 200.  That is then processed and the position of the --

25   based on the GPS data is determined.  Then the invention

describes testing the reliability of that information and doing the same from the cellular data down at block 300, 301, and 304.

And then in block 400 it actually takes that information and combines it in this new and non-obvious way to determine the position of that device.

Similarly, the '139 patent is directed to a method and apparatus for wireless terminal or mobile handsets to select a base station from a plurality of base stations according to the communication services that are offered by the wireless terminal, the communication quality required.

Again, this was back in 2005, your Honor.  The inventors foresaw the problems associated with wireless terminals selecting base stations regardless of the needs of the device.

Essentially, what the devices were doing is just determining what cellular tower is giving me the most powerful signal and then selecting that -- of multiple cell towers, selecting the ones that give me the most power.

But in some instances cell towers are grouped in a certain fashion, and maybe -- you know, even though I am receiving a high power in one -- from one satellite tower, I may -- that group itself may have a lot of bandwidth being taken up, for example, by multiple users.

For example, a cell tower at your neighbor's house

1   that lives next to a Safeway, it also is in a group of cell

2   towers that actually have a lot of bandwidth being used

3   because that Safeway has so many users in there that are

4   using their phones.

5            So that -- when you group those cell towers

6   together, that quality of the service provided from that

7   group is not as high as maybe that single cell tower that

8   your phone is receiving a power signal from.

9            So what the inventors came up with is an idea for

10  actually categorizing the quality of the service within a

11  group of services, indexing that quality, and then selecting

12  from the group the single cell tower to be used within that

13  group.

14           So, for example, if you select one that has -- you

15  want to watch movies on your phone, for example, that require

16  a very high bandwidth, you want to get into a group of cell

17  towers that can actually provide that bandwidth across the

18  entire group, so that if you jump from one tower to the next

19  you don't see disruptions in your service.  So when you are

20  watching your movie at your neighbor's house and you switch

21  over to another tower that has a bunch of people at the

22  Safeway using that same tower, you don't see disruptions in

23  your movie watching capabilities.

24           The '139 patent claims directed to a first step of

25  obtaining an index of communication quality between the

1    terminal and the base stations, the second step of

2    calculating the characteristic qualities of the communication

3    qualities for each group; that is, it determines the entire

4    group's total group score, as the Defendants pointed out, and

5    a step of specifying one of the plurality of groups based on

6    the characterizing quantities and selecting one of the base

7    stations.

8            So from that, as I described, it selects, based on

9    the characterizing qualities of that group, a single base

10   station to connect to for the device.

11           In looking at the diagram from Figure 2, the patent

12   describes instances where, for example, base station 201 and

13   203 are in a single -- are in a group of base stations.

14           So like I previously discussed, if 201 and 203 are

15   in a group and 202 and 204 are in a group, and 201 provides a

16   very strong signal, so my device can read from 201 that that

17   signal is strong; therefore, I want to connect to that

18   signal.

19           But if you combine 201 and 203, you see that the

20   group score, the group -- or the total power that is output

21   by that group is actually kind of small.  Whereas, the

22   combined output of 202 and 204, though maybe neither one of

23   them individually is higher than 201, together as a group

24   they provide much -- much stronger signal.  And, therefore,

25   my device would connect to that group instead, so that I know

1    if I jump from 202 to 204 I will see minimal disruption.

2           And, of course, as the Court is well aware, the

3    Alice Supreme Court provided the two-part test, whether the

4    claim is issued directed to one of the patent's ineligible

5    concepts such as abstract idea.  If so, whether the claim has

6    an inventive concept, an element or combination of elements

7    sufficient to ensure that the patent in practice -- practice

8    amounts to significantly more than a patent upon the

9    ineligible concept itself.

10          One thing important to note here is that in Alice

11   the Supreme Court struck a delicate balance between trying --

12   to tying up fundamental building blocks of innovation while

13   not swallowing up patent law as a whole, rightly explaining

14   that all inventions at some level embody abstract ideas, laws

15   of nature, or natural phenomenon.

16          As pointed out in this slide here in the quote from

17   the Alice decision:  We have repeatedly emphasized this

18   concern that patent law not inhibit further discovery by

19   improperly tying up the future use of these building blocks

20   of human ingenuity.  At the same time, we tread carefully to

21   construe this exclusionary principle, lest to swallow all

22   patent law as a whole.

23          Therefore, the Courts in applying 101 must

24   distinguish between patents that claim the building blocks of

25   human ingenuity and those that simply integrate those

1    building blocks to come up with something new and

2    non-obvious.

3              It is our position that is, in fact, what the

4    inventors of the '292 and the one three patent -- '139 patent

5    have done here.

6              The claims of the '292 patent did not attempt to

7    monopolize every potential solution for combining two data

8    sources based on their reliability.

9              The claims are directed to solving a specific

10   problem of locating a mobile device.

11             The claims require specific data sources, GPS and

12   cellular data signals.

13             The claims require specific ways of combining that

14   data, applying a reliability estimate before combining the

15   two.

16             The specification discloses concrete examples of

17   how reliability is calculated and how the data sources are

18   combined to get their location.

19             Taking that a step further, Your Honor.  It is

20   important to look at the fact that this patent is not

21   preempting any building blocks.  You know, if you look at the

22   claims of the '292 patent, it is not preventing the use of

23   GPS to get position information.  It is not preempting the

24   use of cellular signals to determine calculations.  The

25   claims do not preempt the determination of reliability of GPS

1    signals.

2           It is not preempting any fundamental building

3    blocks.  It is not preventing anybody else from using those

4    that are well-known devices.  What it has done is combined

5    conventional, if you will, in a non-conventional way, in a

6    very new and non-obvious way to address these very specific

7    problems that the inventors foresaw.

8           The same is true with the '139 patent.  The claims

9    of the '139 patent do not preempt or attempt to monopolize

10   every potential solution for selecting a particular object

11   within a group, as the Defendants would have you believe.

12          The claims are directed to solving a very specific

13   problem.  The inventors of the '139 patent saw that there was

14   a problem with simply selecting a base station based on the

15   highest power of the base station that you could find.

16          The claims are limited to the specific metrics of

17   indexing of communication qualities and characterizing the

18   quantities of the communication quality.

19          The claims require a specific way of using these

20   metrics, not previously known to a select base station.

21          Again, even taking it a step further, they do not

22   preempt any building blocks.  The claims do not preempt the

23   selection of a base station from a group of base stations.

24          It doesn't preempt the use of index of

25   communication qualities.  It doesn't preempt the use of

1   characterizing quantities to select a base station.

2          It doesn't prevent anyone else from using these

3   building blocks, if you will.  It only claims them in a very

4   non-conventional way to solve the specific problem that the

5   inventors had identified.

6          What Huawei does for both of the patents here is

7   they read out the claim elements to a point of abstraction.

8   They basically do what the Supreme Court warned against in

9   the Alice decision by attempting to generalize the patents to

10   a point of abstraction.

11          Huawei argues that the claims of the '292 patent

12   are directed to nothing more than a combination -- nothing

13   more than combining two data sources.  And the claims of the

14   '139 patent are directed to nothing more than collecting and

15   analyzing data that a wireless terminal uses to select a base

16   station.

17          However, this creates -- Huawei, however, creates

18   its abstract idea by dismissing all context and claim

19   elements from the patents as conventional or data

20   manipulation.

21          So, basically, they strip away all of the

22   limitations of the claim and boil down to only their very

23   basics, in an attempt to make this appear as an abstract idea

24   rather than a true invention that it is.

25          As the Court, I am sure is all too aware, there is

1    no bright line test that is dictated by the Supreme Court or

2    the Federal Circuit.  However, the case law is important, and

3    it establishes some specific guideposts that we can look to

4    to determine what is patent -- what patent eligible -- what

5    is patent eligible and what is not.

6           First, are the claims directed to an improvement of

7    computer-related functionality?  You know, in the Enfish case

8    the Court said that:  Claims directed to a specific

9    improvement to the way a computer operates are typically

10   patent eligible.  The key question here, whether the focus of

11   the claims is on the specific asserted improvement in

12   computer capabilities or instead on the process that

13   qualifies as an abstract idea.

14          In this instance, Your Honor, with both the '292

15   and '139 patent, the claims are an improvement to the

16   computer-related functionality.  They were improving the way

17   that a mobile device determines its position by gathering GPS

18   and cellular data, so it was an improvement of that

19   computer-related functionality.

20          And with respect to the '139 they were also

21   collecting data from multiple base stations to determine the

22   best communication qualities of the group of base stations to

23   better select the base station for that particular device's

24   needs.

25          So it is our position that at this point you can

1   decide that these patents are, in fact, an improvement on

2   computer-related technology that makes them entitled to --

3   eligible for patentability.  That is to say, these inventors

4   identified a discrete problem.

5            They took what was on the shelf for them, these

6   conventional, you know, knowledgeable information that they

7   knew of; but they combined that in a very non-conventional

8   way to solve these discrete problems that they had

9   identified.  That is, improving on the computer-related

10  functionality, not simply using a computer to solve a

11  specific problem that you can do by hand, for example.

12           The second guidepost that we have identified in our

13  briefing, Your Honor, is:  Do the claims require more

14  specific hardware than a general purpose computer?

15           This gets to the point I was just raising.  In the

16  Thales case the Court said that:  Just as claims directed to

17  a new and useful technique for defining a database that runs

18  on general purpose computer equipment are patent eligible, so

19  too are claims directed to a new and useful technique for

20  using sensors to more effectively track an object on a moving

21  platform.

22           I will point out the specifics of the Thales case

23  and how they directly line up with the claims here, but I

24  just want to make this point clear is that, you know just --

25  the mathematical equation is required to complete a claim

1    element does not doom that patent to ineligibility.

2            This goes all the way back to Diamond vs. Diehr.

3    In that case the Supreme Court confirmed the eligibility of

4    patent claims despite the inclusion of a mathematical formula

5    running on a general purpose computer to determine the

6    optimal curing time for rubber tires.

7            This is because the claims, viewed in their

8    entirety, improved on the prior art molding for tires.

9    Essentially, what was happening back in the days there was

10   everybody knew how to mold tires, and everybody knew that you

11   had a specific amount of time that was ideal; but they

12   couldn't quite nail it.  They couldn't quite nail that time.

13           So sometimes the curing was a little too long.

14   Sometimes the curing was a little too short.  And when they

15   broke the mold, you know, they weren't quite sure what they

16   were going to get.  Even though they could calculate based on

17   the specific mathematical that is claimed in the claims of

18   the patent at issue, in Diehr the Court said that:

19   Notwithstanding the fact that you are just talking about a

20   general purpose computer running this equation that everybody

21   knows of, you are actually doing it in a very

22   non-conventional way that nobody else was doing before so

23   they can nail that timing just right, in order to break the

24   mold at just the right time.

25           That is exactly the issue with both the patents in

1    this case, the '292 patent and the '139.  Both are

2    combinations that were non-obvious and entitled to patent

3    eligibility.

4         The '292 patent claims more.  It claims a mobile

5    handset, a GPS/cellular receiver, a GPS/cellular position

6    calculation means, a GPS/cellular reliability calculation

7    means, a GPS/cellular combination means.  All of this to

8    combine the positions based on the reliability, which is more

9    than just running a mathematical equation, a weighted average

10   as the Defendants argue, on a general purpose computer.

11        All of these elements are taken into account when

12   they are receiving the cellular position, receiving the GPS

13   position using those components to determine the position of

14   the device, checking with the reliability means to determine

15   which of those is the most reliable, and then combining those

16   to actually get a very reliable position of the device.

17        The '139 patent claims require a terminal and a

18   plurality of base stations that exchange information to

19   determine the most appropriate base station.  It is more than

20   simply running a mathematical equation on a general purpose

21   computer.

22        Third, to the extent the claims use data -- this is

23   the third guidepost that we have pointed out from the case

24   law, do they do so to accomplish specific technical ends

25   rather than simply a result?  That is to say, as the Court

1    pointed out in the Electrical Power Group:  The critical

2    inquiry is whether the claims merely present the results of

3    data collection or whether there is more to the claims with a

4    specific use of the data or a particular tool.  Whether there

5    is more to the claims here than simply just spitting out the

6    results.

7              For example, with the '292 patent, there is more

8    than just getting data, analyzing the data, and spitting out

9    the positioning.  There is collecting GPS data.  There is

10   also collecting cellular data.  There is using that data to

11   determine the position of the device, then checking the

12   reliability of those positions, and then combining the two,

13   so that I get -- so that I get a better position estimate of

14   the device itself.

15             That is much more than just simply analyzing,

16   comparing, and spitting out a result, as the Defendants would

17   have you believe.

18             Another quote here from McRo:  We, therefore, look

19   to whether the claims in these patents focus on a specific

20   means or method that improves the relevant technology.  They

21   did exactly what the inventors had done here with both the

22   '292 and the '139 patent.  They had improved on the relevant

23   technology.  They had gone out and identified a specific

24   problem associated with mobile devices, you know, a better

25   way and a more reliable way of calculating my position.

1          And they sat down, and they said, how are we going

2    to do this better?  They come up with this new and

3    non-obvious way of determining the location.

4          The same is true with respect to selecting the base

5    station from the '139.  They actually came up with a

6    technical solution that addressed the problem that they had

7    identified.  That, Your Honor, is patent eligible.

8          The claims pass the first step with respect to the

9    more than a result.  As I just noted, Your Honor, I went

10   through these, but the claims recite a way to locate the

11   mobile handset using GPS signals, cellular signals, and

12   estimates of those with respect to their reliability.

13         These claims are clearly directed to means and

14   methods of producing a certain result rather than the result

15   that it can produce -- or the result produced.

16         The same is true with respect to the '139 patent.

17   The claims recite a way of identifying a particular base

18   station.  The claims are not directed to specific technical

19   ends not simply a resultant output.

20         The fourth guidepost that we have identified for

21   Your Honor is in the specific result required by the claim, a

22   concrete solution to the problem.

23         The Affinity Labs of Texas case, the Federal

24   Circuit pointed out that the representative claims were

25   directed to providing out-of-region access to regional

1    broadcast content, a broad distribution and familiar concept

2    concerning information distribution that is untethered to a

3    specific or concrete way of implementing it.

4           The claims simply claimed the function of wireless

5    communication, regional broadcast content to an out-of-region

6    recipient, not a particular way of performing that.

7           With respect to the '292 and the '139 patent, we do

8    talk about a very particular way of performing a function.

9    That is what the claims -- you walk by an element-by-element.

10   Don't strip down all of them to just their basic abstract

11   idea.  You have to look at each of the elements claimed in

12   the patents.

13          And you see that there was a particular way that

14   these inventors came up with an idea for selecting the

15   location of GPS, solving the problem of when you are in a big

16   building and you can't get GPS signals, you can still get

17   your -- you can still get your position.  At the same time

18   with locating the best base tower -- the base station, excuse

19   me, locating the best base station, they came up with a very

20   particular way of doing that.

21          Again, although there is not a bright line test for

22   determining claims, there were two cases in particular that

23   we wanted to point out for Your Honor that are very -- line

24   up very well with the claims of each of the patents.

25          The first is the Thales case, that I am sure the

 1   Court is aware of.  The claims are here.  There was a first

 2   inertial sensor mounted to a tracking object, a second

 3   inertial sensor mounted to a moving reference frame, and an

 4   element adapted to receiving signals from said first and

 5   second inertial sensors and configured to determine the

 6   orientation of the object.

 7          So, essentially, Your Honor, the invention in

 8   Thales was a particular configuration of inertial sensors,

 9   very conventional at the time this invention was claimed, and

10   a particular method of using the raw data from the sensors in

11   order to more accurately calculate the position of the

12   orientation of the objects on a moving platform.

13          They said in that case that these claims are

14   eligible.  These claims are not merely directed to an

15   abstract idea of using mathematical equations for determining

16   the relative position of a moving object to a moving

17   reference frame.  Rather, the claims are directed to systems

18   and methods that use inertial sensors in a non-conventional

19   manner to reduce errors to measure the relative position of

20   the orientation to the moving object.

21          That is exactly what we have done here.  Comparing

22   the two, you see that the Thales takes data from two

23   conventional inertial sensors and combining that data using

24   known mathematics to accurately calculate the position and

25   orientation of an object on a moving platform.

1      It is exactly, if you will, Your Honor, what the

2  Defendants are arguing is abstract about the '292 patent.  We

3  are taking data from two, what they argue are, conventional

4  sensors, GPS and cellular data, determining the reliability

5  of that information obtained, combining that data using known

6  mathematics to accurately calculate the position of the

7  mobile handset device.

8      A comparison of the claims in Thales against the

9  claims in the '292 patent comes up with no other

10  determination but patent eligibility.  If they are eligible

11  in Thales, they have to be eligible for the '292 as well, in

12  our opinion.

13      In a very recent case that just came out in August

14  from the Federal Circuit, Visual Memories vs. NVIDIA, the

15  claims there are directed to a memory -- a main memory

16  connected to a bus -- very conventional -- a cache connected

17  to said bus -- again, very conventional components -- wherein

18  a programmable operational characteristics of said system

19  determine a type of data stored.

20      Essentially, the invention there was an enhanced

21  computer memory.  And the Court said that the claims focus on

22  a specific asserted improvement to a computer capability.

23  The use of programmable operational characteristics that are

24  configured based on the type of processor instead of a

25  processor that qualifies as an abstract idea for which the

1    computers are invoked merely as a tool.

2          Just like the patents in Enfish and Thales, the

3    specification discussed the advantages offered by the

4    technology improvement.  If you will look at the

5    specifications of both the '292 and the '139, they are

6    identifying a very specific problem.  And they are coming up

7    with a solution to that problem.  That is what our patent

8    system is all about.

9          Comparing the visual memory invention and what that

10   covered, with the claims of the '139 patent, again, you will

11   see, Your Honor, that if the Visual Memory claims are

12   patentable, so too are the patent claims of the '139.

13         In Visual Memory it was a memory system with

14   programmable operational characteristics defined by the

15   processor, connected to the memory system, enabling the

16   interoperability for multiple processors.

17         Similarly, in the '139 the base station is

18   selecting the communication qualities defined by a terminal's

19   connection to a group of base stations, enabling the terminal

20   to calculate the characterizing quantities of the group of

21   base stations to select a very specific base station that is

22   best suited for that device's needs.

23         We take the position, of course, Your Honor, that

24   there is no need to get to the second step; but even looking

25   at the second step, we believe that the inventions do -- the

inventions of both patents do show an inventive step.  The

claims of both the '292 and '139 patent add significantly

more than alleged abstract idea.

        Huawei takes the position that both are nothing

more than a combination of conventional elements.  However,

the claims are directed to novel and inventive combinations

of the elements.

        As a good case quote that we came up -- that we

found here, Your Honor, In re Wright, 843 F.2d 1216:

Virtually all inventions are combinations and every invention

is formed of old elements.  Only God works with nothing.  Man

must work with old elements.

        In every invention, Your Honor, you are talking

about at some level something as conventional that you are

using to combine those conventional elements and in some new

and non-obvious way to actually come up with something as a

new invention.

        There are almost no instances, certainly in this

day and age, where you are going to find something completely

new and non-conventional that is the core of the -- or the

entirety of the invention.

        The claims pass the second step by solving a

problem specific to computers as well.  The problems arise in

the context of computers.  We are talking about mobile

devices, essentially, a small computer, if you will.  And the

1    claims both improve on the functionality.

2          You know, these were little devices, computers, if

3    you will, processors that were determining the position of

4    that device.  And they improved on the mechanism of how that

5    device actually uses it, actually determines that position.

6          The same thing with selecting the base station.

7    They improved on that functionality, and they solved a very

8    discrete problem, which is why the patents are eligible for

9    patentability under 101.

10          Again, this only gets to the issue of validity and

11    not eligibility.  You know, despite raising it as an

12    eligibility attack, Huawei's real argument here is that the

13    asserted claims are obvious.  They are saying this

14    combination of conventional elements is put together in a

15    conventional way.

16          That is at the core of KSR where the Court said:

17    Simple arrangement of old elements with each performing the

18    same function it made -- it had been known to perform, is a

19    question of obviousness under 103.

20          That is precisely what the Defendants are arguing

21    here.  It is a question of validity.  It is premature to be

22    decided on this motion to dismiss.

23          At a minimum, as we pointed out at the beginning,

24    Your Honor, the Court should go through the process of claim

25    construction to specifically determine the scope of the

1  claims of the '292 and the '139 patent before deciding

2  Huawei's motion to dismiss.

3       An eligibility analysis turns on whether the

4  claimed invention is outside the scope of the patentable

5  subject matter.  That is precisely what the claim

6  construction process does.  It determines as a matter of law

7  what the scope of the claims are.

8       We are at a point now, Your Honor, with two months

9  away, it only makes sense for the parties to argue claim

10  construction and determine what the scope of the claims truly

11  means --

12       THE COURT:  Help me understand, Mr. Fussell,

13  specifically how a claim construction is going to affect the

14  analysis?

15       MR. FUSSELL:  Yes.  Looking at the positions --

16  just, for example, here we have in the GPS receiver means

17  receiving GPS-oriented signals, the Defendants take the

18  position that this is simply a -- GPS-oriented signals -- I'm

19  sorry.  That is a functionality.  The structure -- we agree

20  on the function.  The structure is that the GPS receiver 200

21  is all that is performing that GPS receiver functionality.

22       But if -- you know, the Plaintiff's position, which

23  we believe is a correct construction, is that it is more than

24  just that GPS receiver means.  It is GPS receiver means, the

25  components within the mobile handset for receiving the

1    signal.  That includes the antenna, the transceiver, and the

2    processor that performs GPS receiving processing, and the

3    corresponding recitations in the specification, which we have

4    cited to here and which are included in our joint claim

5    construction statement.

6              As we pointed out earlier, Your Honor, one of the

7    guideposts is, is it more -- excuse me.  Do the claims

8    require more specific hardware than a general purpose

9    computer?

10             As our claim construction points out, just that

11   being of one example, these are a number of components within

12   the device that actually require receiving that signal.  This

13   is just one of the claim limitations.  There are seven

14   means-plus-function limitations that need to be decided by

15   the Court, all of which are comparable and have a similar

16   scope differentiation between the two parties.

17             But just that alone, just pointing out how there

18   are all these multiple components that actually do the

19   receiving process as described in the specification of the

20   '292 patent, actually, do more than just a generic computer,

21   which is -- or just a generic GPS receiver.

22             So, obviously, deciding that, Your Honor, on the

23   front end before deciding the motion to dismiss, makes

24   complete sense, in our opinion.

25             And the same is true for each of the other

1   means-plus-function limitations in the '292 patent.

2          Unless you want me to address the specifics of

3   each, I'm happy to take any additional questions, Your

4   Honor.

5          THE COURT:  On the claim construction issue, is

6   that what you mean --

7          MR. FUSSELL:  Yes, sir.

8          THE COURT:  -- the specifics?  I don't think,

9   Mr. Fussell, that is set forth in the briefs, so it would

10  help me if you don't mind going through that.

11         The brief, of course, was filed --

12         MR. FUSSELL:  Yeah, the briefing was filed before

13  the actual -- the parties exchanged claim constructions and

14  filed their joint claim construction statements.

15         The positions of the parties taken in the

16  presentation slides here are actually directly taken from the

17  joint claim construction statement that has been filed with

18  the Court.

19         Similar to the GPS receiver means, the GPS position

20  calculation means, the parties disagree with the structure

21  that is described in the specification.

22         Again, the Defendants argue that the position --

23  the GPS position calculation means is simply the position

24  calculation unit GPS 201, GPS block 201, in the specification

25  and in Figure 2; whereas, we are -- we disclosed that the

1    structure, as required by the specification, is a processor,

2    a position calculation unit, and/or a mobile handset that

3    performs processing functions or their equivalents.

4              So it is our position, Your Honor, that GPS

5    position calculation means is more than just a simple device.

6    It actually is inclusive of multiple components of the cell

7    phone itself.

8              THE COURT:  Okay.  And so tell me, just so I

9    understand, how does that specifically relate to the

10   eligibility question?

11             MR. FUSSELL:  Well, they are saying, Your Honor,

12   that this is just a general purpose computer running a simple

13   math equation and spitting out a result.  But it is more than

14   just that.

15             As the claims require and as proper claim

16   construction will help the Court determine, it is more than

17   just a general purpose computer.  It is multiple components

18   within that device actually receiving information,

19   calculating the position, calculating the reliability of that

20   position that was determined, and then a separate component,

21   which is actually combining it.

22             So more than just a general purpose computer.  It

23   is actually multiple components of a device that all are

24   required to actually perform the functionality.

25             Now, that is not to say that if it is -- if you

1    agree with their construction, that the patent is not

2    eligible.  I am just saying this can help -- determining this

3    full scope may help with the decision from the Court on

4    determining eligibility.

5            THE COURT:  Very well.  Okay.  And then I guess two

6    other questions.  In the '292, the weighted averaging that

7    occurs, is it possible for that to be performed by the human

8    mind?

9            MR. FUSSELL:  I would say it is, yes.

10           THE COURT:  Okay.  And then last question --

11           MR. FUSSELL:  But I would actually go back to that

12   because it is not just plugging numbers into that equation

13   that is the invention of the '292 patent because, for

14   example, what if your GPS signal is unreliable?  You have no

15   satellites.  Therefore, you have a 0 there.  Then that

16   reliability calculation is 0, and the cellular position is

17   the only one that is taken into account in determining the

18   position of the device.

19           So it is more than just plugging in those numbers

20   into an equation.  It is just like I pointed out in the

21   Diamond vs. Diehr, there was an equation actually called out

22   in the claims of that patent.  And the Courts determined that

23   that was patent eligible because it was a new combination of

24   creating a molding for rubber tires that the inventors came

25   up with, notwithstanding the fact that this arithmetic that

1  had been known to everyone prior to their invention, was

2  capable of being done by hand.  It was simple mathematics.

3          THE COURT:  Okay.  And then, finally, if we were to

4  consider the expert declaration that was filed along with the

5  response, wouldn't we have to convert this to a summary

6  judgment motion?

7          MR. FUSSELL:  Well, as I mentioned before, Your

8  Honor, we think that this issue is premature.  There are

9  issues of fact here.  So we believe it would need to be

10  converted to a summary judgment motion.

11          And we believe that the expert declarations should

12  be taken into account, as they actually point out that these

13  were non -- these are experts in the field that point out

14  that, you know, in 2001 for the '292 patent and in 2005 for

15  the '139 patent, these were non-conventional combinations of

16  elements that were, in fact, entitled to patentability.

17          THE COURT:  Okay.  Thank you very much,

18  Mr. Fussell.

19          MR. YOUNG:  Your Honor, should I start now or --

20          THE COURT:  How about a short break, just a

21  five-minute break?

22          We will be in recess.

23          (Recess was taken.)

24          THE COURT:  Please be seated.

25          Mr. Young.

1           MR. YOUNG:  Yes.  Thank you, Your Honor.

2           I plan to address the various points that Counsel

3  made, pretty much in order.

4           Mr. Fussell mentioned a claim that we are trying to

5  turn this into a validity issue.  We are not.  However, what

6  the specification and file history say about the prior art is

7  relevant to the issue under Step 2 of conventionality.

8           And I will actually quote from this Court's

9  decision in Uniloc vs. Amazon, 16cv570, in a decision issued

10  on March 20, 1990 -- 2017, which is the day before we filed

11  our reply brief.  And I think we probably would have quoted

12  this if we had been able.

13           It is on Page 17 of the Court's decision:  A 101

14  inquiry properly relies on intrinsic evidence concerning the

15  prior art.  In the context of determining whether a claim

16  element is known; i.e., so well-known as to be

17  conventional -- conventional, routine, or contained an

18  inventive concept.  Although the 101 and 103 inquiries may

19  rely on several tools; i.e., references showing claim

20  elements within the prior art, they are distinct and are

21  treated as such herein.

22           So our reference, for example, to what the examiner

23  said about the various elements of the '292 patent is highly

24  relevant to the decision as to whether the claims add

25  anything that is not conventional.

1           As to the '292 patent, Mr. Fussell did go through

2   Figure 1.  We are, basically, in agreement actually on what

3   the claims do and what the figures do.  It is really the

4   legal characterization on which I believe we greatly

5   disagree.

6           On the '139 patent, Counsel talked about the

7   advantages allegedly of the grouping and gave an example of

8   how if Safeway is in the group, that that patent can give an

9   advantage.

10          The problem with that argument is that the claims

11  of the '139 patent actually say nothing at all about how the

12  grouping takes place.  It just says there is a grouping.  It

13  doesn't tell you about what criteria are used to do the

14  grouping.  And for that reason the patent seeks to preempt

15  the basic idea of grouping using any criteria.

16          And that is one of the reasons why it is an

17  abstract idea lacking an inventive concept and should not be

18  given the status of a patent.

19          We are not swallowing up the whole of patent law.

20  I think the case law that we cited in our briefs clearly

21  explains why under Electric Power, Digitech, TLS, and similar

22  cases, the particular claims in these patents should not be

23  given the status of patentability.  We certainly don't say

24  anything out about other situations.

25          I would also note that even if there were some

1    non-preemption, that would not make our argument incorrect.

2    That is, as this Court said in Uniloc, another Uniloc case,

3    versus AVG technologies, in a case that the Court issued a

4    decision on on March 28th, 2017, the day after the last brief

5    in this case -- and that case is 16cv393.  That the argument

6    that the scope of preemption is incomplete, is irrelevant

7    because complete preemption is not required under Alice.  And

8    the Court there cites 134 S.Ct at 2355.

9            So the fact that if a claim -- the preemption is

10   not complete, doesn't matter.  In any case, at least as to

11   the '292 patent, the attempt at preemption here really is

12   complete as to the use of weighted reliability factors in

13   determining how the information from the GPS and the cellular

14   signals are to be combined.

15           There is no limitation to that.  So if you want to

16   rely on reliability, then under these claims if they are

17   allowed to stand, one would be preempted.

18           The -- there is no improvement to computer

19   functionality here.  The use of a weighted average, the

20   grouping of pieces of information, that is no improvement in

21   computer functionality.  That is completely like Enfish and

22   any of the other cases under which patents have been upheld.

23           Now, Mr. Fussell talked about two recent cases, the

24   Thales and Visual Memory cases.  And I want to address both

25   of those.  Thales was mentioned briefly in the parties'

1   briefs, and Visual Memory came out in August and was not

2   mentioned in the briefs.

3        First, Thales.  That case involved a unique and

4   unconventional placement of inertial sensors on various

5   moving objects.  It was a physical arrangement that was

6   unique.  It did result in some information that would then be

7   mathematically combined.  And it was really the physical

8   placement -- and I am looking at Page 9 of the Federal

9   Circuit slip opinion, which the Federal Circuit said:  Used

10  inertial sensors in a non-conventional manner to reduce

11  errors in measuring.

12       Now, there was some calculating involved in that,

13  but I think the key in that case and what distinguishes it

14  from these patents is the physical placement of the sensors

15  which was unique and which was what resulted in the

16  patentable subject matter that the Federal Circuit found in

17  that case.

18       We don't have any unconventional physical

19  placements of anything here on these patents.  The most we

20  have is an alleged novel or unconventional arrangement of

21  information or way of processing information.  But the

22  components that collect the information, the components that

23  calculate the information, are all the same.  They are just

24  receivers, CPUs, processors.  There is nothing unconventional

25  there; and, therefore, the Thales case is not applicable.

1          In connection with Thales, Mr. Fussell referred to

2     the Diamond vs. Diehr case.  And I would point the Court to

3     the discussion in the Alice decision of Diamond vs. Diehr

4     where the Federal Circuit -- actually, it is the Supreme

5     Court.  This is the Supreme Court's case in Alice -- said the

6     invention in Diehr used a thermal couple to record constant

7     temperature measurements, something that the industry had not

8     been able to obtain.

9          So there is a distinction there that is not present

10    in this case.  There is no new physical component of any sort

11    in this case.  It is just using existing generic computing

12    components to calculate information in a way that is

13    allegedly different.

14         With respect to the more recent Visual Memory case,

15    I think that there is some relevant information there that we

16    need to consider.  That case involved a memory system with

17    programmable characteristics that were tailored for use with

18    different processors.

19         In addition, the claims there utilized cache memory

20    differently depending on the type of processor that was being

21    used.  So what you ended up with was an improved memory

22    system that constituted a technological improvement that you

23    don't have in this case.  You don't have a set of components

24    that is unconventional.

25         You don't have a set of components that is

1    unconventional.  You don't have memory components that are

2    being used differently depending on the kind of processor

3    that is being used.  That is -- those are, for one, they are

4    physical components.  They are not simply conventional

5    processing units or receivers.

6          And, two, there are arranged in a way and operate

7    in a way that leads to an improved memory system rather than

8    an abstract idea, which is what had been alleged in that

9    case.  So it is a very different case.

10         I agree with Mr. Fussell that man must work with

11   old elements.  However, if the old elements are abstract

12   ideas under Alice and in Section 101, they are not

13   patentable.

14         Certainly, there are plenty of cases with old

15   elements that are combined in new ways, and Visual Memory is

16   one of those, for example.  But this is not a case where the

17   old elements that we are dealing with are of the kind that

18   lead to patentability.

19         Here, anything that is new is simply in the

20   arrangement of information in the way the information is

21   calculated.  There is nothing new about the things that are

22   used to do that calculation.  And for that reason, there is

23   no inventive step.

24         Now, Mr. Fussell also talked about the claim

25   construction issue, and I don't have a slide on it, but the

1   particular elements that he focused on related to, I believe,

2   the '139 patent.

3          And in those cases where -- simply we have a

4   disagreement on the claim construction.  We say that the

5   corresponding elements are the figures in the diagram.  They

6   say that, yes, that is included, but it also includes

7   antennae, transceivers, and processors.  That actually helps

8   our case on the 101 issue.  Antennae, transceivers and

9   processors are all generic components.  They are all being

10   used in the same way they have always been used, to receive

11   information, to process the information.

12          The processing is allegedly different and unique,

13   but the acts that are performed by those components are

14   conventional generic acts.  It is not like Thales where you

15   had sensors that are actually placed in a new unconventional

16   way.  Those physical components that Hitachi Maxwell alleges

17   are part of the claimed elements here, are actually being

18   used in their conventional, generic way.

19          Now, Mr. Fussell, as to the '292 patent, gave us an

20   example of how the combination might work if GPS, say, is

21   unreliable.  And he talked about how one of those factors

22   could be given a 0 weight.

23          We do have a disagreement on the claim construction

24   here.  He said it is actually not used in the claim.  We

25   believe that it is because Figure 3 actually still has it as

1    part of the equation, the weighted average in the equation.

2    It does mean, though, if there is a 0 reliability, the math

3    is easier because you end up with 0 in some of those places

4    in the equation.

5            But it is still used, and it simply emphasizes our

6    point, which is that if the math is easier it becomes even

7    more easy for someone to do that on paper with a pen.

8            Your Honor asked a question about the procedural

9    aspect of this if the Court were to choose to consider the

10   expert declarations in this case.  We do believe as a

11   procedural matter that it would become a summary judgment

12   motion, and we would move the Court if -- in that instance

13   for summary judgment on the record that exists now.

14           There is a practical reason why an earlier decision

15   on the 101 issue would be helpful.  We are about to start

16   claim construction briefing.  There are 32 claims at issue,

17   many of the claim elements at issue.

18           There are many elements that are in the '292 patent

19   which Plaintiff wants to construe because they are

20   means-plus-function elements.  We believe that even under

21   their construction we should prevail; that these patents are

22   not patentable subject matter; and the claim construction

23   proceedings would actually be significantly facilitated, and

24   the proceeding would be made much easier if this motion were

25   to be granted, as it should.

1          Unless Your Honor has further questions, thank you

2    very much.

3          THE COURT:  I don't.  Thank you, Mr. Young.

4          Mr. Fussell, any short response?

5          MR. FUSSELL:  Just quickly, Your Honor.

6          Just to that last point, Your Honor, I thought that

7    I previously heard Mr. Young say that they would agree to our

8    constructions; therefore, that certainly facilitates the

9    claim construction process.

10          I say that tongue-in-cheek.  I'm sorry.

11          THE COURT:  I understood Mr. Fussell.

12          MR. FUSSELL:  Just to sort of back this up and

13    highlight or take this to a higher level, Your Honor.  That

14    is, what they are asking you to do here is, essentially

15    negate our patents, say it is not patentable under 101, and

16    kick these patents out before ever having claim construction

17    and determining the proper scope of the claims, which we

18    believe is important to the process here, specifically, but

19    also before we even consider experts and the facts at issue

20    in the case.  And we have expert declarations that actually

21    point out that these are experts in the field that actually

22    have stated in their declarations these are non-conventional

23    combinations of -- you know, of these elements, which

24    actually is what the invention is in this case.

25          You know, they are saying that these are

1  conventional elements combined in a non -- in a conventional

2  way.  And we have expert declarations saying that they aren't

3  actually that.  You know, I think that is a fact issue that

4  should be considered by the Court and decided with the full

5  facts before the Court before deciding these issues.  Either

6  that, or as the Court proposed earlier, converting this to a

7  summary judgment motion.  We have no objection to that as

8  well.

9          Just quickly on some of the points raised.  With

10  respect to the Thales case, he points out that the placement

11  of the sensors was unique.  But the placement of the sensors

12  were just doing what they are conventionally meant to do, and

13  that is, determine the position and orientation of one device

14  compared to the position and orientation of another device.

15          And what they did was take those two conventional

16  elements to determine the position and orientation of one and

17  the position and orientation of the other and combine the two

18  instead of just determining the position and orientation with

19  respect to the earth itself.

20          Now, I don't see how that is so different than what

21  we have done here.  We are taking some arguably conventional

22  devices, GPS receivers and cellular receivers, and combining

23  the information in there after determining their reliability

24  and producing an estimate of the position of the device.  It

25  is doing something in a non-conventional way, which is

62

1    exactly what the invention in the Thales case was describing

2    as well.  So I think that clearly supports our position and

3    even their position on that as well.

4            I believe that was all I had unless you have some

5    questions for us.

6            THE COURT:  I don't.  Thank you, Mr. Fussell.

7            MR. FUSSELL:  Thank you.

8            THE COURT:  Mr. Young, this is your motion.  Do you

9    want to have the last word?

10           MR. YOUNG:  Well, Your Honor, thank you very much

11   for your indulgence.  Actually, I had two points.  One,

12   because I wasn't sure we completely heard.

13           We certainly do disagree on the claim construction

14   issues.  I think some of us are chuckling here.  So,

15   obviously, we would agree for the purposes of this 101

16   motion, if that would facilitate the Court's ruling.  But we

17   certainly disagree on the substance of the claim

18   construction.

19           The other issue, and this is a new point, and I

20   certainly would want Mr. Fussell to have a chance to address

21   this, is that he said in his remarks earlier that these

22   claims are more than taking the information, processing it,

23   and spitting out a result.

24           I am actually not so sure that that is right.  I

25   don't know that anything is done in these claims other than

1   spitting out a result.  The '139 claim is actually on the

2   screen in front of the Court.  It talks about the third step

3   of specifying one of the plurality of groups, and then it

4   talks about selecting one of the base stations within the

5   specified group.

6        So it actually gets an answer.  It tells you which

7   base station is selected.  But then it doesn't do anything

8   with that.  So, basically, at the end of the process you end

9   up with an answer as a result of all this information

10  processing, and that is it.  You just get the answer.

11       The '292 claim is similar.  What you do at the end

12  of Method Claim 2 is you output a combined position that

13  takes into account all of the processing that has taken

14  place.  But that's it.  You just end with an answer, which is

15  an X and Y coordinate.  I do think it is just a spitting out

16  of the results.

17       Now, even if it were more than that, it wouldn't

18  determine the issue because you would still have the Alice

19  Step 2 that I think you are just taking information in,

20  processing it, and getting information out.  And that is

21  really all you are doing with these claims.

22       Thank you.

23       THE COURT:  Very well.  Thank you, Mr. Young.

24       Mr. Fussell, do you want to respond to that?

25       MR. FUSSELL:  I would just comment, Your Honor,

1   that, you know, this is exactly how -- what we pointed out in

2   the opening and in the briefing is that his point is the

3   point that we made earlier is that they are just stripping

4   down the claims to abstraction, which you can do, and as the

5   Court warned in Alice, you can do with any claims.  And that

6   is all he is doing here.

7                  THE COURT:   Thank you.  All right.

8                  All right.  Well, very well.  I appreciate the

9   parties being here and the excellent presentations this

10  afternoon.  We are coming up on claim construction briefing

11  and practice.  I think this motion was fully briefed some

12  time ago.  And to the extent there was a delay in getting

13  this set for a hearing, my apologies for that.  We are

14  usually better about doing that.

15                 And in all candor, I have to tell you the next

16  couple of months for us are really busy.  We will endeavor to

17  get an order out on this as quickly as we can.  But we do

18  have a number of trials set both here in Texarkana and in

19  Tyler over the next six weeks.

20                 So I have learned my lesson about making promises

21  about when orders will come out.  But I do -- I do assure you

22  we will get it out as quickly as we possibly can.

23                 So unless the parties have anything else, we will

24  be in recess.  Safe travels to y'all.

25                 (Hearing adjourned.)

1                        <u>CERTIFICATION</u>

2

3                    I HEREBY CERTIFY that the foregoing is a true

4    and correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8    /s/ Shea Sloan _____                    October 2, 2017
     SHEA SLOAN, CSR, RPR
9    Official Court Reporter
     State of Texas No.:  3081
10   Expiration Date:  12/31/18

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25