# THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TEXARKANA DIVISION

HITACHI MAXELL, LTD.,

      Plaintiff,

      v.

HUAWEI DEVICE USA INC. AND
HUAWEI DEVICE CO., LTD.,

      Defendants.

Civil Action No. 5:16–cv–00178–RWS

**JURY TRIAL DEMANDED**

### DECLARATION OF DR. ROBERT AKL, D.Sc.
### REGARDING CLAIM CONSTRUCTION OF
### U.S. PATENT NOS. 7,509,139 AND 6,628,292

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     QUALIFICATIONS ...............................................................................................1

III.    SCOPE OF OPINION ...........................................................................................5

IV.     MATERIALS REVIEWED AND CONSIDERED...............................................5

V.      LEVEL OF ORDINARY SKILL IN THE ART .................................................5

VI.     LEGAL PRINCIPLES ...........................................................................................6

        A.      General Principles of Claim Construction................................................6

        B.      "Means Plus Function" Terms ...................................................................7

        C.      Indefiniteness .............................................................................................8

        D.      Claim Correction ........................................................................................8

VII.    PRIORITY DATES OF THE '292 AND '139 PATENTS ...................................8

VIII.   OVERVIEW OF U.S. PATENT NO. 6,928,292 ("'292 patent") ........................8

        A.      Summary of the '292 Patent.......................................................................8

        B.      Prosecution History of the '292 Patent......................................................12

        C.      The Asserted Claims of the '292 Patent (Claims 1 and 2) .......................13

IX.     OVERVIEW OF U.S. PATENT NO. 7,509,139 ("'139 patent") .......................14

        A.      Summary of the '139 Patent.......................................................................14

        B.      Prosecution History of the '139 Patent......................................................16

        C.      The Asserted Claims of the '139 Patent (1, 7-14) ....................................17

X.      CLAIM CONSTRUCTIONS ................................................................................19

        A.      The '292 patent ..........................................................................................19

                (1)     "GPS receiver means for receiving GPS-oriented signals and
                        generating received GPS signals" (Claim 1) .................................19

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

(2)   "GPS position calculation means for calculating the mobile handset's position from the received GPS signals and outputting a GPS-based position result" (Claim 1) .................................................................24

(3)   "GPS reliability calculation means for calculating GPS positioning reliability based on the GPS-based position result" (Claim 1) .......................28

(4)   "cellular receiver means for receiving cellular oriented signals and generating received cellular signals" (Claim 1) ......................................................34

(5)   "cellular position calculation means for calculating the mobile handset's position from the received cellular signals and outputting a cellular-based position result" (Claim 1) .............................................................38

(6)   "cellular reliability calculation means for calculating cellular positioning reliability based on the cellular-based position result" (Claim 1) .........................................................................................................43

(7)   "GPS/cellular positioning results combining means for combining the GPS-based position result and the cellular-based position result with the GPS positioning reliability and the cellular positioning reliability" (Claim 1) ........................................................................................48

B.   The '139 patent .................................................................................................52

(1)   "a storage unit in which group information generated by classifying the plurality of base stations into groups" (Claim 11) ....................................53

APPENDIX A ...............................................................................................................................58

APPENDIX B ...............................................................................................................................59

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

## I.      INTRODUCTION

1.      My name is Robert Akl, and I have been retained by counsel for Huawei Device USA Inc. and Huawei Device Co., Ltd. ("Huawei") as an expert witness in the above-captioned proceeding to opine on claim construction and indefiniteness issues regarding U.S. Patent Nos. 7,509,139 (the "'139 patent") and 6,628,292 (the "'292 patent").

2.      My opinions are based on my years of education, research and experience, as well as my investigation and study of relevant materials and materials that I was asked to consider (identified below).

3.      I may rely upon these materials, my knowledge and experience, or additional materials to respond to arguments raised by Maxell or opinions offered by its experts. Further, I may also consider additional documents and information in forming any necessary opinions, including documents that may not yet have been provided to me.

4.      My analysis of the materials produced in this matter is ongoing and I will continue to review any new material as it is provided. This declaration represents only those opinions that I have formed to date. I reserve the right to revise, supplement, or amend my opinions below based on new information and on my continuing analysis of the materials already provided.

5.      I am being compensated on a per-hour basis for my time spent working on issues in this case at the rate of $650 an hour. My compensation does not depend on the outcome of this matter or the opinions that I express.

## II.      QUALIFICATIONS

6.      I am an expert in the field of wireless communications. I have studied, taught, practiced, and researched this field for over twenty years. I summarize in this section my educational background, work experience, and other relevant qualifications. A true and accurate copy of my curriculum vitae is attached as **Appendix A** to my declaration.

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

7.      I earned my Bachelor of Science degrees in Electrical Engineering and Computer Science summa cum laude with a grade point average of 4.0/4.0 and a ranking of first in my undergraduate class from Washington University in Saint Louis in 1994. In 1996, I earned my Master of Science degree in Electrical Engineering from Washington University in Saint Louis with a grade point average of 4.0/4.0. I earned my Doctorate of Science in Electrical Engineering from Washington University in Saint Louis in 2000, again with a grade point average of 4.0/4.0, with my dissertation on "Cell Design to Maximize Capacity in Cellular Code Division Multiple Access (CDMA) Networks."

8.      While a graduate student, from 1996 through 2000, I worked at MinMax Corporation in St. Louis, where I designed software packages that provided tools to flexibly allocate capacity in a CDMA communications network and maximize the number of subscribers. I also analyzed and simulated different audio compression schemes. I also validated the hardware architecture for an Asynchronous Transfer Mode (ATM) switch capable of channel group switching, as well as performed logical and timing simulations, and developed the hardware architecture for the ATM switch. I also worked with Teleware Corporation in Seoul, South Korea, where I designed and developed algorithms commercially deployed in a software package suite for analyzing the capacity in a CDMA network implementing the IS-95 standard to maximize the number of subscribers.

9.      After obtaining my Doctorate of Science degree, I worked as a Senior Systems Engineer at Comspace Corporation from October of 2000 to December of 2001. At Comspace, I designed and developed advanced data coding and modulation methods for improving the reliability and increasing the available data rates for cellular communications. I coded and simulated different encoding schemes (including Turbo coding, Viterbi decoding, trellis coded modulation, and Reed-Muller codes) and modulation techniques using amplitude and phase characteristics and multi-level star constellations. This work further entailed the optimization of soft decision parameters and

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

interleavers for additive white Gaussian and Rayleigh faded channels. I also extended the control

and trunking of Logic Trunked Radio (LTR) to include one-to-one and one-to-many voice and data

messaging.

10.     In January of 2002, I joined the faculty of the University of New Orleans in

Louisiana as an Assistant Professor in the Department of Electrical Engineering. While in this

position, I designed and taught two new courses called "Computer Systems Design I and II." I also

developed a Computer Engineering Curriculum with a strong hardware-design emphasis, formed a

wireless research group, and advised graduate and undergraduate students.

11.     In September of 2002, I received an appointment as an Assistant Professor in the

Department of Computer Science and Engineering at the University of North Texas (UNT), in

Denton, Texas. In May of 2008, I became a tenured Associate Professor in the Department of

Computer Science and Engineering. As a faculty member, I taught courses and directed research in

wireless communications, including 2G, 3G, 4G, CDMA/WCDMA, GSM, UMTS, LTE, wireless

sensors, Bluetooth, VoIP, multi-cell network optimization, call admission control, channel coding,

ad-hoc networks, and computer architecture. I am the director of the Wireless Sensor Lab ("WiSL").

Several of my research projects are funded by industry. In January of 2015, I was promoted to

Associate Chair of Graduate Studies in the Department of Computer Science and Engineering.

12.     In addition to advising and mentoring students at UNT, I was asked to join the

faculty of the University of Arkansas in Little Rock as an Adjunct Assistant Professor from 2004 to

2008 to supervise the research of two Ph.D. graduate students doing research in wireless

communications. At UNT, I have advised and supervised more than 250 undergraduate and

graduate students, many of whom received a master's or doctorate degree under my guidance.

13.     In addition to my academic work, I have remained active in the communication

industry through my consulting work. In 2002, I consulted for Input/Output Inc. and designed and

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

implemented algorithms for optimizing the frequency selection process used by sonar for scanning

the bottom of the ocean. In 2004, I worked with Allegiant Integrated Solutions in Ft. Worth, Texas

to design and develop an integrated set of tools for fast deployment of wireless networks. Among

other features, these tools optimize the placement of Access Points and determine their respective

channel allocations to minimize interference and maximize capacity. I also assisted the Collin

County Sheriff's Office (Texas) in a double homicide investigation, analyzing cellular record data to

determine user location.

14.     I have authored and co-authored approximately 75 journal publications, conference

proceedings, technical papers, book chapters, and technical presentations in a broad array of

communications-related technologies, including networking and wireless communication. I have also

developed and taught over 100 courses related to communications and computer system designs,

including several courses on LTE, VoIP, wireless communication, communications systems, sensor

networks, source coding and compression, computer systems design, and computer architecture.

These courses have included introductory courses on communication networks and signals and

systems, as well as more advanced courses on wireless communications. A complete list of my

publications and the courses I have developed and/or taught is also contained in my curriculum

vitae.

15.     My professional affiliations include services in various professional organizations and

serving as a reviewer for several technical publications, journals, and conferences. I have also

received several awards and recognitions, including the IEEE Professionalism Award (2008), UNT

College of Engineering Outstanding Teacher Award (2008), and Tech Titan of the Future (2010)

among others, which are listed in my curriculum vitae.

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

16.     A complete list of cases in which I have testified at trial, hearing, or by deposition within the preceding four years is provided in my curriculum vitae. In the listed cases, I have been retained by both patent owners as well as petitioners.

## III.    SCOPE OF OPINION

17.     I have been asked to provide my opinions regarding certain claim terms from the '139 and '292 patents that Maxell and Huawei have asked the Court to construe.

18.     This declaration, including the exhibits hereto, sets forth my opinion on this topic.

## IV.    MATERIALS REVIEWED AND CONSIDERED

19.     In connection with my work on this matter, I have reviewed and considered the materials identified in **Appendix B** to my declaration.

20.     I also have relied on my academic and professional experience in reaching the opinions expressed in this declaration.

## V.    LEVEL OF ORDINARY SKILL IN THE ART

21.     In rendering the opinions set forth in this declaration, I was asked to consider the patent claims and the prior art through the eyes of a person of ordinary skill in the art ("POSITA"). I considered factors such as the educational level and years of experience of those working in the pertinent art; the types of problems encountered in the art; the teachings of the prior art; patents and publications of other persons or companies; and the sophistication of the technology. I understand that a POSITA is not a specific real individual, but rather a hypothetical individual having the qualities reflected by the factors discussed above.

22.     Taking these factors into consideration, I agree with Maxell and Dr. Braasch that a POSITA as of the time of the '139 and '292 patents would be "someone with a working knowledge of cellular and GPS wireless communications. The person would have gained this knowledge

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

through an undergraduate Bachelor of Science degree in Electrical Engineering or an equivalent

degree, and at least two years of experience working in the field of wireless communications." Dkt.

95 at 13, 29; Dkt. 95-1 ¶ 18. I also agree that "[f]or all of the levels of ordinary skill in the art … it is

understood that additional education or experience may serve as a substitute for the defined

requirements." Dkt. 95 at 7 n.6.

## VI.    LEGAL PRINCIPLES

### A.    General Principles of Claim Construction

23.    The legal principles set forth in this section were provided to me by Huawei's

counsel. I am informed that a purpose of claim construction is to determine the meaning and scope

of patent claims asserted to be infringed. I understand that in district court litigation patent claims

are generally given the meaning that the terms would have to a person of ordinary skill in the art in

question as of the earliest claimed priority date.

24.    I understand that the person of ordinary skill in the art is deemed to read the claim

term not only in the context of the particular claim in which the disputed term appears, but in the

context of the entire patent, including the specification. I further understand that when construing

the claims of a patent, the principal considerations are the plain language of the claim (including the

surrounding claim language and context), the patent specification and the prosecution history (if in

evidence), which I understand are called, collectively, the "intrinsic evidence." I understand that

while a claim is to be read in light of the specification, one must generally avoid importing

limitations into the claim from the specification. I am also informed that the prosecution history can

often inform the meaning of the claim by demonstrating how the inventor understood the invention

and whether the inventor limited the invention in the course of prosecution, making the claim scope

narrower than it would otherwise be.

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

### B.    "Means Plus Function" Terms

25.    I understand that a claim limitation may be expressed as a means or step for performing a specified function without reciting structure, material, or acts in support thereof, and that these claims shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof. I further understand that a structure in the specification can qualify as a "corresponding structure" only if the specification clearly links that structure to the function specified in the claim. I understand that features that do not actually perform the recited function, or are unnecessary to perform the claimed function or merely enable the pertinent structure to operate as intended, do not constitute corresponding structure and so do not serve as claim limitations. I understand that if a corresponding structure for a means-plus-function element cannot be identified in the specification, then the claim is indefinite.

26.    I am further informed that in the context of computer-implemented inventions (such as claims that recite processes that are performed by software running on a computer), the "corresponding structure" in the specification cannot simply be a general purpose computer or microprocessor; instead, the structure is a specific algorithm for performing the claimed function. I am further informed that even where a specification discloses a physical structure for performing the function (such as a general purpose computer), the claim will be invalid as indefinite if the specification fails to disclose the algorithm for performing the recited claim function.

27.    I understand that when a claim limitation lacks the word "means," there is a presumption that the limitation is not a means-plus-function element. But I also understand that this presumption may be overcome if the limitation in question fails to recite sufficiently definite structure (such as a "nonce" word), or else recites function without reciting sufficient structure for performing that function.

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

### C.      Indefiniteness

28.      I understand that a claim is indefinite if, read in light of the specification and its

prosecution history, fails to inform, with reasonable certainty, those skilled in the art about the scope

of the claimed invention.

### D.      Claim Correction

29.      I understand that if a claim contains an obvious error that the District Court can

correct the error but only if the (1) the correction is not subject to reasonable debate based on

consideration of the claim language and the specification and (2) the prosecution history does not

suggest a different interpretation of the claims.

## VII.    PRIORITY DATES OF THE '292 AND '139 PATENTS

30.      I have been asked to assume that the earliest possible priority date for the '292 patent

is March 21, 2001. I have therefore analyzed the claim constructions and knowledge of one of

ordinary skill for this patent as of that date or somewhat before that date.

31.      I have been asked to assume that the earliest possible priority date for the '139 patent

is April 13, 2005. I have therefore analyzed the claim constructions and knowledge of one of

ordinary skill for this patent as of that date or somewhat before that date.

## VIII.   OVERVIEW OF U.S. PATENT NO. 6,928,292 ("'292 patent")

### A.      Summary of the '292 Patent

32.      The '292 Patent describes a technique (and a device that implements that technique)

to calculate a mobile handset's position (i.e., geographic location). The technique calculates both

GPS-based and cellular-based position results and combines them based on their respective

reliabilities. '292 patent, 3:11-16.

33.      For the GPS operations, the technique requires receiving GPS-based signals and

calculating (1) an estimate of its position and (2) the reliability of that estimate. It then requires the

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

same steps for cellular-based signals. After that, the GPS-based and cellular-based positions are combined based on their reliabilities to calculate a combined-position estimate.

34.     Figure 1 illustrates a functional block diagram of a device implementing the "position determination method." *Id.*, 3:24-27. Signals are received at antenna **100**. Though the preferred embodiment has one antenna structure, the '292 patent states "one antenna for GPS signals and another antenna for cellular signals may be separately provided on the terminal handset." 4:65-5:2. As shown by the single line connecting antenna **100** to the two receivers, every signal received at antenna **100** is sent to GPS Receiver **200** and Cellular Receiver **300**.

35.     The GPS Receiver **200** filter GPS signals "out of the signals received by antenna **100**" and generates GPS-oriented signals. *Id.*, 3:27-32. The received GPS-oriented signals are then conveyed to Position Calculation Unit for GPS **201**, *id.*, 3:33-35. Position Calculation Unit for GPS **201** calculates the position of the handset using the GPS signals and outputs GPS-based position calculation result **202**, which is then sent to the GPS/Cellular Positioning Results Combining Unit **400**. In addition, Position Calculation Unit for GPS **201** provides information about the reliability of the GPS-based position calculation result **203** and sends it to the GPS Reliability Calculation Unit **204**. *Id.*, 3:44-52. GPS Reliability Calculation Unit **204** calculates the reliability of the GPS position data **205**, *id.*, 3:49-52, and conveys that result to GPS/Cellular Positioning Results Combining Unit **400**.

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS



'292 Patent, Fig. 1

36.     Blocks **300**, **301**, and **304** perform identical processing of cellular-based signals to generate cellular-based position data **302** and reliability of the cellular-based position data **305**, which are both provided to GPS/Cellular Positioning Results Combining Unit **400**.

37.     GPS/Cellular Positioning Results Combining Unit **400** then combines the GPS-based position **202** and the cellular-based position **302** according to their respective reliabilities, **205** and **305**, to generate combined position data **401**. *Id.*, 4:43-48.

38.     Though the preferred embodiment of the method arranges the GPS steps before the cellular steps, the '292 patent discloses that the ordering can be reversed or "carried out simultaneously," because the "order of the GPS/cellular steps is not limited." *Id.*, 3:18–23.

39.     Figure 3 is the only disclosed "embodiment of the GPS/cellular positioning results combining unit **400**." *Id.*, 4:49-50. The left side of Figure 3 shows all the data that is input to GPS/Cellular Positioning Results Combining Unit **400**. $L_{gps}$ (composed of two GPS-based coordinates: $X_{gps}$ and $Y_{gps}$) is the estimate of GPS-based position and $W_{gps}$ is the reliability of the GPS-based estimate. Similarly, $L_{cell}$ (composed of two cellular-based coordinates: $X_{cell}$ and $Y_{cell}$) is the estimate of the cellular-based position and $W_{cell}$ is the reliability of the cellular-based estimate.

40.     In the Combination Operation Unit **410**, the x-coordinate of the GPS-based position calculation result **203** is weighted (i.e., multiplied) by GPS reliability data ($W_{gps}$), and the x-coordinate

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

of the cellular-based calculation result **302** is weighted (i.e., multiplied) by cellular reliability data ($W_{cell}$). The same calculations are performed for the y-coordinates. Then to calculate the x- and y-coordinates of the combined position estimate, the weighted x-coordinates are combined and averaged (divided by the total reliability for the GPS- and cellular-based position estimates) and the weighted y-coordinates are combined and average the same way. The result of this weighted averaging is a new pair of coordinates L = (X, Y).



'292 Patent, Fig. 3

41.     Despite this simple arithmetic, the '292 patent asserts that combining the two position determinations based on their reliabilities will lead to a more accurate position determination. *Id.*, 5:7-12.

42.     The '292 patent also describes what occurs when an individual position estimates is very unreliable. For example, if the reliability of the GPS-based position result is considered too unreliable, the "the GPS reliability calculation unit **204** preferable outputs a value of 0 as the reliability **205** so that the GPS-based position calculation result **202** has no effect on further processing." '292 patent, 3:60-4:3; *see also id.*, 4:36-48 (disclosing a similar procedure for when the cellular-based position result is too unreliable). So, if for example, the GPS-based position result **202** is considered too unreliable, the reliability of that result (i.e., $W_{gps}$) will be set to zero in the weighted average equation shown in Figure 3. But the GPS-based position calculation result **202** will still be

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

input to GPS/Cellular Positioning Results Combining Unit **400**; however, it will be multiplied by zero so that the position estimate will have "no effect on" the combined position estimate. *Id.*, 4:1-3. That is, the combined operation still combines the GPS-based position calculation result **202** with the cellular-based calculation results **302**; it just does this combining after multiplying the GPS-based position result **202** by the appropriate weight, which in this example would be zero.

### B.    Prosecution History of the '292 Patent

43.    I have reviewed the prosecution history of the '292 patent.

44.    The '292 patent claims priority to an application filed on March 12, 2002, which, in turn, claims priority to a Japanese Patent Application filed on March 19, 2001.

45.    In the first Office Action, the Patent Office Examiner found that, except for receiving GPS- and cellular-based signals simultaneously and calculating GPS-based and cellular-based positions simultaneously, every limitation in what became claims 1 and 2 was disclosed in a single-prior art reference. *See* Office Action at 3–4, 5–6 (Sept. 22, 2004).

46.    For two dependent claims pending during prosecution that had the simultaneous limitations, the Examiner said the claims would be allowed if they were rewritten as independent claims. *Id.* at 11. The inventors subsequently rewrote these claims to be independent claims. *See* Amendment and Response at 2-3 (December 22, 2004). On August 9, 2005, these claims issued as claims 1 and 2. *See* Notice of Allowability at 2 (April 12, 2005).

47.    Although the Patent Office Examiner stated he was allowing claims 1 and 2 because the simultaneous reception and simultaneous calculations of the GPS- and cellular-based position estimates were not disclosed in the prior art, only claim 2—the method claim—recites both of these simultaneous limitations. Claim 1—the apparatus claim—only requires that the GPS- and cellular-based signals be received simultaneously; claim 1 does not require that the GPS- and cellular-positions also be calculated simultaneously.

– 12 –

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

### C.     The Asserted Claims of the '292 Patent (Claims 1 and 2)

48.     The '292 patent contains two independent claims. I understand that Maxell has

asserted both of these claims.

49.     Claim 1 is the sole apparatus claim and it contains seven limitations, each of which

includes the words "means for." I understand that the parties agree that these terms should be

construed as means-plus-function limitations. I have been asked to assume that all of these

limitations should be construed as means-plus-function limitations.

50.     Each means limitation of claim 1 attempts to mirror one of the functional blocks

shown in Figure 1:

> [Claim] 1. A mobile handset capable of determining its position using radio
> waves, the mobile handset comprising:
>
> [1a] GPS receiver means for receiving GPS-oriented signals and generating
> received GPS signals;
>
> [1b] GPS position calculation means for calculating the mobile handset's position
> from the received GPS signals and outputting a GPS-based position result;
>
> [1c] GPS reliability calculation means for calculating GPS positioning reliability
> based on the GPS-based position result;
>
> [1d] cellular receiver means for receiving cellular-oriented signals and generating
> received cellular signals;
>
> [1e] cellular position calculation means for calculating the mobile handset's
> position from the received cellular signals and outputting a cellular-based
> position result;
>
> [1f] cellular reliability calculation means for calculating cellular positioning
> reliability based on the cellular-based position result; and
>
> [1g] GPS/cellular positioning results combining means for combining the GPS-
> based position result and the cellular-based position result with the GPS
> positioning reliability and the cellular positioning reliability, wherein said GPS
> and cellular receiver means are adapted to receive GPS and cellular-oriented
> signals simultaneously.

51.     The first three limitations above—the GPS-related limitations—follow GPS blocks

**200, 201, 204** in Figure 1, respectively. They receive and generate GPS signals, calculate a GPS-based

– 13 –

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

position result, and calculate GPS positioning reliability based on the GPS-based position result. The next three limitations—the cellular-related limitations—follow the parallel cellular blocks **300, 301,** and **304**, respectively. They receive and generate cellular signals, calculate a cellular-based position result, and calculate a cellular positioning reliability based on the cellular-based position result. The last limitation, the combining means, corresponds to GPS/Cellular Position Results Combining Unit **400**. The last limitation further requires that the receiver means **200** and **300** be adapted to receive GPS- and cellular-oriented signals simultaneously.

52.     Claim 2 is a method claim and is similar to claim 1. The primary difference with claim 2 compared to claim 1, is that claim 2 requires the GPS and cellular signals to be received simultaneously and the GPS- and cellular-based positions to be calculated "simultaneously," *id.*, 6:18-38, whereas claim 1 only requires that the receivers be adapted to receive these signals simultaneously, *id.*, 6:15-17.

## IX.   OVERVIEW OF U.S. PATENT NO. 7,509,139 ("'139 patent")

### A.     Summary of the '139 Patent

53.     The '139 Patent claims a simple three-step method for "selecting one wireless base station … from multiple base stations in a wireless system." '139 Patent, 1:13-15, 2:19. The method begins with base stations that have been classified into several groups. In one embodiment, the wireless terminal then obtains indexes of wireless communication quality (e.g., received power, bit rates, or SNR values) between the wireless terminal and each base station. In the second step, the terminal uses these metrics to calculate characterizing quantities (i.e., "group scores") for each group of base stations. In the last step, the terminal specifies a group based on the group scores. It then selects a base station from the specified group is as its connection base station. *Id.*, 2:37-3:5. In an alternative embodiment, the calculations and selections are performed by the "system side." *Id.*, 6:48-8:43.

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS




54. '139 Patent, Figs. 1 and 2

55.     This method is illustrated in Figures 1 and 2 (above). Figure 2 depicts a wireless

terminal **200** (e.g., a mobile unit) that is receiving signals **211** to **216** from several base stations **201** to

**206**. Figure 1 shows the steps for selecting the base station to which a wireless terminal should

connect. In Figure 1, as required by step **101**, the base stations of Figure 2 have been organized into

groups. *Id.*, 2:22-26. In step **102**, communication quality between terminals and base stations (i.e., the

"indexes of communication quality") are obtained. In step **103**, these metrics of communication

quality (i.e., indexes) are used to calculate a "group score" (i.e., a "characterizing quantity" for each

group). *Id.*, 4:58-62. In step **104**, a group is specified based on the group scores. *Id.*, 5:25-27. Finally,

in step **105**, a particular base station within that specified group is selected. *Id.*, 5:27-29.

56.     Figures 3A to 3C (below) illustrate how to tabulate and calculate the group scores for

the base stations. The table in Figure 3A depicts (1) the groups into which the base-stations have

been classified and (2) the data that has been collected and calculated for each base station and each

group. Figure 3A lists three base station groups, identified by Group IDs G1, G2, and G3. Group

G1, for example, has two base stations—Base Stations with IDs 201 and 202. The Received Power

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

levels for each of these two base stations are R1 and R2 respectively and are listed in the last column of Figure 3A. The second column of Figure 3A shows the Group Score associated with each group. Figures 3B and 3C demonstrate two ways to calculate a Group Score: Figure 3B shows that the Group Score can be a summation of the Received Power associated with each base station in a group; Figure 3C shows that the Group Score can be a simple average of Received Powers.



FIG.3A

GROUP IDENTIFICATION TABLE                    301

| GROUP ID | GROUP SCORE | BASE STATION ID | RECEIVED POWER |
|---|---|---|---|
| G1 | S1 | 201 | R1 |
|  |  | 202 | R2 |
| G2 | S2 | 203 | R3 |
|  |  | 204 | R4 |
| G3 | S3 | 205 | R5 |
|  |  | 206 | R6 |

FIG.3B

EXAMPLE OF GROUP SCORE CALCULATION    302

CASE WHERE SUM TOTAL OF RECEIVED POWER = GROUP SCORE

$$S1 = R1 + R2$$
$$S2 = R3 + R4$$
$$S3 = R5 + R6$$

FIG.3C                    303

CASE WHERE AVERAGE OF RECEIVED POWER = GROUP SCORE

$$S1 = \frac{R1 + R2}{2}$$
$$S2 = \frac{R3 + R4}{2}$$
$$S3 = \frac{R5 + R6}{2}$$

57. '139 Patent, Figs. 3A, 3B and 3C

58.     In the next step, the Group Scores are ranked according to some criteria (for example, maximum Group Score) to specify a particular group of base stations. Once a base station group is specified, the table in Figure 3A can be used again to select a base station from the specified group. This base station becomes the "connection destination" for the terminal.

59.     The '139 patent also mentions that the "wireless communication function and the base station selection algorithm are implemented by executing … software" in generic "RAM" (random access memory) using a generic "CPU" (central processing unit). *Id.*, 6:1-3.

**B.     Prosecution History of the '139 Patent**

60.     I have reviewed the prosecution history of the '139 patent.

61.     The '139 patent claims priority to an application filed on January 11, 2006, which, in turn, claims priority to a Japanese Patent Application filed on April 13, 2005.

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

62.     In the very first Office Action, the Patent Office Examiner allowed claim 1-16 because he found that, for claim 1, that "the prior art of record fails to teach or suggest alone, or in combination a second step of calculating characterizing quantities of the communication quality for each of the groups; and a third step of specifying one of the plurality of groups based on the charactering quantities and selecting one of base stations, which belong to the specified group, as a connection destination base station of said terminal." Office Action at 2 (Nov. 12, 2008). For claims 11 and 15, the Examiner found that "the prior art of record fails to teach or suggest alone, or in combination a stations [sic], calculates-characterizing quantities of the communication quality for each of the stored groups, specifies one of the plurality of groups based on the charactering quantities, and selects one of base stations, which belong to the specified group, as the connection destination base station." *Id.*

63.     The '139 patent subsequently issued on March 24, 2009.

**C.     The Asserted Claims of the '139 Patent (1, 7-14)**

64.     **Claim 1:** Claim 1, a method claim, mirrors the base-station-selection algorithm disclosed in Figure 1:

> [Claim] 1. A connection control method for selecting one base station, to which a terminal is to connect, from a plurality of base stations in a wireless communication system, said connection control method comprising:
>
> [1a] a first step of obtaining an index of communication quality between the terminal and the base stations for each of said plurality of base stations wherein, said plurality of base stations being classified into a plurality of groups;
>
> [1b] a second step of calculating characterizing quantities of the communication quality for each of the groups; and
>
> [1c] a third step of specifying one of the plurality of groups based on the charactering quantities and selecting one of base stations, which belong to the specified group, as a connection destination base station of said terminal.

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

65.     The first limitation—"obtaining an index of communication quality"—corresponds to steps **101** and **102** in Figure 1.[1] The second limitation—"calculating characterizing quantities of the communication quality" step—corresponds to step **103**. The final limitation—the combined step for "specifying" and "selecting"—corresponds to steps **104** and **105**.

66.     **Claim 11:** Independent claim 11—an apparatus claim—is similar to claim 1. Claim 11 requires a wireless terminal with a storage unit that stores information calculated by claim 1's method and a control unit that performs the calculating, specifying, and selecting steps.

67.     **Claims 7-9:** Claims 7 through 9 depend on claim 1. They add using well-known metrics of wireless communication—received power, bit rates, and signal-to-noise ratio (SNR)—as the criteria for the final base-station selection step. Claim 7 requires selecting the base station with the strongest received power from among the base stations in the specified group; claim 8 requires selecting the base station with the highest communication bit rate from among the base stations in the specified group; claim 9 requires selecting the base station with the highest SNR value from among the base stations in the specified group.

68.     **Claim 10:** Claim 10 claims a terminal positioning method "using times at which a signal, which is sent and received between a base station and said terminal, are received by a plurality of base stations, said base station being selected and connected by the method according to claim 1."

69.     **Claims 12-13:** Claims 12 through 13 depends on claim 11. Claim 12 requires using received power or SNR value in calculating characterizing quantities; claim 13 requiring using a bit rate in calculating the characterizing quantities.

---

[1] Examples of metrics that can serve as indices of communication quality are received power, bit rates, and signal-to-noise ratios (SNRs), which a person of ordinary skill would have been familiar with as standard metrics of wireless communication, which the '139 patent does not claim to have invented. '139 Patent, 2:51-3:11.

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

70.     **Claim 14**: Claim 14, which depends on claim 11, is similar to claim 10. It requires the wireless terminal to "send[] and receive[] a wireless signal, which is for detecting a position using propagation time differences of the signal, to and from the connection destination base station."

# X.     CLAIM CONSTRUCTIONS

71.     I have carefully reviewed the proposed claim constructions offered by Huawei and Maxell, as well as Maxell's arguments and citations in its claim construction briefing for the '292 and '139 patents and the opinions of Dr. Braasch regarding the '292 patent. In the sections below, I provide my opinions as to how the terms at issue would have been understood by a person of ordinary skill in the art.

## A.     The '292 patent

72.     In my opinion, Huawei's proposed constructions for the disputed terms of the '292 patent most align with the plain and ordinary meanings to a person of ordinary skill in the art at the time of the alleged invention of '292 patent. In addition, it is my opinion that for at least three of the means-plus-function terms of claim 1 of the '292 patent—the "GPS reliability calculation means," the "cellular reliability calculation means," and the "cellular position calculation means"—the specification of the '292 patent fails to describe structure (e.g., any algorithm) for performing the claimed functions and therefore, notwithstanding the presence in the patent of functionally-named boxes or blocks, fails to describe any structure to perform those functions.

### (1)     "GPS receiver means for receiving GPS-oriented signals and generating received GPS signals" (Claim 1)

| Maxell's Proposed Construction | Huawei's Proposed Construction |
|---|---|
| **Function:** "receiving GPS-oriented signals and generating received GPS signals" | **Function:** "(1) receiving GPS oriented signals and (2) generating received GPS signals" |
| **Structure:** "A GPS receiver 200 and/or components within a mobile handset that receive GPS signals, such as, an antenna and a | **Structure:** "GPS receiver 200, Block 600 in Figure 2" |

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

| | |
|---|---|
| transceiver or a processor that performs GPS receiving processes as described in Fig. 2 (block 600) and corresponding recitations in the specification as provided below or equivalents thereof. *See[,] e.g.*, (2:64-65; block 600 in Fig. 2), (3:24-32), (4:65-5:2), (2:53-57), (5:3-7)." | |

73.     I have been asked to opine on how a person of ordinary skill in the art at the time of the invention would understand the function and corresponding structure disclosed in the '292 patent for the "GPS receiver means for receiving GPS-oriented signals and generating received GPS signals" limitation.

74.     As to the function, the parties agree. A person of ordinary skill in the art would understand that these are two distinct functions and that the GPS receiver means must perform each of these functions and that the '292 patent must, therefore, disclose structure to perform each of these functions.

75.     As to the structure, in my opinion, the only structure disclosed in the '292 patent that is clearly associated with the GPS receiver means is GPS receiver 200 and Block 600 in Figure 2, as Huawei has proposed. A person of ordinary skill in the art would find this to be the minimal structure necessary to implement the claimed functions of the GPS receiver means. GPS receiver 200 and Block 600 in Figure 2 denote to one of ordinary skill structure for implementing the claimed functions of receiving GPS-oriented signals and generating received GPS signals.

76.     In my opinion, Maxell's proposed structure is incorrect because it includes (1) structure that is not part of the GPS receiver means structure and (2) other disclosure that is not structure, would otherwise be considered superfluous to a person of ordinary skill in the art, or is not the minimal required structure to implement the claimed functions of the GPS receiver means.

77.     I disagree with Maxell that the GPS receiver means includes all "components within a mobile handset that receive GPS signals, such as an antenna and a transceiver or a processor."

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

78.     In my opinion, the '292 patent does not disclose that an antenna is clearly linked to the claimed functions. Instead, it would be clear to one of ordinary skill in the art that the antenna **100** is an independent structure, separate and independent of the GPS receiver means. This is shown clearly in Figure 1, for example, where antenna **100** is labeled and placed outside of GPS Receiver **200** (and Cellular Receiver **300**). In my opinion, at no point does the '292 patent require or suggest that an antenna is part of the structure required to perform the claimed functions of receiving GPS oriented signals and generating GPS signals. In my opinion, an antenna is not required to implement these claimed functions. It is my understanding that an inventor does not have to claim all components that are necessary to implement a working device. Though an antenna may be necessary to better receive wireless signals, the '292 patent distinguishes between the receiving performed at the antenna and the receiving performed at the GPS and cellular receivers.

79.     In my opinion, the '292 patent also does not disclose a processor or transceiver as part of the structure for the GPS receiver means. I do not find the words "processor" (or "computer") or "transceiver" in the '292 patent's disclosure. Nor does the specification clearly link (by implication) a processor to the GPS receiver means.

80.     In my opinion, the additional citations to the specification that Maxell identifies—(2:64-65); (3:24-32), (4:65-5:2), (2:53-57), and (5:3-7)—go beyond the minimally required structure to implement the claimed functions.

81.     **(2:64-65):** These lines do not disclose structure clearly linked to the functions of receiving GPS oriented signals and generating GPS signals. Column 2, lines 64 to 65 simply states that "These GPS-related processes are labeled **610**." This tells where to look in Figure 2 for the GPS-related processes; it is not structure, let alone structure associated with receiving GPS-oriented signals and generating received GPS signals.

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

82.     **(3:24-32):** These lines disclose operations (i.e., functions), not structure that is clearly linked to the functions of receiving GPS oriented signals and generating GPS signals. The '292 patent explains that these are only "prefer[red]" operations. '292 patent, 3:28. A person of ordinary skill in the art would likewise understand that the operations described here could be performed in a GPS receiver and that some of them, for example, baseband modulation, typically would be performed in a GPS receiver. But, in my opinion, the disclosure that Huawei identifies is sufficient to denote the structure to one of ordinary skill and no more than that is necessary.

83.     **(4:65-5:2):** These lines do not disclose structure clearly linked to the functions of receiving GPS oriented signals and generating GPS signals. This disclosure notes that "although one single antenna **100** is shared for receiving GPS and cellular signals" at the GPS and cellular-receivers, "in the presently preferred embodiment, one antenna for GPS signals and another for cellular signals may be separately provided on the terminal handset." As I explained above, a person of ordinary skill in the art would understand that whether there is one antenna or two antennas, the antenna is a distinct structure from the GPS and cellular receivers and not part of the structure associated with the GPS receiver means functions. A person of ordinary skill in the art would understand that the word "receiving" has different meanings depending on the context. For example, column 3, lines 27 to 32 notes that the "GPS receiver **200**" is "**receiving** the GPS signals … out of the signals **received** by an antenna **100**." That is, both GPS receiver **200** *and* antenna **100** perform receive operations. The receive function claimed here for the GPS receiver means— receiving GPS oriented signals—is **after** the antenna **100** has received signals and then, as I explained above, passes those signals to **both** the GPS and cellular receivers, which perform their distinct receive operations).

84.     My opinion that 4:65-5:2 is not part of the disclosure for the GPS receiver is further supported by the fact that Maxell does not also identify 4:65-5:2 as part of the structure for the

– 22 –

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

cellular receiver. Column 4, line 65 to column 5, line 2, if is part of the structure of the GPS and

receiver means (and I do not believe that it is) then it would naturally have to be part of the structure

of the cellular receiver means (and I do not believe that it is). By only including 4:65-5:2 in one

receiver, but not the other, Maxell demonstrates that it should not be associated with either.

85.     **(2:53-57):** These lines disclose exemplary operations performed in a GPS receiver,

but these lines do not disclose structure. As I explained above, in my opinion, the disclosure that

Huawei identifies is sufficient to denote the structure to one of ordinary skill and no more than that

is necessary.

86.     **(5:3-7):** These lines do not disclose structure clearly linked to the functions of

receiving GPS oriented signals and generating GPS signals. Column 5, lines 3 to 7 state that "a single

mobile handset can cover both areas where position determination using GPS signals is practical and

areas where position determination using cellular signals is practical thereby extending location

information serviceable areas." This describes one of the alleged advantages of the positioning

technique disclosed in the '292 patent; it is not part of the structure for receiving GPS oriented

signals and generating GPS signals.

87.     I have reviewed Dr. Braasch's declaration in support of Maxell's proposed

constructions. *See generally* Dkt. 95-1. In my opinion, the operations that Dr. Braasch identifies are

just examples of operations performed in the preferred embodiment. *Id.* ¶¶ 35-38. The '292 patent

discloses that antenna **100**, which is a different structure from both the GPS and cellular receiver, is

"for **receiving** GPS signals and cellular signals." '292 patent, 4:65-67. As those signals are received

by antenna **100** they will be processed to generate GPS-oriented signals, which the GPS receiver

means "**is receiving**." In my opinion, the operations that Dr. Braasch identifies—"(1) receiving the

GPS signals of high/medium frequencies out of the signals received by an antenna 100; (2)

baseband signal modulation; (3) synchronization acquisition; and (4) reception timing calculation"—

– 23 –

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

are exemplary operations performed in an exemplary GPS receiver.  But, as I explained above, my

opinion is that the disclosure that Huawei identifies is sufficient to denote the structure to one of

ordinary skill and no more than that is necessary.

> (2)   **"GPS position calculation means for calculating the mobile handset's position from the received GPS signals and outputting a GPS-based position result" (Claim 1)**

| Maxell's Proposed Construction | Huawei's Proposed Construction |
|---|---|
| **Function:** "calculating the mobile handset's position from the received GPS signals and outputting a GPS-based position result" | **Function:** "(1) calculating the mobile handset's position from the received GPS signals and (2) outputting a GPS-based position result." |
| **Structure:** "At least one processor, for example, position calculation unit 201 and/or a mobile handset that perform processing functions or equivalents thereof. *See[,] e.g.*, (2:64-65; block 601 in Fig. 2), (3:24-38), (2:53-60), (5:3-7)." | **Structure:** "position calculation unit for GPS 201, Block 601 in Fig. 2" |

88.     I have been asked to opine on how a person of ordinary skill in the art at the time of

the invention would understand the function and corresponding structure disclosed in the '292

patent for the "GPS position calculation means for calculating the mobile handset's position from

the received GPS signals and outputting a GPS-based position result" limitation.

89.     As to the function, the parties agree. A person of ordinary skill in the art would

understand that these are two distinct functions and that the GPS position calculation means must

perform each function and that the '292 patent must, therefore, disclose structure to perform each

of these functions.

90.     As to the structure, in my opinion, the only structure disclosed in the '292 patent that

is clearly associated with the GPS position calculation means and the minimal structure necessary to

implement the claimed functions of the GPS position calculation means is position calculation unit

for GPS 201 and Block 601 in Fig. 2, as Huawei has proposed. A person of ordinary skill in the art

would find this to be the minimal structure necessary to implement the claimed functions of the

GPS position calculation means. Position calculation unit for GPS 201 and Block 601 in Figure 2 are sufficient to call to mind the structure implementing the claimed functions of calculating the mobile handset's position from the received GPS signals and outputting a GPS-based position result.

91.     In my opinion, Maxell's proposed structure is incorrect because it includes (1) structures that is not part of the GPS position calculation means and (2) other disclosure that is not structure, would otherwise be considered superfluous to a person of ordinary skill in the art, or is not the minimal required structure to implement the claimed functions of the GPS position calculation means.

92.     I disagree with Maxell that the GPS position calculation means include "[a]t least one processor." I do not find the words "processor" or "computer" in the '292 patent's disclosure. Nor does the specification clearly link (by implication) a processor to the GPS position calculation means. In my opinion, a person of ordinary skill in the art would not understand that a processor is necessary to perform the claimed functions of calculating the mobile handset's position from the received GPS signals and outputting a GPS-based position result.

93.     In my opinion, the additional citations to the specification that Maxell identifies— (2:64-65), (3:24-38), (2:53-60), and (5:3-7)—are not part of the minimally required structure to implement the claimed functions..

94.     **(2:64-65):** These lines do not disclose structure clearly linked to the functions of calculating the mobile handset's position from the received GPS signals and outputting a GPS-based position result. Column 2, lines 64 to 65 states that "These GPS-related processes are labeled **610**." This tells where to look in Figure 2 for the GPS-related processes; it is not structure, let alone structure associated with calculating the mobile handset's position from the received GPS signals and outputting a GPS-based position result.

95.     **(3:24-38):** These lines just refer to the inputs to and outputs from a GPS position calculation unit. A person of ordinary skill would understand that the structure includes ports for inputting and outputting this data, but the data itself is not part of the structure that calculates the mobile handset's position from the received GPS signals and outputting a GPS-based position result. Column 3, line 24 to 31 discuss "receive operations," not (1) calculating the mobile handset's position from the received GPS signals or (2) outputting a GPS-based position result. Lines 33-42 states that "a position calculation unit for **GPS 201** calculates  the position of the mobile handset using the GPS signals and outputs the GPS-based position calculation result **202** to a GPS/cellular positioning results combining unit **400**. At the same time, the position calculation unit for GPS **201** outputs information about the reliability of the GPS-based position calculation result **203** (for example, the number of GPS satellites used in the above calculation and the received signal quality of the signals from the GPS satellites) to a GPS reliability calculation unit **204**." This describes inputs ("GPS signals"), an output ("GPS-based position calculation result **202**"), and destinations for the output ("GPS / cellular positioning results combining unit **400**" and "GPS reliability calculation unit **204**"). In my opinion, these are exemplary operations performed by a GPS position calculation unit but these operations are not necessary to denote structure to a person of ordinary skill. Instead, as I explained above, my opinion is that the disclosure that Huawei identifies is sufficient to denote the structure to one of ordinary skill and no more than that is necessary.

96.     **(2:53-60):** These lines do not disclose structure clearly linked to the functions of calculating the mobile handset's position from the received GPS signals and outputting a GPS-based position result. Column 2, lines 53 to 60 is similar to columns 3, lines 24 to 38. 2:53-60 mentions (1) "receiver operation for GPS-oriented signals," which is not structure associated with calculating the mobile handset's position from the received GPS signals or outputting a GPS-based position result; (2) that the handset "calculates its position using GPS signals," which is one of the functions

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

itself, not structure associated with that function; and (3) that the mobile handset "also calculates the reliability" for the GPS-based position result, which concerns a function of the GPS reliability calculation unit **205**, not structure, let alone structure associated with the different functions of calculating the mobile handset's position from the received GPS signals and outputting a GPS-based position result.

97.      **(5:3-7):** These lines do not disclose structure clearly linked to the functions of calculating the mobile handset's position from the received GPS signals and outputting a GPS-based position result. Column 5, lines 3 to 7 state that "a single mobile handset can cover both areas where position determination using GPS signals is practical and areas where position determination using cellular signals is practical thereby extending location information serviceable areas." This describes one of the alleged advantages of the positioning technique disclosed in the '292 patent; it is not part of the structure for calculating the mobile handset's position from the received GPS signals or outputting a GPS-based position result.

98.      I have reviewed Dr. Braasch's declaration in support of Maxell's proposed constructions. *See generally* Dkt. 95-1. I do not agree with Dr. Braasch that "the '292 Patent describe the techniques that are implemented by the claimed GPS position calculation means." *Id.* ¶ 39. I disagree with Dr. Braasch's opinions for two reasons.

99.      First, I note that Dr. Braasch does not rely on all of the alleged structure identified by Maxell. Instead, he only cites to and discusses 3:24-32 and 5:3-12. Column 5, lines 8-12 is not within the structure identified by Maxell; and 3:24-32 and 5:3-7 is substantially less than the disclosures that Maxell asserts to be structure for this limitation. *Compare* Dkt. 95 at 26 (citing (2:64-65; block 601 in Fig, 2), (3:24-38), (2:53-60), (5:3-7)) *with* Dkt. 95-1 at 17-18 (citing (3:44-4:3), (5:3-12)).

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

100.    Second, I disagree that the extra disclosure that Dr. Braasch identifies is structure for

the functions of (1) calculating the mobile handset's position from the received GPS signals or

(2) outputting a GPS-based position result. Dr. Braasch states that "in order to perform a 'position

determination'" the mobile handset will "execute[] the receive operations," which "includ[e:] (1)

**receiving** the GPS signals of high/medium frequencies out of the signals received by the antenna

100; (2) **baseband signal modulation**; (3) **synchronization** acquisition; and (4) **reception** timing

calculation." Dkt. 95-1 at 13 (emphasis added). These are exemplary operations performed in a GPS

calculation unit means for performing the function of calculating the mobile handset's position from

the received GPS signals and outputting a GPS-based position result. But, as I explained above, my

opinion is that the disclosure that Huawei identifies is sufficient to denote the structure to one of

ordinary skill and no more than that is necessary.

(3)    **"GPS reliability calculation means for calculating GPS positioning reliability
based on the GPS-based position result" (Claim 1)**

| Maxell's Proposed Construction | Huawei's Proposed Construction |
|---|---|
| **Function:** "calculating GPS positioning reliability based on the GPS-based position result"<br><br>**Structure:** "A GPS reliability calculation unit 204 and/or components within a mobile handset that perform processing functions, such as, a CPU programmed to execute processing in accordance with the algorithm set forth in the specification, a processor that performs GPS reliability calculation processes described in Fig. 2 (block 602) and corresponding recitations in the specification as provided herein, or equivalents thereof. *See e.g.*, (2:60-65; block 602 in Fig. 2), (3:38-4:3), (5:3-7)." | **Function:** "calculating GPS positioning reliability based on the GPS-based position result"<br><br>**Structure:** "GPS reliability calculation unit 204, which is insufficient structure because the specification does not disclose the necessary algorithm or flowchart, which renders the term indefinite" |

101.    I have been asked to opine on how a person of ordinary skill in the art at the time of

the invention would understand the function and corresponding structure disclosed in the '292

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

patent for the "GPS reliability calculation means for calculating GPS positioning reliability based on the GPS-based position result" limitation.

102.    As to the function, the parties agree that the function is "calculating GPS positioning reliability based on the GPS-based position result."

103.    As to structure, the parties agree that one way to accomplish the GPS reliability calculation means is by implementing an algorithm disclosed in the specification.

104.    In my opinion, that algorithm is not disclosed in the specification of the '292 patent. Instead, the only structure associated with the GPS reliability means is GPS reliability calculation unit 204, which is disclosed as a black box in the specification. The specification does not disclose the algorithm that is performed in that black box. Beyond missing an algorithm, the '292 patent does not have any disclosure that denotes sufficient structure to one of ordinary skill.

105.    As I explain below, at most, the specification of the '292 patent discloses potential inputs to the black box reliability means and a desired output from the black box reliability means, but the structure (e.g., the algorithm) for converting those inputs to the desired output is not disclosed and is necessary for a person of ordinary skill in the art to understand what structure the inventors tried to claim here.

106.    In my opinion, the additional citations to the specification that Maxell identifies as structure—(2:60-65; block 602 in Fig. 2), (3:38-4:3), and (5:3-7)—are not structure (e.g., not an algorithm) and are not associated with the claimed function of calculating GPS positioning reliability based on the GPS-based position result.

107.    **(2:60-65; block 602 in Fig. 2):** These lines do not disclose structure clearly linked to the function of calculating GPS positioning reliability based on the GPS -based position result.

- Block **602** in Figure 2 states "CALCULATE THE RELIABILITY ($W_{gps}$) FOR $L_{gps}$." This mimics the claimed function itself and states the output, it does not denote structure or

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

disclose an algorithm for the claimed function of calculating GPS positioning reliability

based on the GPS-based position result.

- Column 2, lines 60 to 65 disclose that the mobile handset "calculates the reliability ($W_{gps}$) for

  $L_{gps}$ **602** *using* the number of GPS satellites used in calculating $L_{gps}$ and the received signal

  quality (such as a signal-to-noise ratio in decibels) for the signals from each GPS satellite.

  These GPS-related processes are labeled **610**." (Emphasis added.) In my opinion, a person of

  ordinary skill would not understand this to be describing structure—e.g., it is not an

  algorithm—for calculating GPS positioning reliability based on the GPS -based position

  result. Instead, 2:60-65 only describes inputs (e.g., the number of GPS satellites and received

  signal quality) and an output "the reliability ($W_{gps}$) for $L_{gps}$ **602**," none of which is the

  structure (the algorithm) that converts these inputs to the desired output.

108.    It is my understanding that the fact that a person of ordinary skill in the art could

conceive of ways to calculate the reliability of the GPS-based position result using these inputs is

not, on its own, sufficient structure. In my opinion, a person would need to know a specific

structure (e.g., an algorithm) used to covert these inputs into a GPS-based reliability value.

109.    A person of ordinary skill in the art would also understand that the number of GPS

satellites and received signal quality are not themselves the reliability of the GPS-based position

estimate. For example, a person of ordinary skill in the art would understand that neither of these

numbers could be inserted into the weighted average equation shown in Figure 3. This is because a

person of ordinary skill in the art would understand that the equation shown in Figure 3 requires

that the reliability for the GPS-based position result (the weight applied to the GPS-based position

result, $W_{gps}$) be of the same "dimension" as the reliability for the GPS-based position result (the

weight applied to the cellular-based position result, $W_{cell}$). For example, GPS receivers usually only

need four satellites to obtain accurate estimates of position but sometimes can receive and use six or

– 30 –

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

even 12 satellites. But a person of ordinary skill in the art would understand that six satellites is not necessarily 50% more accurate than an estimate using four satellites, and would also understand that 12 satellites is not necessarily (and would almost never be) 3x as accurate as using four satellites. In addition, a cellular-based positioning technique may use signals received from at least three base stations but could also be receiving information from many more base stations. A person of ordinary skill in the art would understand that having twice as many satellites available than cellular base stations does not necessarily mean that GPS position estimate is twice as accurate as the cellular position estimate. But if the number of satellites and number of base stations were simply inserted into the equation shown in Figure 3, the GPS-based position estimate would be weighted twice as highly as the cellular-based position estimate. This is not necessarily true and a person of ordinary skill in the art would expect it rarely, if ever, to be true.

110.    **(3:38-4:3):** These lines do not disclose structure clearly linked to the function of calculating GPS positioning reliability based on the GPS-based position result.

- Column 3, lines 38 to 43, states that the GPS-based position calculation unit **201**, **not** the GPS reliability calculation unit **204**, *outputs* "information about the reliability of the GPS-based position calculation result **203** (for example, the number of GPS satellites used in the above calculation and the received signal quality of the signals from the GPS satellites) **to** a GPS reliability calculation unit **204**." (Emphasis added.) This describes potential **inputs** to GPS reliability calculation unit **204**. None of this is structure clearly linked to the function of calculating GPS positioning reliability based on the GPS-based position result.

- Column 3, lines 44 to 49, states that "the GPS reliability calculation unit **204** calculates the reliability of the GPS-based position calculation result **205** based on the information about the reliability **input** from the position calculation unit for GPS **201** and the unit **204** *outputs* the reliability **205** to the GPS/cellular positioning combining unit **400**." (Emphasis added.)

– 31 –

This too simply describes inputs and outputs, not structure—e.g., an algorithm—for the function of calculating GPS positioning reliability based on the GPS-based position result.

- Column 3, lines 49 to 59, is similar to 3:38-43: these lines describe inputs to the GPS reliability calculation unit **204** ("the number of the number of GPS satellites used" or "the quality of the signals received from the GPS satellites"); none of this is structure clearly linked to the function of calculating GPS positioning reliability based on the GPS -based position result.

- Column 3, line 60 to column 4, line 3 is similar to 3:38-43 and 3:49-59 and describes what the output should be if "the GPS reliability calculation unit **204** ... determine[s] that positioning by GPS is impossible." In that case, "the GPS reliability calculation unit **204** preferably outputs a value of 0 as the reliability **205** so that the GPS-based position calculation results **202** has no effect on further processing." This too describes only inputs (information indicating that the GPS-based position result is unreliable) and an output (a value of zero for GPS-based position calculation result **205**). None of this is structure clearly linked to the function of calculating GPS positioning reliability based on the GPS -based position result. In fact, the '292 patent states that zero is "preferably" output and does not describe what else could be output or how to calculate an output other than zero in these circumstances or how to determine whether to use the "preferable" output of zero.

111.    **(5:3-7):** These lines do not disclose structure clearly linked to the function of calculating GPS positioning reliability based on the cellular-based position result. Column 5, lines 3 to 7 states that "a single mobile handset can cover both areas where position determination using GPS signals is practical and areas where position determination using cellular signals is practical thereby extending location information serviceable areas." This describes one of the alleged

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

advantages of the positioning technique disclosed in the '292 patent; it is not part of the structure

for calculating GPS positioning reliability based on the GPS -based position result.

112. Maxell also states that the '292 patent discloses that the GPS reliability values be

"high" or "low" depending on the number of satellites and GPS signal quality and that "the[]

processing steps" for determining these values "will be executed by a processor":

> For example, if the GPS-based position was calculated based on signals received from four
> GPS satellites, the reliability of the result will be high because signals from multiple sources
> provided the same result. In an alternative example, the reliability of the GPS position can be
> calculated using the quality of the signals that have been received from the GPS satellites
> and/or the signal-to-noise ratio of the various signals. *Id.* For example, if the position was
> calculated based on a signal that was very noisy, the reliability of the result will be low.
> Because the '292 Patent also makes clear that the disclosed invention can be performed by
> "a single mobile handset," which will necessarily include a processor, one of ordinary skill in
> the art will recognize that these processing steps will be executed by a processor. Exh. 1 ¶ 42.

Dkt. 91 at 19.

113. I disagree with Maxell. I do not see any disclosure that denotes to a person of

ordinary skill the structure that converts the number of base stations and GPS-signal quality to

qualitative values like "high" and "low." The 292 patent does not say that the reliabilities values

could have qualitative values "high" or "low" and Maxell does not explain what it means by "high"

and "low." There is no algorithm disclosed that informs a person of ordinary skill how to determine

whether the number of satellites and signal quality should be given a "high" or "low" reliability

value. A person of ordinary skill in the art also knows that the qualitative values "high" or "low"

could not be used in the disclosed combiner—i.e., a combiner executing the weighted averaging in

Figure 3. A person of ordinary skill in the art would need to know how to convert these qualitative

values into quantitative values (i.e., numbers) or into at least relative, quantitative values (i.e., a

ratio—a number—for how much extra weight to give to a "high" value compared to a "low" value).

Thus a person of ordinary skill in the art would not only need to know the structure (e.g., the

algorithm) that determines whether the reliability is "high" or "low," but would also need to know

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

how to convert Maxell's "high" and "low" values into quantities values. In my opinion, neither

structure is disclosed.

114.    I have reviewed Dr. Braasch's declaration in support of Maxell's proposed

constructions. *See generally* Dkt. 95-1. I do not agree with Dr. Braasch that "the '292 Patent is

necessarily disclosing components of a mobile handset including, for example, a processor, such as a

baseband processor or an application processor that will be used to perform the determinations

related to the number of GPS satellites and/or the received signal quality." *Id.* ¶ 42. As Dr. Braasch

notes, the '292 patent simply states that the GPS reliability value "relate[s] to the number of GPS

satellites and/or the received signal quality." But stating that the GPS-based reliability value **relates**

to (i.e., is correlated with and maybe used as inputs) one or both of the number of satellites and

received signal quality, does **not** disclose structure to one of ordinary skill or describe an algorithm

for converting this information to a GPS-based reliability value.

> (4)    **"cellular receiver means for receiving cellular oriented signals and generating
>         received cellular signals" (Claim 1)**

| Maxell's Proposed Construction | Huawei's Proposed Construction |
|---|---|
| **Function:** "receiving cellular-oriented signals and generating received cellular signals" | **Function:** "(1) receiving cellular-oriented signals and (2) generating received cellular signals" |
| **Structure:** "A cellular receiver 300 and/or components within a mobile handset that receive and generate cellular signals, such as, an antenna, a transceiver, a processor that performs cellular receiving processes as described in Fig. 2 (block 603) and corresponding recitations in the specification provided herein, or equivalents thereof. *See e.g.,* (2:66-3:4), (3:10-11; see block 603 in Fig. 2), (4:4-9), (2:53-57), (5:3-7)." | **Structure:** "cellular receiver 300, Block 603 in Fig. 2" |

115.    I have been asked to opine on how a person of ordinary skill in the art at the time of

the invention would understand the function and corresponding structure disclosed in the '292

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

patent for the "cellular receiver means for receiving cellular-oriented signals and generating received

cellular signals" limitation.

116.     As to the function, the parties agree. A person of ordinary skill in the art would

understand that these are two distinct functions and that the GPS receiver means must perform each

function and that the '292 patent must, therefore, disclose structure to perform each of these

functions.

117.     As to the structure, in my opinion, the only structure disclosed in the '292 patent that

is clearly associated with the cellular receiver means and the minimal structure necessary to

implement the claimed functions of the cellular receiver means is cellular receiver 300 and Block 603

in Figure 2, as Huawei has proposed. A person of ordinary skill in the art would find this to be the

minimal structure necessary to implement the claimed functions of the cellular receiver means.

Cellular receiver 300 and Block 604 in Figure 2 denote to one of ordinary skill structure for

implementing the claimed functions of receiving cellular-oriented signals and generating received

cellular signals.

118.     In my opinion, Maxell's proposed structure is incorrect (1) structure that is not part

of the cellular receiver means structure and (2) other disclosure that is not structure, would

otherwise be considered superfluous to a person of ordinary skill in the art, or is not the minimal

required structure to implement the claimed functions of the cellular receiver means.

119.     I disagree with Maxell that the cellular receiver means includes all "components

within a mobile handset that receive cellular signals, such as an antenna and a transceiver or a

processor."

120.     In my opinion, the '292 patent does not disclose that an antenna is clearly linked to

the claimed functions. Instead, it would be clear to one of ordinary skill in the art that the antenna

**100** is an independent structure, separate and independent of the cellular receiver means. This is

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

shown clearly in Figure 1, for example, where antenna **100** is labeled and placed outside of cellular

Receiver **300** (and GPS Receiver **200**). In my opinion, at no point does the '292 patent require or

suggest that an antenna is part of the structure required to perform the claimed functions of

receiving cellular oriented signals and generating cellular signals. In my opinion, an antenna is not

required to implement these claimed functions. It is my understanding that an inventor does not

have to claim all components that are necessary to implement a working device. Though an antenna

may be necessary to better receive wireless signals, the '292 patent distinguishes between the

receiving performed at the antenna and the receiving performed at the GPS and cellular receivers.

121.    In my opinion, the '292 patent also does not disclose a processor or transceiver as

part of the structure for the cellular receiver means. I do not find the words "processor" (or

"computer") or "transceiver" in the '292 patent's disclosure. Nor does the specification clearly link

(by implication) a processor to the cellular receiver means.

122.    In my opinion, the additional citations to the specification that Maxell identifies—

(2:66-3:4), (3:10-11), (4:4-9), (2:53-57), and (5:3-7)—go beyond the minimally required structure to

implement the claimed functions.

123.    **(2:66-3:4):** These lines do not disclose structure clearly linked to the functions of

receiving cellular oriented signals and generating cellular signals. A person of ordinary skill in the art

would understand that the operations described here could be performed in a cellular receiver but

they would not have to be performed in a cellular receiver. Instead, cellular receiver 300 and Block

603 in Figure 2 are all that is necessary for person of ordinary skill in the art to understand the

structure of the cellular receiver means.

124.    **(3:10-11):** These lines do not disclose structure clearly linked to the functions of

receiving cellular oriented signals and generating cellular signals. This tells where to look in Figure 2

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

for the cellular-related processes; it is not structure, let alone structure associated with receiving cellular-oriented signals and generating received cellular signals.

125.     **(4:4-9):** These lines disclose operations (i.e., functions), not structure that it is clearly linked to the functions of receiving cellular oriented signals and generating cellular signals. The '292 patent explains that these are only "prefer[red]" operations. '292 patent, 4:6. A person of ordinary skill in the art would likewise understand that the operations described here could be performed in a cellular receiver and that some of them, for example, baseband modulation, typically would be performed in a cellular receiver. But, in my opinion, the disclosure that Huawei identifies is sufficient to denote the structure to one of ordinary skill and no more than that is necessary.

126.     **(2:53-57):** These lines do not disclose structure clearly linked to the functions of receiving cellular oriented signals and generating cellular signals. These lines concern "a receive operation for GPS-oriented signals," these lines do **not** concern the functions associated with the **cellular** receiver means.

127.     **(5:3-7):** These lines do not disclose structure clearly linked to the functions of receiving cellular oriented signals and generating cellular signals. Column 5, lines 3 to 7 state that "a single mobile handset can cover both areas where position determination using GPS signals is practical and areas where position determination using cellular signals is practical thereby extending location information serviceable areas." This describes one of the alleged advantages of the positioning technique disclosed in the '292 patent; it is not part of the structure for receiving cellular oriented signals and generating cellular signals.

128.     I have reviewed Dr. Braasch's declaration in support of Maxell's proposed constructions. *See generally* Dkt. 95-1. I disagree with Dr. Braasch's opinion for this limitation for the same reasons I disagree with his opinions for the GPS receiver means. In my opinion, Dr. Braasch identifies examples of operations performed in the preferred embodiment of an exemplary cellular

– 37 –

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

receiver. *Id.* ¶¶ 43-45. But, as I explained above, my opinion is that the disclosure that Huawei

identifies is sufficient to denote the structure to one of ordinary skill and no more than that is

necessary.

> **(5)**  **"cellular position calculation means for calculating the mobile handset's position from the received cellular signals and outputting a cellular-based position result" (Claim 1)**

| Maxell's Proposed Construction | Huawei's Proposed Construction |
|---|---|
| **Function:** "calculating the mobile handset's position from the received cellular signals and outputting a cellular-based position result" | **Function:** "(1) calculating the mobile handset's position from the received cellular signals and (2) outputting a cellular based position result." |
| **Structure:** "A position calculation unit 301 and/or components within a mobile handset that perform processing functions, such as, a CPU programmed to execute processing in accordance with the algorithm set forth in the specification, or a processor that performs cellular position calculation processes as described in Fig. 2 (block 604) and corresponding recitations in the specification as provided herein, or equivalents thereof. *See e.g.*, (1:23-27), (3:10-11; block 604 in Fig. 2), (4:4-16), (2:66-3:6), (5:3-7)." | **Structure:** "position calculation unit for cellular 301, which is insufficient structure because the specification does not disclose the necessary algorithm or flowchart, which renders the term indefinite" |

129.    I have been asked to opine on how a person of ordinary skill in the art at the time of

the invention would understand the function and corresponding structure disclosed in the '292

patent for the "cellular position calculation means for calculating the mobile handset's position from

the received cellular signals and outputting a cellular-based position result" limitation.

130.    As to the function, the parties agree. A person of ordinary skill in the art would

understand that these are two distinct functions and that the cellular position calculation means must

perform each function and that the '292 patent must, therefore, disclose structure to perform each

of these functions.

131.   As to structure, the parties agree that one way to accomplish the required cellular

position calculation means is by implementing an algorithm that needs to be disclosed in the

specification.

132.   In my opinion, the only structure disclosed in the '292 patent that is clearly

associated with the cellular position calculation means is position calculation unit for cellular 301 but

this does not denote structure on its own and the '292 patent does not disclose an algorithm or

flowchart for calculating the mobile handset's position from the received cellular signals.

133.   In my opinion, position calculation unit for cellular **301** does not denote structure

and is not an algorithm for performing the claimed functions. It is, instead, a black box that takes in

inputs—received cellular signals—and produces a desired output—a cellular based position result—

but the algorithm being performed within that black box is not disclosed in the '292 patent.

134.   A person of ordinary skill in the art would understand that, at the time of the

invention of the '292 patent, there were several ways to calculate a wireless terminal's position using

cellular-based signals and that at the time of the alleged invention these techniques were (and to this

day typically still are) calculated as algorithms executed in a general-purpose processor. Categorically,

the cellular-position techniques included (1) time-of-arrival (TOA) techniques, which measured the

differences in the times of arrival of different RF signals received from or at cellular base stations,

(2) angle-of-arrival (AOA) techniques, which determines the angles of arrival of the cellular-based

signals received from or at base stations, (3) frequency-difference-of-arrival (FDOA) techniques,

which measures the shifts in frequencies for the signals received from or at cellular base stations.

There were also hybrids of these techniques, such as AOA/TDOA. *See, e.g.*, US 6,154,657, 2:40-54

(discussing TOA, AOA, and TDOA techniques). But even identifying the cellular-position

technique by category (which the '292 patent does not do) would not be enough for a person of

ordinary skill in the art to understand the structure because there are many other details and variants

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

within each category. In my opinion, the '292 patent disclosure the structure or an algorithm, a
flowchart, or a similar description of an algorithm.

135.    In my opinion, the additional citations to the specification that Maxell identifies—
(1:23-27), (3:10-11; block 604 in Fig. 2), (4:4-16), (2:66-3:6), and (5:3-7)—do not disclose structure
for the claimed function of calculating the mobile handset's position from the received cellular
signals and outputting a cellular-based position result; they do not denote structure to one of
ordinary skill nor do they disclose an algorithm for calculating a wireless terminal's position using
received cellular position.

136.    **(1:23-27):** These lines do not disclose structure clearly linked to the function of
calculating the mobile handset's position from the received cellular signals and outputting a cellular-
based position result. In my opinion, these lines to do not disclose to one of ordinary skill in the art
an algorithm. Column 1, lines 23-27—which is part of the background of the invention, not
description of the alleged invention of the '292 patent—refers to a Japanese patent application (JP-
A-181242/1995) that the '292 patent states disclosed a "known" method "in which a mobile handset
receives radio-frequency (RF) carriers transmitted from base station for cellular telephony
communications, and the handset calculates its current location using the propagation delay time of
the RF carriers." The description of JP-A-181242/1995 suggests that this Japanese patent
application discloses a TOA technique. But, as I noted above, a person of ordinary skill in the art
would need to know more than the category of cellular-based positioning to know the algorithm for
the claimed functions of (1) calculating the mobile handset's position from the received cellular
signals and (2) outputting a cellular based position result. The fact that the inventors of JP-A-
181242/1995 sought a patent for a specific TOA technique further supports my opinion that just
knowing the category of the cellular-positioning technique is insufficient. Thus, in my opinion, 1:23-
27 is not describing an algorithm.

137.     **(3:10-11; block 604 in Fig. 2):** These lines do not disclose structure clearly linked to the functions of calculating the mobile handset's position from the received cellular signals and outputting a cellular-based position result. Column 3, lines 10 to 11 simply states that "These cellular-related processes are labeled **620**." This just informs where to look in Figure 2 for the cellular-rated processes; it is not structure or an algorithm. Likewise, block **604** in Fig. 2— "CALCULATE POSITIONING RESULTS L$_{cell}$ USING CELLULAR SIGNAL"—is a desired result that mimics the claimed function itself; it is not structure (e.g., an algorithm) for calculating the desired result.

138.     **(2:66-3:6):** These lines do **not** disclose structure clearly linked to the functions of calculating the mobile handset's position from the received cellular signals and outputting a cellular-based position result.

- Column 2, line 66 to column 3, line 6 begins by discussing "a receive operation," not calculating a position using cellular signals. This is not structure (e.g., an algorithm) for calculating the mobile handset's position from the received cellular signals and outputting a cellular-based position result.

- The description in 2:66-3:6 then states that "the mobile handset calculates positioning result L$_{cell}$ using the cellular signals **604**." As with the statement in 3:10-11, this just mimics the function and states the desired result; it is not structure (e.g., an algorithm for calculating the mobile handset's position from the received cellular signals and outputting a cellular-based position result.

- The description in 2:66-3:6 then mentions that calculating cellular reliability, not calculating a position using cellular signals. This is not structure (e.g., an algorithm) for calculating the mobile handset's position from the received cellular signals and outputting a cellular-based position result.

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

139.     **(5:3-7):** These lines do not disclose structure clearly linked to the functions of calculating the mobile handset's position from the received cellular signals and outputting a cellular-based position result. Column 5, lines 3 to 7 states that "a single mobile handset can cover both areas where position determination using GPS signals is practical and areas where position determination using cellular signals is practical thereby extending location information serviceable areas." This describes one of the alleged advantages of the positioning technique disclosed in the '292 patent; it is not structure (e.g., an algorithm) for calculating the mobile handset's position from the received cellular signals and outputting a cellular-based position result.

140.     I have reviewed Dr. Braasch's declaration in support of Maxell's proposed constructions. *See generally* Dkt. 95-1. I do not agree with Dr. Braasch that "the '292 Patent describe the techniques that are implemented by the claimed cellular position calculation means." Dkt. 95-1 at 17-18. I disagree with Dr. Braasch's opinions for at least two reasons.

141.     First, Dr. Braasch does not rely on the alleged structure identified by Maxell. Instead, he only cites to and discusses 3:44-4:3 and 5:3-12, neither of which are within the disclosures that Maxell asserts to be disclosed structure on by Maxell. *Compare* Dkt. 95 at 21 (citing (1:23-27), (3:10-11; block 604 in Fig. 2), (4:4-16), (2:66-3:6), (5:3-7)) *with* Dkt. 95-1 at 17-18 (citing (3:44-4:3), (5:3-12)).

142.     Second, I disagree that the new disclosure that Dr. Braasch identifies is structure for the functions of (1) calculating the mobile handset's position from the received cellular signals and (2) outputting a cellular-based position result. Dr. Braasch states that "in order to perform a 'position determination'" the mobile handset will "execute[] the receive operations," which "includ[es :] (1) **receiving** the cellular signals of high/medium frequencies out of the signals received by the antenna 100; (2) **baseband signal modulation**; (3) **synchronization** acquisition; and (4) **reception** timing calculation." *Id.* ¶ 46 (emphasis added). But "execut[ion] of receiver

– 42 –

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

operations" is, at most, predicate operations performed **before** calculating and outputting the

mobile handset's position. None of these operations—receiving, synchronizing, modulation, or

reception—is structure (e.g., an algorithm) for calculating the mobile handset's position from the

received cellular signals and outputting a cellular-based position result. The operations that Dr.

Braasch identifies do not actually perform the recited function; they are not structure (e.g., the

algorithm) for calculating the mobile handset's position from the received cellular signals and

outputting a cellular-based position result.

(6)     **"cellular reliability calculation means for calculating cellular positioning
reliability based on the cellular-based position result" (Claim 1)**

| Maxell's Proposed Construction | Huawei's Proposed Construction |
|---|---|
| **Function:** "calculating cellular positioning reliability based on the cellular-based position result" | **Function:** "calculating cellular positioning reliability based on the cellular-based position result" |
| **Structure:** "A cellular reliability calculation unit 304 and/or components within a mobile handset that perform processing functions, such as, a CPU programmed to execute processing in accordance with the algorithm set forth in the specification,[sic], a processor that performs cellular reliability calculation processes as described in Fig. 2 (block 605) and corresponding recitations in the specification as provided herein, or equivalents thereof. *See e.g.*, (3:10-11; block 605 in Fig. 2), (4:15-42), (3:6-11), (5:3-7)." | **Structure:** "cellular reliability calculation unit 304, which is insufficient structure because the specification does not disclose the necessary algorithm or flowchart, which renders the term indefinite" |

143.     I have been asked to opine on how a person of ordinary skill in the art at the time of

the invention would understand the function and corresponding structure disclosed in the '292

patent for the "cellular reliability calculation means for calculating cellular positioning reliability

based on the cellular-based position result" limitation.

144.     As to the function, the parties agree that the function is "calculating cellular

positioning reliability based on the cellular-based position result."

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

145.    As to structure, the parties agree that one way to accomplish the cellular reliability

calculation means is by implementing an algorithm.

146.    In my opinion, that algorithm is not disclosed in the specification of the '292 patent

for the same reasons it is not disclosed for the GPS reliability calculation means. Beyond missing an

algorithm, the '292 patent does not have any disclosure that denotes sufficient structure to one of

ordinary skill. The only disclosure clearly associated with the cellular reliability function is cellular

reliability calculation unit 304. But "cellular reliability calculation unit" does not denote structure to

one of ordinary skill. It is disclosed as a black box in the specification. The specification does not

have any other disclosure (e.g., an algorithm) that denotes the structure for this black box. As I

explain below, at most, the specification of the '292 patent discloses potential inputs to the black

box reliability means and a desired output from the black box reliability means, but the structure

(e.g., an algorithm) for converting those inputs to the desired output is not disclosed and is necessary

for a person of ordinary skill in the art to understand what structure the inventors tried to claim

here.

147.    In my opinion, the additional citations to the specification that Maxell identifies—

(3:10-11; block 605 in Fig. 2), (4:15-42), (3:6-11), and (5:3-7)—are not structure (e.g., not an

algorithm) and are not associated with the claimed function of calculating cellular positioning

reliability based on the cellular-based position result.

148.    **(3:10-11; block 605 in Fig. 2):** These lines do not disclose structure clearly linked to

the function of calculating cellular positioning reliability based on the cellular-based position result.

- Block **602** in Figure 2 states "CALCULATE THE RELIABILITY ($W_{cell}$) FOR $L_{cell}$." This

  mimics the claimed function itself and states the output; it does not disclose structure (e.g.,

  an algorithm) for the claimed function of calculating cellular positioning reliability based on

  the cellular-based position result.

– 44 –

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

- Column 3, lines 10 to 11 states "cellular related processes are labeled **620**," which tells where to look in Figure 2 for the cellular related processes. This is not structure (e.g., an algorithm) for the claimed function of calculating cellular positioning reliability based on the cellular-based position result.

149.     **(4:15-42):** These lines do not disclose structure clearly linked to the function of calculating cellular positioning reliability based on the cellular-based position result.

- Column 4, lines 15 to 21, states that the cellular-based position calculation unit **301**, not the cellular reliability calculation unit **304**, *outputs* "information about the reliability of the cellular-based position calculation result **303** (for example, the number of cellular base stations used in the above calculation and the received signal quality of the signals from the cellular base stations) **to** a cellular reliability calculation unit **304**." (Emphasis added.) This only describes potential **inputs** to cellular reliability calculation unit **404** and a desired **output**. None of this is structure (e.g., an algorithm) clearly linked to the function of calculating cellular positioning reliability based on the cellular-based position result.

- Column 4, lines 22 to 28, states that "the cellular reliability calculation unit **304** calculates the reliability of the cellular-based position calculation result **305** based on the information about the reliability **input** from the position calculation unit for cellular **301** and the unit **304** *outputs* the reliability **305** to the GPS/cellular positioning combining unit **400**." (Emphasis added.) This too simply describes inputs and outputs, not structure (e.g., an algorithm) for the function of calculating cellular positioning reliability based on the cellular-based position result.

- Column 4, lines 29 to 35 describe potential inputs to the cellular reliability calculation unit **304** ("the number of the number of cellular base stations used" or "the lowest SNR among

the SNRs of the signals received from the cellular base stations"). But inputs to a structure

(e.g., inputs to an algorithm) is not the structure / algorithm itself.

- Column 4, lines 36 to 42 is similar to the above: it describes what the output should be if
  "the cellular reliability calculation unit **304** ... determine[s] the position of the handset using
  cellular signals is not possible." In that case, "the cellular reliability calculation unit **304**
  preferably outputs a value of 0, so that the cellular-based position calculation results **302**
  using the cellular signals has no effect on further processing." This too describes only inputs
  (information indicating that the cellular-based position result is unreliable) and a potential
  output (a value of zero for cellular-based position calculation result **305**). None of this is
  structure (e.g., an algorithm) clearly linked to the function of calculating cellular positioning
  reliability based on the cellular-based position result. In fact, the '292 patent states that zero
  is "preferably" output but it does not describe what else could be output and how to
  calculate an output other than zero or how to determine whether to use the "preferable"
  output of zero.

150.     **(3:6-11):** These lines do not disclose structure clearly linked to the function of

calculating cellular positioning reliability based on the cellular-based position result. These lines state

that "mobile handset also calculates the reliability ($W_{cell}$) for $L_{cell}$ **605** using the number of cellular

base stations used in calculating $L_{cell}$ and the received signal quality for the signals from each cellular

base station. This only describes potential inputs (e.g., the number of cellular base stations and

received signal quality) and a desired output "the reliability ($W_{cell}$) for $L_{cell}$ **605**," none of which is the

structure that converts these inputs to this output. For the same reasons I described above for the

GPS reliability means, a person of ordinary skill would not understand this to be describing structure

(e.g., an algorithm) for calculating cellular positioning reliability based on the cellular-based position

result. For reasons similar to those I explained above in the context of the GPS reliability means, the

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

number of cellular base stations and received signal quality for the cellular signals are not themselves reliability values and the '292 patent does not disclose an algorithm for converting them into a value for the cellular positioning reliability.

151.    **(5:3-7):** These lines do not disclose structure clearly linked to the function of calculating cellular positioning reliability based on the cellular-based position result. Column 5, lines 3 to 7 state that "a single mobile handset can cover both areas where position determination using GPS signals is practical and areas where position determination using cellular signals is practical thereby extending location information serviceable areas." This describes one of the alleged advantages of the positioning technique disclosed in the '292 patent; it is not part of the structure for calculating cellular positioning reliability based on the cellular-based position result.

152.    I have reviewed Dr. Braasch's declaration in support of Maxell's proposed constructions. *See generally* Dkt. 95-1. I do not agree with Dr. Braasch that "the '292 Patent is necessarily disclosing components of a mobile handset including, for example, a processor, such as a baseband processor or an application processor that will be used to perform the determinations related to the number of cellular base stations and/or the received signal quality." *Id.* ¶ 49. As Dr. Braasch notes, the '292 patent simply states that the cellular reliability value "relate[s] to the number of cellular base stations and/or the received signal quality." But stating that the cellular-based reliability value **relates** to (i.e., is correlated to and could use as inputs) one or both of the number of cellular base stations and received signal quality, is **not** structure (e.g., an algorithm) for converting those inputs to a cellular-based reliability value.

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

> **(7)**   **"GPS/cellular positioning results combining means for combining the GPS-based position result and the cellular-based position result with the GPS positioning reliability and the cellular positioning reliability" (Claim 1)**

| Maxell's Proposed Construction | Huawei's Proposed Construction |
|---|---|
| **Function:** "combining the GPS-based position result and the cellular-based position result with the GPS positioning reliability and the cellular positioning reliability"<br><br>**Structure:** "GPS/cellular positioning results combining unit 400 and/or components within a mobile handset that perform processing functions, such as, a CPU programmed to execute processing in accordance with the algorithm set forth in the specification, a processor that combines GPS/cellular position as described in Fig. 2 (block 605) and corresponding recitations in the specification as provided herein, or equivalents thereof. *See e.g.*, (4:42-56), (Fig. 3 at 400), (3:12-17), (5:3-7)." | **Function:** "**combining**[2] the GPS based position result and the cellular-based position result with the GPS positioning reliability and the cellular positioning reliability"<br><br>**Structure:** "GPS / Cellular Positioning Results Combining Unit **400** performing the weighted mean disclosed in Figure 3 and at col. 4:49-56, block 606 in Fig. 2" |

153.     I have been asked to opine on how a person of ordinary skill in the art at the time of the invention would understand the function and corresponding structure disclosed in the '292 patent for the "GPS/cellular positioning results combining means for combining the GPS-based position result and the cellular-based position result with the GPS positioning reliability and the cellular positioning reliability" limitation.

154.     As to the function, the parties agree that the function is "combining the GPS-based position result and the cellular-based position result with the GPS positioning reliability and the cellular positioning reliability."

---

[2] I have bolded and underlined combining to note that this term is being separately construed, as discussed above.

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

155.     As to the structure, the parties agree that the GPS/cellular positioning results combining means is implementing an algorithm and that that algorithm must be disclosed in the specification.

156.     In my opinion, the only structure (the only algorithm) disclosed in the '292 patent that is clearly associated with the GPS/cellular positioning results combining means and the minimal structure necessary to implement the claimed functions of the GPS/cellular positioning results combining means is GPS / Cellular Positioning Results Combining Unit **400** performing the weighted mean disclosed in Figure 3, 4:49-56, and block 606 in Fig. 2, as Huawei has proposed.

157.     In my opinion, Maxell's proposed structure is incorrect because it includes disclosure that is not part of the GPS/cellular positioning results combining means structure and identifies other disclosure that is not structure clearly linked to the function of combining the GPS-based position result and the cellular-based position result with the GPS positioning reliability and the cellular positioning reliability. Maxell also identifies disclosure that would be considered superfluous to a person of ordinary skill in the art and not the minimal required structure to implement the claimed functions.

158.     In my opinion, the additional citations to the specification that Maxell identifies—GPS/cellular position as described in Fig. 2 (block 605), (4:42-56), (3:12-17), and (5:3-7)—are not part of the minimally required structure to implement the claimed functions.

159.     **Fig. 2 (block 605):** These lines do not disclose structure clearly linked to the function of combining the GPS-based position result and the cellular-based position result with the GPS positioning reliability and the cellular positioning reliability. Block 605 in Figure 2 is a step for calculating the reliability ($W_{cell}$) of the cellular position estimate ($L_{cell}$). A person of ordinary skill would understand that this is not part of the structure necessary to implement the function of combining the GPS- and cellular-based position results with their respective reliabilities. Though

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

Maxell asserts that Block 605 is part of the disclosed structure for the combiner means, Maxell does not similarly assert that the identical block for the GPS operations (Block 602), which is inconsistent. If Maxell has a typo in its structure, and intended to identify Block 606—"COMBINE $L_{gps}$ AND $L_{cell}$ WITH $W_{gps}$ and AND $W_{cell}$"—I would still disagree with Maxell: Block 606 simply restates the claimed function itself; Block 606 does not identify structure to implement that function.

160.    **(4:42-56):** Except for lines 49 to 56, which just describes in words the equation in Figure 3 and is included in Huawei's proposed structure, these lines do not disclose structure clearly linked to the function of combining the GPS-based position result and the cellular-based position result with the GPS positioning reliability and the cellular positioning reliability.

- Column 4, lines 42 to 48, simply mimic the claims function—stating that the combining unit **400** "combines the positioning result **202** using the GPS signals and the positioning result **302** using the cellular signals, depending on the reliability **205** and the reliability **305** for each positioning, and it **400** outputs a position calculation result **401**." But the function for the combiner means is not the structure of the combiner means.

- As to 4:49-56, as Huawei proposes, I agree that this disclosure is clearly linked to the claimed function of this term: it describes in words the algorithm shown in Figure 3 as the structure.

161.    **(3:12-17):** These lines do not disclose structure clearly linked to the function of combining the GPS-based position result and the cellular-based position result with the GPS positioning reliability and the cellular positioning reliability. With Figure 3 and 4:42-48 included as part of the structure, the disclosure at 3:12-17 is superfluous since it simply describes the same thing in different words, though with less detail.

162.    **(5:3-7):** These lines do not disclose structure clearly linked to the function of combining the GPS-based position result and the cellular-based position result with the GPS positioning reliability and the cellular positioning reliability. Column 5, lines 3 to 7 states that "a

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

single mobile handset can cover both areas where position determination using GPS signals is

practical and areas where position determination using cellular signals is practical thereby extending

location information serviceable areas." This describes one of the alleged advantages of the

positioning technique disclosed in the '292 patent; it is not part of the structure (e.g., the algorithm)

for combining the GPS-based position result and the cellular-based position result with the GPS

positioning reliability and the cellular positioning reliability.

163.    I have reviewed Dr. Braasch's declaration in support of Maxell's proposed

constructions. *See generally* Dkt. 95-1. I do not agree with Dr. Braasch that "will use a processor to

perform the calculations depicted in Figure 3 of the '292 Patent and/or to determine the situations

in which it decides to not rely on one of the GPS-based position result or the cellular-based position

result when their reliabilities are set to 0." *Id.* ¶ 51.

164.    As I explained above, the GPS/cellular combining means does not change

depending on whether "one of the GPS-based position result or the cellular-based position result

when their reliabilities are set to 0."

165.    As I also explained above, the GPS/cellular combining means does not "decide[] to

not to rely on one of the GPS-based position result[s] or the cellular-based position result[s]."

*Id.* Instead, a person of ordinary skill in the art would understand that the GPS/cellular combining

means is executing the weighted average equation in Figure 3—that is the only algorithm disclosed

that is clearly linked to the function of combining the GPS-based position result and the cellular-

based position result with the GPS positioning reliability and the cellular positioning reliability.

166.    As I also explained above, a person of ordinary skill in the art would understand that

it is the GPS and cellular **reliability means**, not the **combining means**, that determines what

values to output when the input data it receives is too unreliable.

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

167.    As I also explained above, the '292 patent does not disclose algorithms for the two reliability means. However, that does not change the fact that those means, not the combining means, will determine whether one or both of the reliability values should be zero. Whether zero or non-zero, a person of ordinary skill in the art would understand that the combining means will process those inputs according to the equation shown in Figure 3, which does not require the combining means to make any "decisions" about whether or not "to rely one of the GPS-based position result or the cellular-based position result," as Dr. Braasch opines. Instead, a person of ordinary skill in the art would understand that the algorithm implemented in the combiner means **always** includes the GPS-based and cellular-based position results, regardless of whether one or both have an associated reliability value (an associated weight) equal to zero. If one of the weights is zero, the **output** of the combiner means will not be weighted by the associated position estimate, but the algorithm implemented by combiner means itself will still take that position estimates as an **input** and process it according to the equation shown in Figure 3.

168.    Thus, contrary to Dr. Braasch opinion, "determin[ing] the situations in which … not to rely on one of the GPS-based position result or the cellular-based position result when their reliabilities are set to 0," Dkt. 95-1 at 21, is not disclosed in the '292 patent—there is never a decision not to use one or both of the position results—let alone is this non-existent decision clearly linked to the function of combining the GPS-based position result and the cellular-based position result with the GPS positioning reliability and the cellular positioning reliability. And, even if this decision were considered by the '292 patent, the algorithm for making this decision is not disclosed and so cannot provide structure to the GPS/cellular positioning results combining means.

## B.    The '139 patent

169.    In my opinion, the "storage unit" term of the '139 patent contains an obvious grammatical error as written and, as a result of this clear error, the scope of the claim is unclear as

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

written. It is also my opinion that there are multiple reasonable ways that a person of ordinary skill in the art would understand for the correction.

### (1)   "a storage unit in which group information generated by classifying the plurality of base stations into groups" (Claim 11)

| Maxell's Proposed Construction | Huawei's Proposed Construction |
|---|---|
| "Not indefinite; plain and ordinary meaning" | "Indefinite because the claim term does not inform those skilled in the art about the claim's scope with reasonable certainty" |

170.    I believe that (1) the "storage unit" claim term has an obvious error (it is missing words), (2) because of this error the scope of the claim term is unclear to one of ordinary skill in the art and cannot be determined with reasonable certainty, and (3) there would be multiple, reasonable ways to correct this error that are consistent with the specification and prosecution history, and one of skill in the art would not be able to decide with reasonable certainty which one of those ways to correct the claim to adopt.

171.    As written the "storage unit" claim term has an obvious error. It appears that the term is, at least, missing a verb. It is my opinion that, because of this error, the scope of this claim term is unclear to a person of ordinary skill in the art and cannot be ascertained with reasonable certainty.

172.    A person of ordinary skill in the art would understand that, at the time of the invention of the '139 patent (~April 2005) there were many types of storage units used in wireless terminals that were capable of storing "group information generated by classifying the plurality of base stations into groups."

173.    At a high-level, there were (at least) four main types of computer storage mediums used in wireless terminals around 2005: (1) random access memory (RAM); (2) read only memory (ROM); (3) hard disk drives; and (4) Flash Memory. *See, e.g.*, U.S. Patent No. 7,894,823, 3:29-67 ("Examples of computer storage media include RAM, ROM, EEPROM, flash memory or other

semiconductor memory technology, CD-ROM, digital versatile disks (DVD) or other optical

storage, magnetic cassettes, magnetic tape, magnetic disk storage or other magnetic storage devices

….").

174.    Though the particular type of storage unit used in a wireless terminal would be a

design choice based on commercial concerns (e.g., cost, size, and speed), a person of ordinary skill in

the art at the time of the invention of the '139 patent would have known that any one of these types

of storage units could be used in a wireless terminal and each would be consistent with the current

language of claim 11 and intrinsic evidence.

175.    Each of these types of storage units operate in different ways and sometimes used

for different purposes. For convenience, I will focus on just two of these types of storage units:

RAM and ROM.

176.    RAM is a type of storage unit commonly used in computer devices, in particular

wireless terminals. The advantages of RAM are its small size, low cost, scalability, and ability to have

its data easily read, written, and rewritten. RAM is often used (1) to store computer programs that

are executed by a computer processor and (2) to store general information (e.g., quantitative and

qualitative data used by the software programs executed by the processor). Though there were some

non-volatile RAM commercially available by 2005, in general, most RAM is volatile, meaning that

the stored information is lost once power supplied to this type of storage unit is removed.

177.    ROM is another type of storage unit commonly found in wireless terminals at the

time of the alleged invention of the '139 patent. The advantages of ROM are similar to RAM—it is

small sized, low cost, and scalable. But unlike RAM, ROM is not designed to be easily rewritten on-

the-fly: information is usually written to ROM once and maintained indefinitely. This is useful, for

example, when there is stored information that does not or should not change. Another difference

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

with RAM, is that ROM is typically non-volatile, meaning that it will maintain the information being stored even after power supplied to the storage unit is removed.

178.    In my opinion, a person of ordinary skill in the art would understand that at least RAM or ROM could be used as a storage unit in the wireless terminal claimed in claim 11 of the '139 patent. In my opinion, RAM and ROM are consistent with the specification and not excluded by the prosecution history. In my opinion, the specification and prosecution history of the '139 patent do not exclude, or necessarily require, either RAM or ROM (or any other type of storage unit) but that (1) RAM, (2) ROM, (3) both, or (4) either could be claimed as the type of storage consistent with claim 11.

179.    In my opinion, a person of ordinary skill would understand that either RAM or ROM could store "group information generated by classifying the plurality of base stations into groups."

180.    RAM is consistent with claim 11 because RAM is the preferred embodiment in the '139 patent. *See, e.g.,* '139 patent, Fig. 5, Fig. 12, 5:60-6:11, 7:51-8:5.

181.    It is my understanding that, when construing claim terms, preferred embodiments should generally not be read into a claim. But it is also my understanding that a patentee may choose to limit his claims to a preferred (or even a non-preferred) embodiment. Thus, it is my opinion that one of ordinary skill in the art would understand that a storage unit made of RAM would be a potential storage unit for the alleged invention in claim 11 of the '139 patent.

182.    It is also my opinion that one of ordinary skill in the art would understand that, instead of RAM, the claimed storage unit in claim 11 could be a ROM storage unit. As I explained above, ROM was commonly used as storage units in wireless terminals by 2005. A person of ordinary skill would understand that ROM was capable of storing "group information generated by classifying the plurality of base stations into groups." A person of ordinary skill in the art would also

– 55 –

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

understand that one reason to use ROM to store the group information (e.g., the group IDs) would

be if the device was designed to be used in a static network design, where the available base station

and base station groups were not intended to be rewritten. A person of ordinary skill in the art

would understand that this could be done for ease of use (e.g., a person using the wireless terminal

would not have to worry about identifying base stations or base station groups) or for security

concerns (e.g., to ensure that the wireless terminal would only connect to one of the base stations

pre-stored in the ROM storage unit).

183.    I understand that Maxell has taken the position that this claim term should be given

its plain and ordinary meaning. Dkt. 95 at 59.

184.    I also understand that, in its claim construction briefing, Maxell does not articulate

what it believes the plain and ordinary meaning is. Dkt. 95 at 59.

185.    It also appears from my review of its claim construction briefing that Maxell is not

acknowledging that the "storage unit" term contains a typographic error. Dkt. 95 at 59.

186.    Though Maxell has not acknowledged (or challenged) that the "storage unit" term, in

its infringement contentions Maxell added the words "is stored" to the end of the "storage unit"

term. Specifically, Maxell asserted that "Each of the Accused Huawei '139 Products has a storage

unit in which groups of information generated by classifying the plurality of base stations into

groups **is stored**." Maxell's Preliminary Infringement Contentions of U.S. Patent No. 7,509,139,

Appendix 2 at 56 (emphasis added) (Apr. 21, 2017). I understand from Huawei's counsel that Maxell

did not make similar changes to claim language for any other limitation in its infringement

contentions for the '139 patent.

187.    I agree with Maxell that one reasonable correction for this claim term would be to

add the words "is stored" to the end. In my opinion, under Maxell's proposed correction, a person

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

of ordinary skill in the art would understand that the claimed storage unit could be any type of storage unit commonly used in wireless devices (e.g., RAM or ROM).

188.   Maxell's correction to add "… is stored" is consistent with my opinion that the missing language in "storage unit" term could **also** be corrected to cover (1) a storage unit made of RAM (i.e., the correction would be to add "… is stored in RAM") or (2) a storage unit made of ROM (i.e., the correction would be to add "… is stored in ROM") or (3) a storage unit that is made of both RAM and ROM (i.e., the correction would be to add "… is stored in RAM and ROM").

189.   Unlike Maxell's proposed addition—"… is stored"—the addition of "… is stored in RAM" would reflect the preferred, and only, embodiment actually disclosed in the '139 patent. *See* '139 patent, Fig. 5, 5:60-6:11. But both corrections would be reasonable, and it would not be possible for one of skill in the art to decide with reasonable certainty that only one of these possible corrections was what was intended for the claim.

190.   In my opinion, a person of ordinary skill in the art would believe that each of these potential corrections to claim 11 would be reasonable, consistent with the specification, not excluded by the prosecution history, and resulting in claims of different scope. As I explained above, RAM and ROM are different types of storage units, they operate in different ways, and lead to different results (e.g., information that is permanently vs. temporarily stored in memory). Thus, the storage unit term can be corrected in (at least) two different ways, with each correction giving the claim a different scope.

*            *            *

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of October, 2017.

Dr. Robert Akl, D.Sc.

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

# APPENDIX A

## (Curriculum Vitae)

# Robert Akl, D.Sc.



## Professional Summary

Dr. Akl has over 20 years of industry and academic experience. He is currently a Tenured Associate Professor at the University of North Texas and a Senior Member of IEEE. He has designed, implemented, and optimized both hardware and software aspects of several wireless communication systems for CDMA, WiFi, and sensor networks. Dr. Akl has broad expertise in wireless communication, Bluetooth, CDMA/WCDMA network optimization, GSM, LTE, VoIP, telephony, computer architecture, and computer networks. He is a very active researcher and is well published and cited. He has been awarded many research grants by leading companies in the industry and the National Science Foundation. He has developed and taught over 100 courses in his field. Dr. Akl has received several awards and commendation for his work, including the 2008 IEEE Professionalism Award and was the winner of the 2010 Tech Titan of the Future Award.

Dr. Akl has extensive experience with patents in the wireless and networking industry.  In the past ten years, he has worked as a technical expert in dozens of patent related matters, involving thousands of hours of research, investigation, and study.  He has repeatedly been qualified as an expert by Courts, and has provided numerous technology tutorials to Courts, and given testimony by deposition and at trial.  He has worked with companies large and small, both for and against the validity and infringement of patents, and has also helped counsel and Courts to understand technology that often seems complex.  In doing so, he has become familiar with, and actively worked with, the legal principles that underlie patentability and validity and claim interpretation in the wireless and networking industries.

## Areas of Expertise

2G, 3G, 4G, CDMA/WCDMA, GSM, UMTS, LTE, Ad-hoc Networks, Bluetooth, Call Admission Control, Channel Coding, Compression, Computer Architecture, Multi-cell Network Optimization, Packet-networks, Telephony, VoIP, Wi-Fi, Wireless Communication, Wireless Sensors.

## Education

| Year | College/University | Degree | GPA |
|------|--------------------|--------|-----|
| 2000 | Washington University in Saint Louis | D.Sc. in Electrical Engineering | **4.0 / 4.0** |
| 1996 | Washington University in Saint Louis | M.S. in Electrical Engineering | **4.0 / 4.0** |
| 1994 | Washington University in Saint Louis | B.S. in Electrical Engineering | **4.0 / 4.0** |
| 1994 | Washington University in Saint Louis | B.S. in Computer Science | **4.0 / 4.0** |

Graduated *summa cum laude* and ranked first in undergraduate class.
Dissertation: "Cell Design to Maximize Capacity in Cellular Code Division Multiple Access (CDMA) Networks." Advisors: Dr. Manju Hegde and Dr. Paul Min.

## Litigation Support and Expert Witness Experience

L1.   2017   **Mayer Brown LLP**
       Case:   <u>Silver Spring Networks, Inc.</u> v. Sunrise Technologies, Inc.
                IPR2017-XXX, IPR2017-XXX
       Matter:   *Inter Partes* Review, power meter
       Project:   Two declarations to support two IPR petitions

L2.   2017   **Covington & Burling LLP**
       Case:   Hitachi Maxell, Ltd. v. <u>Huawei Device USA Inc. et al.</u>
                Eastern district of Texas, Texarkana division, Case No. 5:16-cv-00178-RWS
       Matter:   Patent infringement, 3G/4G
       Project:   Declaration regarding claim construction

L3.   2017   **Finnegan Henderson Farabow Garrett & Dunner LLP**
       Case:   <u>LG Electronics, Inc. et al</u>. v. BLU Products, Inc. and CT Miami, LLC
                In the Matter of Certain LTE Wireless Communication Devices and Components Thereof, ITC Investigation No. 337-TA-1051
       Matter:   Patent infringement, 4G/LTE
       Project:   Declaration regarding claim construction, second declaration regarding claim construction

L4.   2017   **Sidley Austin LLP**
       Case:   <u>Huawei Technologies Co., Ltd.</u> v. Samsung Electronics Co., Ltd.
                IPR2017-01979, IPR2017-01980, IPR2017-01986
       Matter:   *Inter Partes* Review, 4G LTE
       Project:   Three declarations to support three IPR petitions

L5.   2017   **Finnegan Henderson Farabow Garrett & Dunner LLP**
       Case:   Motorola Solutions, Inc. v. <u>Hytera Communications Corp. Ltd. et al.</u>
                In the Matter of Certain Two-way Radio Equipment Systems, Related Software and Components Thereof, ITC Investigation No. 337-TA-1053
       Matter:   Patent infringement, two-way radio
       Project:   Declaration regarding claim construction, invalidity expert report

L6.   2017   **Haynes and Boone, LLP**
       Case:   <u>Rackspace US, Inc.</u> v. Realtime Data LLC
                IPR2017-01691
       Matter:   *Inter Partes* Review, data compression
       Project:   Declaration to support IPR petition

L7.   2017   **Pillsbury Winthrop Shaw Pittman LLP**
     Case:   <u>HTC Corp and ZTE (USA)</u> v. Cellular Communications Equipment
              IPR2017-01508, IPR2017-01509
     Matter:   *Inter Partes* Review, LTE, power control, emergency notification
     Project:   Two declarations to support two IPR petitions

L8.   2017   **Alston & Bird LLP**
     Case:   <u>Itron, Inc. and Duke Energy Corp.</u> v. Smart Meter Technologies
              IPR2017-01199
     Matter:   *Inter Partes* Review, power meter
     Project:   Declaration to support IPR petition

L9.   2017   **Haynes and Boone, LLP**
     Case:   <u>Ericsson Inc.</u> v. Regents of the University of Minnesota
              IPR2017-01186, IPR2017-01200, IPR2017-01213
     Matter:   *Inter Partes* Review, OFDM and MIMO
     Project:   Three declarations to support three IPR petitions

L10.   2017   **Quinn Emanuel Urquhart & Sullivan, LLP**
     Case:   GENBAND US, LLC v. <u>Metaswitch Networks Ltd, et al.</u>
              Eastern district of Texas, Marshal division, Case No. 2:16-cv-582-
              JRG-RSP
     Matter:   Patent infringement, Internet protocols and VoIP
     Project:   Expert report regarding essentiality

L11.   2017   **Mayer Brown LLP**
     Case:   Uniloc USA, Inc. et al. v. <u>Avaya Inc., and ShoreTel, Inc.,</u> et al.
              Eastern district of Texas, Tyler division, Case Nos. 6:15-cv-1168-JRG
     Matter:   Patent infringement, instant messaging and conference calling
     Project:   Source code review, non-infringement consulting

L12.   2017   **Fish & Richardson P.C.**
     Case:   Nokia Solutions and Networks US LLC, et al. v. <u>Huawei</u>
              <u>Technologies Co. Ltd., et al.</u>
              Eastern district of Texas, Marshal division, Case Nos. 2:16-cv-753-
              JRG-RSP, 2:16-cv-754
     Matter:   Patent infringement, 4G LTE
     Project:   Claim construction, two declarations

L13.   2017   **Rothwell Figg Ernst & Manbeck, PC**
     Case:   Samsung v. <u>Rembrandt Wireless</u>
     Matter:   *Ex Parte* Reexamination, Bluetooth
     Project:   Two declarations to support two patent owner responses,
              supplemental declaration to support patent owner reply

L14. 2016     **Sidley Austin LLP**
Case:     <u>Huawei Technologies Co., et al.</u> v. Samsung Electronics Co, et al. and Samsung Research America v. <u>Hisilicon Technologies Co, LTD</u>
Northern district of California, San Francisco division, Case No. 3:16-cv-2787-WHO
Matter:    Patent infringement, 3G/4G LTE
Project:    Source code review, declaration to support claim construction

L15. 2016     **Bragalone Conroy PC**
Case:     <u>Securus Technologies, Inc.</u> v. Global Tel*Link Corporation
CBM2017-00034
Matter:    Covered Business Method Review, call monitoring and recording
Project:    Declaration to support CBM petition, deposition

L16. 2016     **Braxton, Hilton & Perrone PLLC**
Case:     <u>Biosonix, LLC.</u> v. Hydrowave, LLC et al.
Eastern district of Texas, Case No. 2:16-cv-139-RC
Matter:    Patent infringement, underwater transceivers
Project:    Claim construction, Markman hearing testimony

L17. 2016     **Gray Reed & McGraw**
Case:     <u>Optis Cellular Technology, LLC and PanOptis Patent Management, LLC.</u> v. Blackberry Corporation, et al.
Eastern district of Texas, Marshal division, Case No. 2:16-cv-59-JRG-RSP, Case No. 2:16-cv-61-JRG-RSP, Case No. 2:16-cv-62-JRG-RSP
Matter:    Patent infringement, LTE
Project:    Claim construction, three declarations regarding claim construction, deposition

L18. 2016     **Davidson Berquist Jackson & Gowdey**
Case:     SIPCO, LLC et al v. <u>Emerson Electric Co. et al</u>
Eastern district of Texas, Tyler division, Case No. 6:15-cv-907
<u>Emerson Electric Co. et al</u> v. SIPCO, LLC et al.
Northern district of Georgia, Atlanta division, Case No. 1:15-cv-00319-AT
Matter:    Patent infringement, links in wireless networks and remote monitoring
Project:    Source code review, invalidity consulting

L19. 2016     **McKool Smith**
Case:     Regents of University of Minnesota v. <u>AT&T Mobility LLC</u>, et al.
District of Minnesota, Case No. 0:14-cv-04666-JRT-TNL
Matter:    Patent infringement, LTE and MIMO
Project:    Non-infringement and invalidity consulting, declaration

L20. 2016     **EIP US LLP**
     Case:     GENBAND US, LLC et al. v. Metaswitch Networks Ltd
                 IPR2015-01456, IPR2015-01457
     Matter:    *Inter Partes* Review, media gateways
     Project:    Two declarations to support Patent Owner, two depositions

L21. 2016     **Haynes and Boone, LLP**
     Case:     Cox Communications, Inc. v. AT&T Intellectual Property I, II, LP
                 IPR2015-01187, IPR2015-01227, IPR2015-01273, IPR2015-01536
     Matter:    *Inter Partes* Review, cable networks
     Project:    Four declarations to support Patent Owner, four depositions

L22. 2016     **Mayer Brown LLP**
     Case:     Odyssey Wireless v. Motorola Mobility LLC
                 Eastern district of North Carolina, Western division, Case No. 5:14-cv-491-D
                 Southern district of California, Case No. 3:15-cv-01741-H-RBB
     Matter:    Patent infringement, LTE
     Project:    Source code review, non-infringement consulting

L23. 2016     **Cooley LLP and Finnegan LLP**
     Case:     Saint Lawrence Comm. LLC v. Motorola Mobility LLC, ZTE (USA) Inc.
                 Eastern district of Texas, Marshal division, Case No. 2:15-cv-000351-JRG, Case No. 2:15-cv-000349-JRG
     Matter:    Patent infringement, speech compression, coding and decoding
     Project:    Invalidity expert report, expert report regarding AMR-WB standard, expert report regarding Opus and Silk, supplemental expert report regarding invalidity, two-day depositions, jury trial testimony for Motorola

L24. 2015     **Sidley Austin LLP**
     Case:     Evolved Wireless, LLC v. Microsoft Corp, et al.
                 District of Delaware, Case No. 15-cv-546
     Matter:    Patent infringement, LTE
     Project:    Prior art and invalidity consulting

L25. 2015     **McKool Smith**
     Case:     Optis Wireless Technology, LLC and PanOptis Patent Management, LLC. v. ZTE Corporation and ZTE (USA) Inc.
                 Eastern district of Texas, Marshal division, Case No. 2:15-cv-300-JRG-RSP
     Matter:    Patent infringement, cellular messages and multimedia attachments
     Project:    Source code review, claim construction, declaration

L26. 2015     **Fish & Richardson, P.C.**
     Case:     Saint Lawrence Comm. LLC v. LG Elec., Inc. et al.
             Eastern district of Texas, Marshal division, Case No. 2:14-cv-1055-JRG
     Matter:    Patent infringement, speech compression, coding and decoding
     Project:    Invalidity expert report

L27. 2015     **Finnegan Henderson Farabow Garrett & Dunner LLP**
     Case:     LG Electronics, Inc. v. Cellular Communications Equipment LLC
             IPR2016-00178
     Matter:    *Inter Partes* Review, LTE
     Project:    Declaration to support IPR petition

L28. 2015     **McKool Smith**
     Case:     AT&T, et al. v. Cox Communication, Inc., et al.
             District of Delaware, Case No. 14-1106-GMS
     Matter:    Patent infringement, cable networks
     Project:    Claim construction, declaration

L29. 2015     **McKool Smith**
     Case:     Ericsson Inc., et al. v. TCL Communication, et al.
             Eastern district of Texas, Marshal division, Case No. 2:15-cv-00011-RSP
     Matter:    Patent infringement, wireless devices and systems
     Project:    Source code review, claim construction, declaration, infringement expert report, validity expert report, two-day depositions

L30. 2015     **Foley & Lardner LLP**
     Case:     Kyocera Communications, Inc. v. Cellular Communications Equipment LLC
             IPR2015-01559, IPR2015-01564
     Matter:    *Inter Partes* Review, LTE
     Project:    Two declarations to support two IPR petitions

L31. 2015     **Fish & Richardson, P.C.**
     Case:     Fairfield Industries Inc. v. Wireless Seismic, Inc.
             Southern district of Texas, Case No. 4:14-cv-02972-KPE
     Matter:    Patent infringement, wireless sensor networks
     Project:    Non-infringement expert report

L32. 2015     **Quinn Emanuel Urquhart & Sullivan, LLP**
     Case:     GENBAND US, LLC v. Metaswitch Networks Ltd, et al.
             Eastern district of Texas, Marshal division, Case No. 2:14-cv-33-JRG-RSP
     Matter:    Patent infringement, Internet protocols and VoIP
     Project:    Expert report regarding essentiality, non-infringement expert report,

rebuttal expert report regarding non-practice, supplemental rebuttal
expert report, three-day depositions, jury trial testimony

L33. 2015    **Foley & Lardner LLP; Duane Morris LLP**
     Case:   Mobile Telecommunications Technologies, LLC v. <u>Leap Wireless
             International</u>, <u>Cricket Communications, Inc.</u>
             Eastern district of Texas, Marshal division, Case No. 2:13-cv-00885-
             RSP
     Matter: Patent infringement, OFDM and MIMO
     Project: Non-infringement expert report, deposition

L34. 2015    **Hogan Lovells US LLP; Kenyon & Kenyon LLP**
     Case:   One-E-Way v. <u>Beats Electronics, LLC</u>, <u>Sony Corporation</u>, et al.
             In the Matter of Certain Wireless Headsets, ITC Investigation No.
             337-TA-943
     Matter: Patent infringement, wireless communication
     Project: Claim construction, declaration

L35. 2015    **McKool Smith**
     Case:   Solocron Media, LLC v. <u>AT&T Inc.</u>, et al.
             Eastern district of Texas, Marshal division, Case No. 2:13-cv-1059-
             JRG
     Matter: Patent infringement, ringtone download
     Project: Claim construction, claim invalidity expert report

L36. 2015    **EIP US LLP**
     Case:   <u>Good Technology Software, Inc.</u> v. Mobile Iron, Inc.
             IPR2015-00833, IPR2015-00836, IPR2015-01090
     Matter: *Inter Partes* Review, software management in wireless devices
     Project: Three declarations to support three IPR petitions

L37. 2015    **McKool Smith**
     Case:   AirWatch LLC v. <u>Good Technology Corp</u>
             Northern district of Georgia, Case No. 1:14-cv-02281-SCJ
     Matter: Patent infringement, software management in wireless devices
     Project: Claim construction, declaration

L38. 2015    **Simpson Thacher & Bartlett LLP**
     Case:   IXI Mobile (R&D) Ltd. et al. v. <u>Apple Inc.</u>
             Southern district of New York, Case No. 14-cv-7594-RJS
     Matter: Patent infringement, PDA and Bluetooth
     Project: Invalidity consulting

L39. 2014 **Bragalone Conroy PC**
  Case: Global Tel*Link Corporation v. Securus Technologies, Inc.
     IPR2014-00785, IPR2014-00810, IPR2014-00824, IPR2014-00825,
     IPR2014-01278, IPR2014-01282, IPR2014-01283
  Matter: *Inter Partes* Review, VoIP call monitoring and recording, allocating
     telecommunication resources and information systems
  Project: Seven declarations to support seven Patent Owner's responses, five
     depositions

L40. 2014 **Orrick, Herrington & Sutcliffe LLP**
  Case: Shopkick, Inc. v. Novitaz, Inc.
     IPR2015-00277, IPR2015-00278
  Matter: *Inter Partes* Review, wireless customer service management
  Project: Two declarations to support two IPR petitions

L41. 2014 **Paul Hastings LLP**
  Case: Cellular Communications Equipment LLC v. AT&T, et al.
     Eastern district of Texas, Tyler division, Case No. 6:13-cv-507-LED
     (Lead Case for Consolidation)
  Matter: Patent infringement, 3G cellular communication
  Project: Claim construction, declaration

L42. 2014 **Baker Botts LLP**
  Case: Orlando Communications LLC v. AT&T, et al.
     M.D. Florida, Case No. 6:14-cv-01021
  Matter: Patent infringement, 3G/4G cellular communication
  Project: Non-infringement and claim construction consulting

L43. 2014 **EIP US LLP**
  Case: Good Technology Software, Inc. v. AirWatch, LLC
     IPR2015-00248, IPR2015-00875
  Matter: *Inter Partes* Review, software management in wireless devices
  Project: Two declarations to support two IPR petitions

L44. 2014 **Bragalone Conroy PC**
  Case: Securus Technologies, Inc. v. Global Tel*Link Corporation
     IPR2015-00153, IPR2015-00155, IPR2015-00156
  Matter: *Inter Partes* Review, VoIP call monitoring and recording
  Project: Three declarations to support three IPR petitions, two depositions

L45. 2014 **Andrews Kurth LLP**
  Case: Sony Mobile Communications (USA) v. Adaptix Inc.
     IPR2014-01524, IPR2014-01525
  Matter: *Inter Partes* Review, subcarrier selection in LTE
  Project: Two declarations to support two IPR petitions, deposition

L46. 2014     **Steptoe & Johnson LLP, Baker & McKenzie LLP**
      Case:     VTech Communications, Inc. and Uniden America Corporations v.
                Spherix Incorporated
                IPR2014-01432
      Matter:     *Inter Partes* Review, IP telephony
      Project:     Declaration to support IPR petition, deposition, reply declaration,
                deposition

L47. 2014     **Steptoe & Johnson LLP, Baker & McKenzie LLP**
      Case:     Spherix Inc. v. VTech Telecommunications Ltd., et al.
                Spherix Inc. v. Uniden Corp, et al.
                Northern district of Texas, Dallas Division, Case No. 3:13-cv-3494
                and 3:13-cv-3496
      Matter:     Patent infringement, IP telephony
      Project:     Claim construction, declaration, deposition

L48. 2014     **McKool Smith**
      Case:     Good Technology Corp. v. MobileIron, Inc.
                Northern district of California, Case No. 5:12-cv-05826-PSG
      Matter:     Patent infringement, software management in wireless devices
      Project:     Claim construction, three declarations, claim invalidity expert report,
                non-infringement expert report, deposition, jury trial testimony

L49. 2014     **Lee & Hayes**
      Case:     Broadcom Corp. v. Ericsson, Inc.
                IPR2013-00601, IPR2013-00602, and IPR2013-00636
      Matter:     *Inter Partes* Review, ARQ protocols
      Project:     Three declarations to support Patent Owner's Response, two
                declarations to support Patent Owner's Motion to Amend, deposition,
                two reply declarations

L50. 2014     **Sidley Austin LLP**
      Case:     Adaptix, Inc. v. Huawei Technologies Co., et al.
                Eastern district of Texas, Case No. 6:13-cv-00438, 439, 440 and 441
      Matter:     Patent infringement, subcarrier selection in LTE
      Project:     Non-infringement consulting, source code review

L51. 2014     **Finnegan Henderson Farabow Garrett & Dunner LLP**
      Case:     Cell and Network Selection LLC v. Huawei Technologies Co., et al.
                Eastern district of Texas, Case No. 6:13-cv-00404-LED-JDL
      Matter:     Patent infringement, base station selection in LTE
      Project:     Non-infringement consulting

L52. 2014     **Feinberg Day Alberti & Thompson LLP**
      Case:     DSS Technology Management, Inc. v. Apple Inc.
                Eastern district of Texas, Tyler division, Case No. 6:13-cv-00919-JDL

| | | |
|---|---|---|
| Matter: | Patent infringement, PDA and Bluetooth |
| Project: | Claim construction and invalidity consulting |

**L53. 2014**  **Sheppard Mullin Richter & Hampton LLP**
Case:    Digcom Inc. v. ZTE (USA), Inc.
          District of Nevada, Case No. 3:13-cv-00178-RCJ-WGC
Matter:   Patent infringement, cellular communication
Project:  Claim construction consulting

**L54. 2014**  **Lott & Fischer**
Case:    Zenith Electronics, LLC, et al. v. Craig Electronics, Inc.
          Southern district of Florida, Case No. 9:13-cv-80567-DMM/DLB
Matter:   Patent infringement, HDTV transmission and reception
Project:  Opening expert report regarding nonessentiality

**L55. 2013**  **McKool Smith**
Case:    Zenith Electronics, LLC, et al. v. Curtis International Ltd.
          Southern district of Florida, Case No. 9:13-cv-80568-DMM/DLB
Matter:   Patent infringement, HDTV transmission and reception
Project:  Claim construction, declaration, deposition

**L56. 2013**  **Gibson Dunn**
Case:    Straight Path IP Group v. Sharp Corp. and Sharp Electronics Corp.
          In the Matter of Certain Point-to-Point Network Communication
          Devices and Products Containing Same, ITC Investigation No. 337-
          TA-892
Matter:   Patent infringement, point-to-point network communication
Project:  Non-infringement consulting

**L57. 2013**  **Kilpatrick Townsend & Stockton LLP**
Case:    Monec Holding AG v. Motorola Mobility LLC, et al.
          District of Delaware, Case No. 1:11-cv-798-LPS-SRF
Matter:   Patent infringement, displaying books on tablets
Project:  Non-infringement expert report for Motorola, non-infringement expert
          report for HTC, deposition

**L58. 2013**  **Gartman Law Group**
Case:    Lone Star WiFi LLC v. Legacy Stonebriar Hotel, Ltd; et al.
          Eastern Dist. Of Texas, Tyler, Case No. 6:12-cv-957
Matter:   Patent infringement, levels of access in Wi-Fi networks
Project:  Claim validity consulting

**L59. 2013**  **White & Case, LLP**
Case:    Nokia Corp and Nokia, Inc. v. HTC Corp and HTC America, Inc.
          In the Matter of Certain Portable Electronic Communication Devices,
          Including Mobile Phones and Components Thereof, ITC Investigation

No. 337-TA-885
Matter:    Patent infringement, App download and installation
Project:   Non-infringement consulting

L60. 2013    **Heim, Payne & Chorush, LLP**
Case:      <u>Rembrandt Wireless</u> v. Samsung Electronics Co., et al.
           Eastern Dist. of Texas, Marshal, Case No. 2:13-cv-213-JRG-RSP
Matter:    Patent infringement, Bluetooth
Project:   Expert report regarding validity, deposition, jury trial

L61. 2013    **Davis Polk & Wardwell LLP; Baker Hostetler**
Case:      <u>Comcast</u> v. Sprint; and Nextel Inc.
           Eastern Dist. of Pennsylvania, Case No. 2:12-cv-00859-JD
Matter:    Patent infringement, SMS/MMS in Cellular Networks
Project:   Infringement expert report, validity expert report, reply expert report,
           declaration, two-day depositions, jury trial testimony

L62. 2013    **McKool Smith**
Case:      Samsung Electronics America v. <u>Ericsson Inc.</u>
           In the Matter of Certain Wireless Communications Equipment and
           Articles Therein, ITC Investigation No. 337-TA-866
Matter:    Patent infringement, LTE uplink and downlink
Project:   Prior art research, source code review, claim construction, claim
           invalidity expert report, non-infringement expert report, ITC hearing
           testimony

L63. 2012    **DLA Piper US LLP**
Case:      <u>CSR Technology Inc.</u> v. Freescale Semiconductor, Inc.
           USDC-San Francisco, Case No. 3:12-cv-02619-RS
Matter:    Patent infringement, radio transceivers
Project:   Claim construction, declaration

L64. 2012    **Fish & Richardson PC**
Case:      GPNE Corp. v. <u>Apple, Inc.;</u> et al.
           USDC-ND California, Case No. 5:12-cv-02885-LHK
Matter:    Patent infringement, resource allocation in wireless networks
Project:   Prior art research consulting

L65. 2012    **Polsinelli Shughart PC**
Case:      <u>Single Touch Interactive, Inc.</u> v. Zoove Corporation
           Northern district of California, Case No. 3:12-cv-00831-JSC
Matter:    Patent infringement, abbreviated dialing, information delivery
Project:   Claim construction, Markman hearing testimony, two declarations

L66. 2012    **K & L Gates**
Case:      EON Corp. IP Holdings, LLC v. <u>Novatel Wireless, Inc.;</u> et al.

|  |  | DC-Tyler, Texas, Case No. 6:11-cv-00015-LED-JDL |
|---|---|---|
|  | Matter: | Patent infringement, wireless modem and 3G services |
|  | Project: | Non-infringement expert report, deposition |

L67. 2012     **Simpson Thacher & Bartlett LLP**
       Case:      CSR Technology, Inc. v. Bandspeed, Inc.
                  Western Dist. of Texas, Case No. 1:12-cv-297-LY
       Matter:    Patent infringement, packet identification in 2.4 GHz and 5 GHz
       Project:    Source code review, Markman hearing testimony, infringement expert report

L68. 2012     **Sheppard Mullin Richter & Hampton LLP**
       Case:      Wi-LAN v. HTC America, Inc., et al.
                  Eastern Dist. of Texas, Case No. 6:10-cv-521-LED
       Matter:    Patent infringement, CDMA, Orthogonal Codes
       Project:    Source code review, non-infringement expert report, deposition, jury trial testimony

L69. 2012     **Dechert LLP**
       Case:      Hitachi v. TPV and Vizio, Inc.; and Vizio v. Hitachi, LTD.
                  Eastern Dist. of Texas, Case No. 2:10-cv-260
       Matter:    Patent infringement, HD television transmission and reception
       Project:    Prior art research, claim invalidity consulting

L70. 2012     **Fish & Richardson PC**
       Case:      InterDigital Commc'n, LLC v. Huawei Tech. Co. LTD; LG Electronics, Inc.; Nokia, Inc.; and ZTE (USA) Inc.
                  Certain Wireless Devices With 3G Capabilities and Components Thereof, ITC Investigation No. 337-TA-800
       Matter:    Patent infringement, channel coding in UMTS, HSDPA
       Project:    Non-infringement consulting

L71. 2012     **Fish & Richardson PC**
       Case:      InterDigital Commc'n, LLC v. Huawei Tech. Co. LTD; LG Electronics, Inc.; Nokia, Inc.; and ZTE (USA) Inc.
                  Dist. of Delaware, Case No. 1:11-cv-00654-UNA
       Matter:    Patent infringement, channel coding in UMTS, HSDPA
       Project:    Non-infringement consulting

L72. 2011     **O'Melveny & Myers LLP**
       Case:      MobileMedia Ideas, LLC v. Apple, Inc.
                  Dist. of Delaware, Case No. 1:10-cv-00258-SLR-MPT
       Matter:    Patent infringement, voice control, call rejection in mobile phones
       Project:    Source code review, prior art research, declaration, claim invalidity expert report, non-infringement expert report, deposition, jury trial testimony

L73. 2011     **Wilmer Cutler Pickering Hale and Dorr**
      Case:     Apple, Inc. v. Samsung Electronics Co.
                Northern Dist. of California, Case No. 5:11-cv-01846-LHK
      Matter:    Patent infringement, channel coding in CDMA, E-AGCH, TFCI
      Project:    Prior art research, claim construction consulting

L74. 2011     **Weil, Gotshal & Manges LLP**
      Case:     Vizio, Inc. v. Renesas Electronics America, Inc.
                ITC Investigation No. 337-TA-789
      Matter:    Patent infringement, HD television transmission and reception
      Project:    Claim invalidity consulting

L75. 2011     **Shapiro Cohen**
      Case:     TenXc Wireless Inc. v. Andrew LLC
                TenXc Wireless Inc. v. Mobi Antenna Technologies Ltd.
      Matter:    Patent infringement, antenna design, sectorized cellular network
      Project:    Claim validity consulting

L76. 2010     **Fish & Richardson PC**
      Case:     Vizio, Inc., v. LG Electronics, Inc.
                ITC Investigation No. 337-TA-733
      Matter:    Patent infringement, HD television transmission and reception
      Project:    Claim charts, claim construction expert report, deposition

L77. 2010     **Fish & Richardson PC**
      Case:     Vizio, Inc., v. LG Electronics, Inc.
                Dist. of Maryland, Case No. 1:09-cv-1481-BEL
      Matter:    Patent infringement, HD television transmission and reception
      Project:    Claim charts, claim construction expert report, deposition

L78. 2008     **Kaye Scholer LLP**
      Case:     eBay Inc. v. IDT.
                Western Dist. of Arkansas, Case No. 4:08-cv-4015-HFB
      Matter:    Patent infringement, long distance communication using Internet
      Project:    Prior art research, claim construction consulting

L79. 2008     **Simpson Thacher & Bartlett LLP**
      Case:     Commil USA, LLC v. Cisco Systems, Inc.
                Eastern Dist. of Texas, Case No. 2:07-cv-00341-DF-CE
      Matter:    Patent infringement, two-level wireless protocol
      Project:    Prior art research

L80. 2006     **Woodfill and Pressler**
      Case:     Charles Russell v. Interinsurance Exchange of the Auto Club
                Harris County, Texas, Case No. 2005-19706

Matter:    House fire and insurance claim
Project:    Determining user location using cellular phone records, expert report, deposition, jury trial testimony

## Consulting History

From:    1/2013    **Heim, Payne & Chorush, LLP**
To:    3/2013    Houston, TX
    Duties:    Analyze patents on wireless technologies.

From:    4/2007    **Collin County Sheriff's Office**
To:    5/2007    McKinney, TX
    Duties:    Analyzed cellular record data and determined user location in a double-homicide investigation.

From:    4/2004    **Allegiant Integrated Solutions**
To:    5/2004    Fort Worth, TX
    Duties:    Designed and developed an integrated set of tools for fast deployment of wireless networks. The tools optimize the placement of Access Points and determine their respective channel allocations to minimize interference and maximize capacity.

From:    3/2002    **Input/Output Incorporated**
To:    4/2002    New Orleans, LA
    Duties:    Designed and implemented an algorithm in MATLAB for optimizing the frequency selection process used by sonar for scanning the bottom of the ocean.

From:    6/1998    **Teleware Corporation**
To:    7/1998    Seoul, South Korea
    Duties:    Designed and developed a software package for analyzing the capacity in a CDMA network to maximize the number of subscribers.

## Employment History

From:    1/2015    **University of North Texas**
To:    Present    Denton, TX
    Position:    *Associate Chair of Graduate Studies Department of Computer Science and Engineering*
    In charge of all administrative duties related to the Masters and PhD programs in the department.

From:    5/2008    **University of North Texas**
To:    Present    Denton, TX
    Position:    *Tenured Associate Professor Department of Computer Science and Engineering*

Conducting research on cellular networks and wireless sensor networks. Teaching wireless communication courses. Advising graduate and undergraduate students.

From: 9/2002      **University of North Texas**
To:   5/2008      Denton, TX
      Position:   *Assistant Professor Department of Computer Science and Engineering*
                  Conducting research on WCDMA/UMTS wireless networks. Teaching wireless communication and computer architecture courses. Advising graduate and undergraduate students.

From: 1/2002      **University of New Orleans**
To:   8/2002      New Orleans, LA
      Position:   *Assistant Professor Department of Electrical Engineering*
                  Designed and taught two new courses "Computer Systems Design I and II". Developed a Computer Engineering Curriculum with strong hardware-design emphasis. Formed a wireless research group. Advised graduate and undergraduate students.

From: 10/2000     **Comspace Corporation**
To:   12/2001     Coppell, TX
      Position:   *Senior Systems Engineer*
                  Designed, coded (in Matlab), and simulated Viterbi decoding, Turbo coding, trellis coded modulation (TCM), and Reed-Muller codes. Optimized soft decision parameters and interleavers for additive white Gaussian and Rayleigh faded channels. Extended the control and trunking of push-to-talk Logic Trunked Radio (LTR) to include one-to-one and one-to-many voice and data messaging.

From: 8/1996      **MinMax Corporation**
To:   8/2000      Saint Louis, MO
      Position:   *Research Associate*
                  Designed software packages that provide the tools to flexibly allocate capacity in a CDMA network and maximize the number of subscribers. Analyzed and simulated different audio compression schemes. Validated, simulated (logical and timing), and developed the hardware architecture for an ATM switch capable of channel group switching.

From: 8/1994      **Washington University**
To:   8/2000      Saint Louis, MO
      Position:   *Research and Teaching Assistant*
                  Taught, consulted, and graded Circuit Analysis at the undergraduate level and Network Design at the graduate level.

## Publications

## Conference Proceedings

C1.  U. Sawant, **R. Akl**, "Evaluation of Adaptive and Non Adaptive LTE Fractional Frequency Reuse Mechanisms," *IEEE WOCC 2017 The 26th Annual Wireless and Optical Communications Conference*, April 2017, paper no. 1570341174, 6 pgs.

C2.  U. Sawant, **R. Akl**, "A Novel Metric to Study the Performance of Sectorized Fractional Frequency Reuse Techniques in LTE," *IEEE WTS 2017 The 16th Annual Wireless Telecommunications Symposium*, April 2017, paper no. 1570338498, 7 pgs

C3.  S. Alotaibi, **R. Akl**, "Dynamic Frequency Partitioning Scheme for LTE HetNet Networks Using Fractional Frequency Reuse," *IEEE WCNC '17 Wireless Communications and Networking Conference*, March 2017, paper no. 1570332420, 5 pgs.

C4.  U. Sawant, **R. Akl**, "Performance Evaluation of Network Productivity for LTE Heterogenous Networks with Reward-Penalty Weights Assessment," *IEEE CCWC 2017 The 7th Annual Computing and Communication Workshop Conference*, January 2017, paper no. 1570328396, 6 pgs.

C5.  S. Alotaibi, **R. Akl**, "Self-Adjustment Downlink Transmission Power for Femtocells in Co-Channel Deployment in Heterogeneous Networks," *IEEE CCWC 2017 The 7th Annual Computing and Communication Workshop Conference*, January 2017, paper no. 1570326815, 6 pgs.

C6.  U. Sawant, **R. Akl**, "Performance Evaluation of Sectorized Fractional Frequency Reuse Techniques Using Novel Metric," *IEEE ISCC 2016 The Twenty-First IEEE Symposium on Computers and Communications*, June 2016, paper no. 1570275270, 7 pgs.

C7.  R. Tidwell, S. Akumalla, S. Karlaputi, **R. Akl**, K. Kavi, and D. Struble, "Evaluating the Feasibility of EMG and Bend Sensors for Classifying Hand Gestures," *1st International Conference on Multimedia and Human Computer Interaction*, July 2013, paper no. 63, 8 pgs.

C8.  **R. Akl**, K. Pasupathy, and M. Haidar, "Anchor Nodes Placement for Effective Passive Localization," *2011 IEEE International Conference on Selected Topics in Mobile and Wireless Networks (iCOST)*, October 2011, paper no. 1569490799, pp. 127 - 132.

C9.  **R. Akl**, P. Kadiyala, and M. Haidar, "Non-Uniform Grid-Based Routing in Sensor Networks", *9th IEEE Malaysia International Conference on Communications*, December 2009, paper no. 1569243649, pp. 536 - 540.

C10. M. Haidar, M. Al-Rizzo, Y. Chan, **R. Akl**, M. Bouharras, "Throughput Validation of an Advanced Channel Assignment Algorithm in IEEE 802.11 WLAN", *ICCSN 2009 – International Conference on Communication Software and Networks*, February 2009, paper no. P385, pp. 801 - 806.

C11. **R. Akl** and D. Keathly, "Robocamp: Encouraging Young Women to Embrace STEM," 4th Annual TETC Best Practices Conference, February 2009, 13 pgs.

C12. M. Haidar, R. Ghimire, M. Al-Rizzo, **R. Akl**, Y. Chan, "Channel Assignment in an IEEE 802.11 WLAN Based on Signal-to-interference Ratio", *IEEE CCECE – Canadian Conference on Electrical and Computer Engineering: Communications and Networking*, May 2008, paper no. 1569092894, pp. 1169 - 1174.

C13. H. Al-Rizzo, M. Haidar, **R. Akl**, and Y. Chan, "Enhanced Channel Assignment and Load Distribution in IEEE 802.11 WLANs," *IEEE International Conference on Signal Processing and Communication*, November 2007, paper no. 1569042132, pp. 768 - 771.

C14. **R. Akl** and Y. Saravanos, "Hybrid Energy-Aware Synchronization Algorithm in Wireless Sensor Networks," *18th Annual IEEE International Symposium on Personal, Indoor and Mobile Radio Communications*, September 2007, paper no 692, 5 pgs.

C15. M. Haidar, **R. Akl**, and H. Al-Rizzo, "Channel Assignment and Load Distribution in a Power-Managed WLAN," *18th Annual IEEE International Symposium on Personal, Indoor and Mobile Radio Communications*, September 2007, paper no. 463, 5 pgs.

C16. D. Keathly and **R. Akl,** "Attracting and Retaining Women in Computer Science and Engineering: Evaluating the Results," *Proceedings of American Society for Engineering Education: ASEE Annual Conference*, June 2007, paper no. AC 2007-1229, 10 pgs.

C17. M. Haidar, **R. Akl**, H. Al-Rizzo, Y. Chan, R. Adada, "Optimal Load Distribution in Large Scale WLAN Networks Utilizing a Power Management Algorithm," *Proceedings of IEEE Sarnoff Symposium*, May 2007, 5 pgs.

C18. R. Dantu, P. Kolan, **R. Akl,** and K. Loper, "Classification of Attributes and Behavior in Risk Management Using Bayesian Networks," *Proceedings of IEEE Intelligence and Security Informatics Conference*, May 2007, pp. 71-74.

C19. **R. Akl** and A. Arepally, "Dynamic Channel Assignment in IEEE 802.11 Networks," *Proceedings of IEEE Portable 2007: International Conference on Portable Information Devices*, March 2007, pp 309-313.

C20. **R. Akl** and U. Sawant, "Grid-based Coordinated Routing in Wireless Sensor Networks," *Proceedings of IEEE CCNC 2007: Consumer Communications and Networking Conference*, January 2007, pp. 860-864.

C21. **R. Akl** and A. Arepally, "Simulation of Throughput in UMTS Networks with Different Spreading Factors," *Proceedings of IEEE VTC Fall 2006: Vehicular Technology Conference,* September 2006, pp. C1-5.

C22. A. Alhabsi, H. Al-Rizzo, and **R. Akl,** "Parity Assisted Decision Making for QAM Modulation," *International Conference on Mobile Computing and Wireless Communications*, September 2006, paper no. 1568988776, 5 pgs.

C23. **R. Akl** and R. Garlick**,** "Retention and Recruitment of Women in Computer Engineering," *ICEE 2006: International Conference on Engineering Education,* July 2006, paper no. 3318, 5 pgs.

C24. R. Garlick and **R. Akl,** "Intra-Class Competitive Assignments in CS2: A One-Year Study," *ICEE 2006: International Conference on Engineering Education,* July 2006, paper no. 3325, 5 pgs.

C25. **R. Akl**, D. Tummala, and X. Li, "Indoor Propagation Modeling at 2.4 GHz for IEEE 802.11 Networks," *WNET 2006: Wireless Networks and Emerging Technologies,* July 2006, paper no. 510-014, 6 pgs.

C26. P. Chen, K. Kavi, and **R. Akl,** "Performance Enhancement by Eliminating Redundant Function Execution," *Proceedings of IEEE: 39th Annual Simulation Symposium*, April 2006, pp. 143-150.

C27. **R. Akl** and S. Nguyen, "Capacity Allocation in Multi-cell UMTS Networks for Different Spreading Factors with Perfect and Imperfect Power Control," *Proceedings of IEEE CCNC 2006: Consumer Communications and Networking Conference*, January 2006, vol. 2, pp. 928-932.

C28. W. Li, K. Kavi, and **R. Akl**, "An Efficient Non-Preemptive Real-Time Scheduling," *18th International Conference on Parallel and Distributed Computing Systems*, Las Vegas, NV, September 2005, pp. 154-160.

C29. S. Nguyen and **R. Akl**, "Approximating User Distributions in WCDMA Networks Using 2-D Gaussian," *CCCC20T 05: International Conference on Computing, Communications, and Control Technologies*, July 2005, 5 pgs.

C30. **R. Akl** and S. Park, "Optimal Access Point Selection and Traffic Allocation in IEEE 802.11 Networks," *Proceedings of 9th World Multiconference on Systemics, Cybernetics and Informatics (WMSCI 2005): Communication and Network Systems, Technologies and Applications*, July 2005, vol. 8, pp. 75-79.

C31. **R. Akl**, M. Naraghi-Pour, M. Hegde, "Throughput Optimization in Multi-Cell CDMA Networks," *IEEE WCNC 2005 - Wireless Communications, and Networking Conference*, March 2005, vol. 3, pp. 1292-1297.

C32. **R. Akl**, "Subscriber Maximization in CDMA Cellular Networks," *Proceedings of CCCT 04: International Conference on Computing, Communications, and Control Technologies*, August 2004, vol. 3, pp. 234-239.

C33. **R. Akl** and A. Parvez, "Global versus Local Call Admission Control in CDMA Cellular Networks," *Proceedings of CITSA 04: Communications, Information and Control Systems, Technologies and Applications*, July 2004, vol. 2, pp. 283-288.

C34. **R. Akl** and A. Parvez, "Impact of Interference Model on Capacity in CDMA Cellular Networks," *Proceedings of SCI 04: Communication and Network Systems, Technologies and Applications*, July 2004, vol. 3, pp. 404-408. Selected as **best paper** of those presented in the session: Tele-Communication Systems, Technologies and Application II.

C35. **R.G. Akl**, M.V. Hegde, M. Naraghi-Pour, P.S. Min, "Call Admission Control Scheme for Arbitrary Traffic Distribution in CDMA Cellular Systems," *IEEE Wireless Communications and Networking Conference*, September 2000, vol. 1, pp. 465-470.

C36. **R.G. Akl**, M.V. Hegde, M. Naraghi-Pour, P.S. Min, "Cell Placement in a CDMA Network," *IEEE Wireless Communications and Networking Conference*, September 1999, vol. 2, pp. 903-907.

C37. **R.G. Akl**, M.V. Hegde, P.S. Min, "Effects of Call Arrival Rate and Mobility on Network Throughput in Multi-Cell CDMA," *IEEE International Conference on Communications*, June 1999, vol. 3, pp. 1763-1767.

C38. **R.G. Akl**, M.V. Hegde, M. Naraghi-Pour, P.S. Min, "Flexible Allocation of Capacity in Multi-Cell CDMA Networks," *IEEE Vehicular Technology Conference*, May 1999, vol. 2, pp. 1643-1647.

**Journal Publications**

J1. M. Haidar, H.M. Al-Rizzo, **R. Akl**, and Z. Elbazzal, "The Effect of an Enhanced Channel Assignment Algorithm in an IEEE 802.11 WLAN," *World Scientific and Engineering Academy and Society Transactions on Communications*, WSEAS, Vol. 8, Issue 12, December 2009.

J2. **R. Akl**, P. Kadiyala, and M. Haidar, "Non-Uniform Grid-Based Coordinated Routing in Wireless Sensor Networks", *Journal of Sensors*, article ID 491349, volume 2009, 11 pages.

J3.   M. Haidar, M. Al-Rizzo, Y. Chan, **R. Akl**, "User-Based Channel Assignment Algorithm in a Load-Balanced IEEE 802.11 WLAN", *International Journal of Interdisciplinary Telecommunications & Networking (IJITN)*, April-June 2009, 1(2), pp. 66-81.

J4.   **R. Akl**, D. Keathly, and R. Garlick, "Strategies for Retention and Recruitment of Women and Minorities in Computer Science and Engineering," *iNEER Special Volume: Innovations 2007- World Innovations in Engineering Education and Research*, 9 pgs., 2007.

J5.   R. Garlick and **R. Akl**, "Motivating and Retaining CS2 Students with a Competitive Game Programming Project," *iNEER Special Volume: Innovations 2007- World Innovations in Engineering Education and Research*, 9 pgs., 2007.

J6.   **R. Akl** and S. Nguyen, "UMTS Capacity and Throughput Maximization for Different Spreading Factors," *Journal of Networks*, July 2006, vol. 1, issue 3, pp. 40-49. ISSN: 1796-2056

J7.   W. Li, K. Kavi, and **R. Akl**, "A Non-preemptive Scheduling Algorithm for Soft Real-time Systems," *Journal of Computer and Electrical Engineering,* 2006, vol. 32, 18 pgs. ISSN: 0045-7906

J8.   **R. Akl**, A. Parvez, and S. Nguyen, "Effects of Interference on Capacity in Multi-Cell CDMA Networks," *Journal of Systemics, Cybernetics and Informatics*, 2006, vol. 3, no. 1, p825612, 7 pgs. ISSN: 1690-4524

J9.   **R.G. Akl**, M. Hegde and M. Naraghi-Pour, "Mobility-based CAC Algorithm for Arbitrary Traffic Distribution in CDMA Cellular Systems," *IEEE Transactions on Vehicular Technology,* March 2005*, vol. 54, no. 2, pp. 639-651.

J10.  **R.G. Akl**, M.V. Hegde, M. Naraghi-Pour, P.S. Min, "Multi-Cell CDMA Network Design," *IEEE Transactions on Vehicular Technology*, May 2001, vol. 50, no. 3, pp. 711-722.

## Technical Papers

T1.   J. Williams, **R. Akl,** et al, "Flight Control Subsystem," *The Eagle Feather*, Special Section: Undergraduate Research Initiative in Engineering, University of North Texas, Vol. 7, 2010.

T2.   **R.G. Akl**, M.V. Hegde, A. Chandra, P.S. Min, "CDMA Capacity Allocation and Planning," Technical Document, Washington University Department of Electrical Engineering WUEE-98, April 1998.

## Book Chapters

B1.   R. Akl, Y. Saravanos, and M. Haidar, "Chapter 18: Hybrid Approach for Energy-Aware Synchronization in Sensor Networks," *Sustainable Wireless Sensor Networks*, December 2010, pgs. 413-429, ISBN: 978-953-307-297-5.

B2.   K. Kavi, **R. Akl** and A. Hurson, "Real-Time Systems: An Introduction and the State-of-the-Art," *Encyclopedia of Computer Science and Engineering*, John Wiley & Sons, Volume 4, January 2009, pgs. 2369-2377.

B3.   **R. Akl** and K. Kavi, "Chapter 12: Modeling and Analysis using Computational Tools," *Introduction to Queuing Theory: Modeling and Analysis*, Birkhauser Boston, December 2008, pgs. 295-320.

## Technical Presentations

P1.   "Bio-Com Project," Raytheon, Richardson TX, May 2012, (invited).

P2.   "Bio-Com Project," Net-Centric Software and Systems I/UCRC Meeting, Denton TX, December 2011, (invited).

P3.   "Student Outreach Report: Robocamp," College of Engineering Advisory Board Meeting, Denton TX, May 2011, (invited).

P4.   "Robocamp: Encouraging Young Women to Embrace STEM," 4th Annual TETC Best Practices Conference, Austin TX, February 2009, (invited).

P5.   "Self-Configuring Wireless MEMS Network (demo)," Southern Methodist University, Dallas TX, January 2008, (invited).

P6.   "Energy-aware Routing and Hybrid Synchronization in Sensor Networks," *Southern Methodist University,* Dallas TX, September 2007, (invited).

P7.   "Retention and Recruitment of Women in Computer Engineering," *ICEE 2006: International Conference on Engineering Education,* Puerto Rico, July 2006, (refereed).

P8.   "Capacity Allocation in Multi-cell UMTS Networks for Different Spreading Factors with Perfect and Imperfect Power Control," *IEEE CCNC 2006: Consumer Communications and Networking Conference*, Las Vegas, NV, January 2006, (refereed).

P9.   "Research, Teaching, and Outreach," CSE Advisory Council Meeting, *UNT Research Park*, Denton, TX, December 2005, (invited).

P10.  "WiFi and WCDMA Network Design," *University of Arkansas*, Little Rock, AR, April 2005, (invited).

P11. "WiFi and WCDMA Network Design," *Southern Methodist University*, Dallas, TX, March 2005, (invited).

P12. "Current Research in Wireless at UNT," *Nortel Networks*, Richardson, TX, October 2004, (invited).

P13. "Subscriber Maximization in CDMA Cellular Networks," *International Conference on Computing, Communications, and Control Technologies*, Austin, TX, August 2004, (refereed).

P14. "Global versus Local Call Admission Control in CDMA Cellular Networks," *International Conference on Cybernetics and Information Technologies, Systems and Applications*, Orlando, FL, July 2004, (refereed).

P15. "Impact of Interference Model on Capacity in CDMA Cellular Networks," *8th World Multi-Conference on Systemics, Cybernetics, and Informatics*, Orlando, FL, July 2004, (refereed).

P16. "CDMA Network Design," IEEE Communications Society – New Orleans Chapter, New Orleans, LA, May 2002, (invited).

P17. "Cell Design to Maximize Capacity in CDMA Networks," Louisiana State University, Baton Rouge, LA, April 2002, (invited).

P18. "Call Admission Control Scheme for Arbitrary Traffic Distribution in CDMA Cellular Systems," *IEEE Wireless Communications and Networking Conference*, Chicago, IL, September 2000, (refereed).

P19. "Cell Placement in a CDMA Network," *IEEE Wireless Communications and Networking Conference*, September 1999, (refereed).

P20. "Effects of Call Arrival Rate and Mobility on Network Throughput in Multi-Cell CDMA," *IEEE International Conference on Communications*, June 1999, (refereed).

P21. "Flexible Allocation of Capacity in Multi-Cell CDMA Networks," *IEEE Vehicular Technology Conference*, May 1999, (refereed).

P22. "CCAP: A Strategic Tool for Managing Capacity of CDMA Networks," Teleware Co. Ltd., Seoul, South Korea, 1998, (invited).

## Courses Developed

- CSCE 5933: LTE Physical Layer Using MATLAB.
  Research issues in the design of LTE physical layer and simulate using MATLAB. Topics include modulation and coding, OFDM, channel modeling, MIMO, and

link                                                                              adaption.

- CSCE 6590: Advanced Topics in Wireless Communications & Networks: 4G/LTE.
  Research issues in the design of next generation wireless networks: cellular systems, medium access techniques, signaling, mobility management, control and management for mobile networks, wireless data networks, Internet mobility, quality-of-service for multimedia applications, caching for wireless web access, and ad hoc networks.

- CSCE 5933: Fundamentals of VoIP.
  Fundamentals of VoIP, with emphasis on network infrastructure implementation and security. Topics include IP protocol suite, SS7, speech-coding techniques, quality of service, session initiation protocol, and security issues.

- CSCE 5540: Introduction to Sensor Networks.
  Topics include: design implications of energy (hardware and software), and otherwise resource-constrained nodes; network self-configuration; services such as routing under network dynamics, localization, time-synchronization and calibration; distributed data management, in-network aggregation and collaborative signal processing, programming tools and language support.

- CSCE 5510. Wireless Communication.
  Point-to-point signal transmission through a wireless channel, channel capacity, channel encoding, and multi-user transmissions. First, second, and third generation cellular systems, and mobility management.

- CSCE 3510. Introduction to Wireless Communication.
  Fundamentals of wireless communications and networking, with emphasis on first, second, and third generation cellular systems. Topics include point-to-point signal transmission through a wireless channel, cellular capacity, multi-user transmissions, and mobility management.

- CSCE 3020. Communications Systems.
  Introduction to the concepts of transmission of information via communication channels. Amplitude and angle modulation for the transmission of continuous-time signals. Analog-to-digital conversion and pulse code modulation. Transmission of digital data. Introduction to random signals and noise and their effects on communication. Optimum detection systems in the presence of noise.

- ENEE 3583. Computer Systems Design I (UNO).
  The design process of digital computer systems is studied from the instruction set level, system architecture level, and digital logic level. Topics include machine organization, register transfer notation, processor design, memory design, and input/output considerations. Includes semester project.

- ENEE 3584. Computer Systems Design II (UNO).
  The design and evaluation of contemporary computer systems are analyzed to compare the performance of different architectures. Topics include performance metrics, computer arithmetic, pipelining, memory hierarchies, and multiprocessor systems.

- ENEE 3514. Computer Architecture Laboratory (UNO).
  Selected experiments examining programmable logic, VHDL and logic synthesis, and including a final design project, to accompany and complement the lecture course ENEE 3584. Three hours of laboratory.

## Courses Taught

Fall 2017
- CSCE 5933.3: LTE Physical Layer Using MATLAB
- CSCE 6940.743: VoLTE and VoWiFi

Spring 2017
- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2016
- CSCE 5933.3: LTE Physical Layer Using MATLAB (4.7 / 5.0)

Spring 2016
- CSCE 5950.743: Thesis (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2015
- CSCE 3010.1: Signals and Systems (5.7 / 7.0)

Spring 2015
- CSCE 5934.743: Directed Study (no evaluation done)

Fall 2014
- CSCE 3010.1: Signals and Systems (3.32 / 4.00)
- CSCE 6590.1: Advanced Topics in Wireless Communications & Networks: 4G/LTE (3.79 / 4.00)

Spring 2014
- CSCE 3510.1: Intro to Wireless Communication (808 – Highly Effective)
- CSCE 5510.1: Wireless Communications (808 – Highly Effective)

Fall 2013
- CSCE 6590.1: Advanced Topics in Wireless Communications & Networks: 4G/LTE (804 – Highly Effective)

Spring 2013
- CSCE 4890.743: Directed Study (no evaluation done)
- CSCE 6940.743: Individual Research (no evaluation done)

Fall 2012
- CSCE 3010.1: Signals and Systems (793 – Highly Effective)
- CSCE 5540.1: Intro to Sensor Networks (814 – Highly Effective)

Spring 2012
- CSCE 3020.1: Communication Systems (809 – Highly Effective)

- CSCE 3510.1: Intro to Wireless Communication (811 – Highly Effective)
- CSCE 5510.1: Wireless Communications (817 – Highly Effective)
- EENG 3810.1: Communication Systems (801 – Highly Effective)

Fall 2011
- CSCE 3010.1: Signals and Systems (793 – Highly Effective)
- CSCE 5540.1: Intro to Sensor Networks (824 – Highly Effective)

Spring 2011
- CSCE 3020.1: Communication Systems (820 – Highly Effective)
- CSCE 3510.1: Intro to Wireless Communication (812 – Highly Effective)
- CSCE 5510.1: Wireless Communications (812 – Highly Effective)
- EENG 3810.1: Communication Systems (826 – Highly Effective)

Fall 2010
- CSCE 3010.1: Signals and Systems (857 – Highly Effective)
- CSCE 5540.1: Intro to Sensor Networks (831 – Highly Effective)

Spring 2010
- CSCE 3020.1: Communication Systems (792 – Highly Effective)
- CSCE 3510.1: Intro to Wireless Communication (793 – Highly Effective)
- CSCE 5510.1: Wireless Communications (834 – Highly Effective)
- EENG 3810.1: Communication Systems (854 – Highly Effective)

Fall 2009
- CSCE 3010.1: Signals and Systems (4.40 / 5.00)
- CSCE 5540.1: Intro to Sensor Networks (4.70 / 5.00)
- EENG 2620.1: Signals and Systems (4.40 / 5.00)

Spring 2009
- CSCE 3020.1: Communication Systems (4.87 / 5.00)
- CSCE 3510.1: Intro to Wireless Communication (4.65 / 5.00)
- CSCE 5510.1: Wireless Communications (4.79 / 5.00)

Fall 2008
- CSCE 3010.1: Signals and Systems (4.91 / 5.00)
- CSCE 5540.2: Intro to Sensor Networks (4.10 / 5.00)
- EENG 2620.3: Signals and Systems (4.91 / 5.00)

Spring 2008
- CSCE 3020.1: Communication Systems (4.68 / 5.00)
- CSCE 3510.1: Intro to Wireless Communication (3.96 / 5.00)
- CSCE 5510.1: Wireless Communications (4.75 / 5.00)

Fall 2007
- CSCE 3010.1: Signals and Systems (4.57 / 5.00)
- CSCE 5540.2: Intro to Sensor Networks (4.01 /5.00)

Summer 2007
- CSCE 3020.1: Fund. of Communication Theory (no evaluation done)
- EENG 3810.1: Communication Systems (no evaluation done)

Spring 2007
- CSCE 5510.2: Wireless Communications (4.75 / 5.00)
- CSCE 5933.6: Fundamentals of VoIP (4.70 / 5.00)

Fall 2006
- CSCE 3010.1: Signals and Systems (4.58 / 5.00)
- CSCE 5540.1: Intro to Sensor Networks (4.70 / 5.00)
- EENG 2620.1: Signals and Systems (4.58 / 5.00)

Summer 2006
- CSCE 3020.1: Fund. of Communication Theory (no evaluation done)
- CSCE 3510.21: Intro to Wireless Communications (no evaluation done)
- CSCE 5510.21: Intro to Wireless Communications (no evaluation done)
- EENG 3810.1: Communication Systems (no evaluation done)

Spring 2006
- CSCE 2610.2: Computer Organization (3.69 / 5.00)
- CSCE 3010.1: Signals and Systems (4.41 / 5.00)
- EENG 2620.1: Signals and Systems (4.41 / 5.00)

Fall 2005
- CSCE 3510.1: Intro to Wireless Communications (4.52 / 5.00)
- CSCE 5510.1: Wireless Communications (4.46 / 5.00)
- CSCE 5933.6: Intro to Sensor Networks (4.60 / 5.00)

Summer 2005
- CSCE 3010.21: Signals and Systems (no evaluation done)
- CSCE 3510.21: Intro to Wireless Communications (no evaluation done)

Spring 2005
- CSCE 3510.02: Intro to Wireless Communications (4.46 / 5.00)
- CSCI 3100.02: Computer Organization (4.14 / 5.00)

Fall 2004
- CSCE 3510.01: Intro to Wireless Communications (4.15 / 5.00)
- CSCI 4510.01: Machine Structures (4.55 / 5.00)
- CSCI 5330.02: Intro to Wireless Communications (4.05 / 5.00)

Summer 2004
- CSCI 4330.22: Intro to Wireless Communications (no evaluation done)
- CSCI 4330.23: Intro to Wireless Communications (no evaluation done)
- CSCI 5330.22: Intro to Wireless Communications (no evaluation done)

Spring 2004
- CSCI 3100: Computer Organization (4.64 / 5.00)
- CSCI 4330: Intro to Wireless Communications (4.22 / 5.00)

Fall 2003
- CSCI 4510: Machine Structures (4.49 / 5.00)
- CSCI 5330: Intro to Wireless Communications (4.83 / 5.00)

Summer 2003
- CSCI 3100: Computer Organization (no evaluation done)

Spring 2003
- CSCI 3100: Computer Organization (3.84 / 5.00)

Fall 2002
- CSCI 4510: Machine Structures (4.38 / 5.00)

## Funded Proposals

R1.  "Robotics and App Design Summer Camp" under Texas Higher Education Coordinating Board: Engineering Summer Program. Requested amount is $11,727. Submitted 5/5/17. Robert Akl (PI), **awarded $11,727.**

R2.  "UNT GenCyber Summer Program: Inspiring the Next Generation of Cyber Stars in North Texas," National Security Agency (NSA). Requested amount is $85,000. Submitted 11/4/2016. Robert Akl (co-PI), **awarded $85,000**.

R3.  "App Design Summer Camp" under Texas Higher Education Coordinating Board: Engineering Summer Program. Requested amount is $12,900. Submitted 5/6/16. Robert Akl (PI), **awarded $12,900.**

R4.  "Robotics, Game and App Programming Summer Camps" under Texas Workforce Commission: Summer Merit Program. Requested amount is $63,000. Submitted 11/16/15. Robert Akl (PI), **awarded $63,000**.

R5.  "App Design Summer Camp" under Texas Higher Education Coordinating Board: Engineering Summer Program. Requested amount is $13,998. Submitted 5/1/15. Robert Akl (PI), **awarded $13,988**.

R6.  "App Design Summer Camp" under Texas Higher Education Coordinating Board: Engineering Summer Program. Requested amount is $12,500. Submitted 5/2/14. Robert Akl (PI), **awarded $12,500**.

R7.  "Robotics, Game and App Programming Summer Camps" under Texas Workforce Commission: Summer Merit Program. Requested amount is $63,000. Submitted 12/14/12. Robert Akl (PI), **awarded $63,000**.

R8.  "Bio-Com Project," funded by Raytheon under Net-Centric Software and Systems I/UCRC 2nd year. Requested amount is $30,000. Submitted 5/12/12. Krishna Kavi (PI), Robert Akl (co-PI), **awarded $30,000.**

R9.  "Bio-Com Project," funded by Raytheon under Net-Centric Software and Systems I/UCRC. Requested amount is $30,000. Submitted 5/12/11. Krishna Kavi (PI), Robert Akl (co-PI), **awarded $30,000.**

R10. "Game Programming for Xbox 360 Summer Camp" under Texas Higher Education Coordinating Board: Engineering Summer Program. Requested amount is $20,000. Submitted 3/21/11. Robert Akl (PI), **awarded $20,000**.

R11. "RoboCamps and Game Programming Summer Camps" under Texas Workforce Commission: Summer Merit Program. Requested amount is $63,000. Submitted 2/17/11. Robert Akl (PI), **awarded $63,000**.

R12. "Game Programming for Xbox 360 Summer Camp" under Texas Higher Education Coordinating Board: Engineering Summer Program. Requested amount is $13,000. Submitted 2/22/10. Robert Akl (PI), **awarded $18,000.**

R13. "Robotics and Game Programming Summer Camps" under Texas Workforce Commission: Summer Merit Program. Requested amount is $63,000. Submitted 10/16/09. Robert Akl (PI), **awarded $63,000**.

R14. "Micro Air Vehicle Design: A Collaborative Undergraduate Project for Electrical Engineering, Computer Engineering, and Computer Science Students," under UNT Undergraduate Research Initiative. Submitted 9/25/2009. Robert Akl (co-PI), **awarded $8,000**.

R15. "Summer Merit Program" under Texas Workforce Commission. Requested amount is $42,000. Submitted 3/20/09. Robert Akl (PI), **awarded $42,000**.

R16. "Robocamp at Stewpot" under Dallas Women's Foundation. Requested amount is $20,000. Submitted 2/23/09. Robert Akl (PI), **awarded $18,600**.

R17. "Robocamp Jump Start" under Motorola Foundation Innovation Generation Grant. Requested amount is $29,852. Submitted 2/12/09. Robert Akl (PI), **awarded $30,700**.

R18. "Engineering Summer Program" under Texas Higher Education Coordinating Board. Requested amount is $7,944. Submitted 2/13/09. Robert Akl (PI), **awarded $11,111**.

R19. "Texas Youth in Technology" under Texas Workforce Commission. Requested amount is $152,393. Submitted 11/10/08. Robert Akl (PI), **awarded $152,393**.

R20. "IUCRC Center Proposal: Net-Centric Software and Systems," under NSF-07-537: Industry/University Cooperative Research Centers. Requested amount is $349,482. Submitted 9/26/08. Krishna Kavi (PI), Robert Akl (co-PI), **awarded $60,000 per year for 5 years**.

R21. "Robocamp and Beyond" under Motorola Foundation Innovation Generation Grant. Requested amount is $30,000. Submitted 6/20/08. Robert Akl (PI), **awarded $30,000**.

R22. Texas Youth in Technology" under Texas Workforce Commission. Requested amount is $30,000. Submitted 2/27/08. Robert Akl (PI), **awarded $31,500**.

R23. "Robocamp Program for Young Women" under RGK foundation. Requested amount is $30,000. Submitted 11/5/07. Robert Akl (PI), **awarded $15,000**.

R24. "Texas Youth in Technology" under Texas Workforce Commission. Requested

amount is $102,514. Submitted 10/22/07. Robert Akl (PI), **awarded $102,514**.

R25. "Women Art Technology" under Hispanic and Global Studies Initiatives Fund. Requested amount is $14,125. Submitted 9/30/07. Jennifer Way (PI), Robert Akl (co-PI), **awarded $12,785**.

R26. "Robocamp Mobile Unit" under Motorola Foundation Innovation Generation Grant. Requested amount is $35,000. Submitted 6/20/07. Robert Akl (PI), **awarded $30,000**.

R27. "ICER: UNT Engineering Challenge Camps" under NSF 0547299. Requested amount is $35,000. Submitted 4/27/07. Oscar Garcia (PI), Robert Akl (senior personnel), **awarded $32,792**.

R28. "IUCRC-Planning Proposal: UNT Research Site Proposal to join Embedded Systems I/UCRC," under NSF-01-116: Industry/University Cooperative Research Centers. Requested amount is $10,000. Submitted 3/31/07. Krishna Kavi (PI), Robert Akl (co-PI), **awarded $10,000**.

R29. "High-assurance NCCS: Ultra Dependability Integration Engineering," Department of Defense. Requested amount is $20,000. Submitted 3/12/07. Krishna Kavi (PI), Robert Akl (co-PI), **awarded $20,000**.

R30. "Recruiting and Retention Strategies for Computer Science at UNT" under Texas Technology Workforce Development Grant Program – 2005. Requested amount is $163,322. Submitted 3/17/05. Robert Akl (PI), **awarded $125,322**.

R31. UNT Faculty Research Grant for Fall 2003, Robert Akl (PI), $5,000, **awarded $4,000**.

R32. UNT Junior Faculty Summer Research Fellowship for Summer 2003, Robert Akl (PI), $5,000, **awarded $5,000**.

## Professional Associations and Achievements

### Membership in Professional Organizations

- Senior Member IEEE
- Member, Federation Council of North Texas Universities
- Member, Eta Kappa Nu Electrical Engineering Honor Society
- Member, Golden Key National Honor Society
- Member, Tau Beta Pi Engineering Honor Society

### Offices and Committee Assignments in Professional Organizations

- Technical Program Committee Member, IEEE Wireless Communications and

Networking Conference, IEEE WCNC
- Technical Program Committee Member, International Wireless Symposium, IWS
- Technical Program Committee Member, IEEE International Conference on Computational Science, IEEE ICCS
- Technical Program Committee Member, IASTED International Conference on Wireless Communications, WC
- Technical Program Committee Member, WTS Wireless Telecommunications Symposium
- Technical Program Committee Member, Mosharaka International Conference on Computer Science and Engineering, Amman
- Invitation to serve as an NSF reviewer/panelist for Engineering Research Centers (ERC) proposals
- Technical Program Committee Member, 18th IEEE International Symposium on Personal, Indoor and Mobile Radio Communication, Greece
- International Program Committee, IASTED International Conference on Wireless and Optical Communication, Canada
- Program Committee Member, Fifth Annual Wireless Telecommunications Symposium, CA
- Technical Publications Chair, IEEE Vehicular Technology Conference, Dallas TX
- Session Chair, International Conference on Computing, Commun. and Control Tech., Austin TX
- Session Chair, International Conference on Cybernetics and Information Technologies, Orlando FL
- Session Chair, 8th World Multi Conference on Systemics, Cybernetic, and Informatics, Orlando FL

## Additional Responsibilities and Activities

- Reviewer, *Wireless Communications and Mobile Computing*, 2012 – present
- Reviewer, *Journal of Sensor and Actuator Networks*, 2012 – present
- Reviewer, *IEEE Transactions on Vehicular Technology*, 2011 – present
- Reviewer, *Elsevier Journal of Computers & Electrical Engineering*, 2008 – present
- Reviewer, *IEEE Globecom*, 2007 – present
- Reviewer, *IEEE International Conference on Advanced Networks and Telecommunication Systems (ANTS)*, 2008 – present
- Reviewer, *The International Wireless Communications and Mobile Computing Conference*, 2007 – present
- Reviewer, *Journal on Wireless Communications and Networking*, 2007 – present
- Reviewer, *IEEE Transactions on Communications*, 2007 - present
- Reviewer, *International Journal of Communication Systems*, 2007 – present
- Reviewer, *IEEE Communications Magazine*, 2005 – present
- Reviewer, *Journal of Wireless Networks*, 2004 – present
- Reviewer, *IEEE Transactions on Mobile Computing*, 2004 – present
- Reviewer, *IEEE Transactions on Wireless Communications*, 2004 – present

- Reviewer, *ACM Crossroads*, 2004 – present

**Honors and Awards**

- Who's Who in America, 2012 Edition
- Winner of Tech Titan of the Future – University Level Award for UNT Robocamps for Girls, Metroplex Technology Business Council, 2010 with **$15,000 cash prize**.
- IEEE Professionalism Award, Ft Worth Chapter, 2008
- UNT College of Engineering Outstanding Teacher Award, 2008
- Certificate of Appreciation: IEEE Vehicular Technology Conference, Dallas, TX, 2005
- Certificate of Appreciation: Denton County Boosting Engineering, Science and Technology (BEST) Robotics Competition, 2004
- Summa Cum Laude Graduate, Ranked First in Undergraduate Class
- The Computer Science Departmental Award for Academic Excellence, Washington University, 1993
- The Dual Degree Engineering Award for Outstanding Senior, Washington University, 1993
- The 1992 Technical Writing Competition Award, The Society for Technical Communication

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

# APPENDIX B

## (Materials Considered)

Declaration of Dr. Robert Akl, D.Sc.,
*Hitachi Maxell v. Huawei Device USA Inc. et al.*, 16-cv-178-RWS

## Materials considered in the Declaration of Dr. Robert Akl, D.Sc.

- U.S. Patent No. 7,509,139 (the "'139 patent");

- Prosecution History of the '139 patent;

- U.S. Patent No. 6,628,292 (the "'292 patent");

- Prosecution History of the '292 patent;

- U.S. Patent No. 7,894,823;

- Hitachi Maxell, Ltd.'s ("Maxell's") complaint for patent infringement (Dkt. 1), first amended complaint for patent infringement (Dkt. 17), and second amended complaint for patent infringement (Dkt. 72);

- Maxell's opening claim construction brief (Dkt. 95) and exhibit Ex. 1 (Expert Declaration of Michael S. Braasch, Ph.D., P.E. Concerning Claim Construction) (Dkt. 95-1);

- Huawei's motion to dismiss the '139 and '292 Patent and associated memoranda of law and exhibits submitted by the parties (Dkt. 26, 26-1 to -4, 29, 29-1 to -3, 31, and 33);

- Transcript of Hearing on Motion to Dismiss (Sept. 27, 2017);

- Maxell's Patent Rule 3-1 and 3-2 Disclosure of Asserted Claims and Infringement Contentions Against the Huawei Defendants and its Appendices 2 ('139 patent) and 4 ('292 patent); and

- P.R. 4-3 Joint Claim Construction and Prehearing Statement (Dkt. 74) as it relates to the '139 and '292 patents.