**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

| | |
|---|---|
| MAXELL, LTD., | |
| *Plaintiff*, | Case No. 5:16-cv-00178-RWS |
| v. | LEAD CASE |
| HUAWEI DEVICE USA INC. and HUAWEI DEVICE CO., LTD., | **JURY TRIAL DEMANDED** |
| *Defendants*. | |
| | |
| MAXELL, LTD., | |
| *Plaintiff*, | Case No. 5:16-cv-00179-RWS |
| v. | **JURY TRIAL DEMANDED** |
| ZTE CORPORATION and ZTE USA INC., | |
| *Defendants*. | |

**PLAINTIFF MAXELL, LTD.'S
REPLY CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

I.   **U.S. Patent No. 5,396,443 ("the '443 Patent")**..................................................**1**

     "detecting means …".............................................................................................1

II.  **U.S. Patent No. 6,754,440 ("the '440 Patent")**..................................................**1**

     "still pictures encoded . . ."................................................................................1

III. **U.S. Patent No. 6,928,292 ("the '292 Patent")**..................................................**2**

    A.    "GPS receiver means …" and similar means-plus-function terms........................3

    B.    Indefiniteness:"GPS reliability calculation means …" and similar terms.............3

    C.    "combining" / "combined" ...........................................................................5

IV. **U.S. Patent No. 7,203,517 ("the '517 Patent")**..................................................**6**

    A.    "waits a longer time until switching"..............................................................6

    B.    "selection switching determination unit …".....................................................7

V.   **U.S. Patent No. 7,671,901 ("the '901 Patent")**..................................................**8**

     "when any change occurs . . ."............................................................................8

VI. **U.S. Patent No. 7,509,139 ("the '139 Patent")**..................................................**9**

    A.    "characterizing quantities …".........................................................................9

    B.    "a storage unit …" ......................................................................................11

VII. **U.S. Patent No. 6,856,760 ("the '760 Patent")**..................................................**12**

     "first encoding method"...................................................................................12

VIII. **U.S. Patent No. 7,116,438 ("the '438 Patent")**..................................................**12**

     "input entered by a user"..................................................................................12

IX. **U.S. Patent No. 6,816,491 ("the '491 Patent")**..................................................**13**

    A.    "controller means . . ."..................................................................................13

    B.    "a demultiplexer …".....................................................................................13

X.   **U.S. Patent No. 6,748,317 ("the '317 Patent")**..................................................**14**

    A.    "walking navigation" ...................................................................................14

    B.    "said device connected to …"..........................................................................14

XI. **U.S. Patent No. 8,736,729 ("the '729 Patent")**..................................................**15**

    A.    "an image sensing device …"..........................................................................15

    B.    "an image instability detector"/ "amount of image-instability…" ......................16

    C.    "to change a position of the second effective set of pixels …"...........................16

    D.    "a signal processing unit configured to form image signals" .............................17

E.      "a display unit …" .............................................................................. 17

**XII. U.S. Patent No. 6,408,193 ("the '193 Patent") ................................................ 17**

A.      "A cellular telephone adapted to be used in a CDMA system, comprising" ........ 17

B.      "variable amplitude amplifier" ......................................................... 18

**XIII.   U.S. Patent No. 6,329,794 ("the '794 Patent") ............................................... 18**

"function/component devices" .................................................................. 19

**XIV.    U.S. Patent No. 8,098,695 ("the '695 Patent") ............................................... 20**

"a controller for receiving . . ." ............................................................... 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acco Brands, Inc. v. Am. Power Conversion Corp.*,
    2003 WL 25782757 (E.D. Tex. July 16, 2003) ......................................................3

*Am Calcar, Inc. v. Am. Honda Motor Co.*,
    651 F.3d 1318 (Fed. Cir. 2011)..................................................................................9

*Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*,
    521 F.3d 1328 (Fed. Cir. 2008)..................................................................................5

*Baker Hughes, Inc. v. Davis-Lynch, Inc.*,
    31 F. App'x 650 (Fed. Cir. 2002) ..............................................................................4

*Beachcombers, Int'l, Inc. v. WildeWood Creative Prods., Inc.*,
    31 F.3d 1154 (Fed. Cir. 1994)............................................................................13, 14

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*,
    262 F.3d 1258 (Fed. Cir. 2001)................................................................................10

*Bradford Co. v. Conteyor N. Am., Inc.*,
    603 F.3d 1262 (Fed. Cir. 2010)................................................................................10

*CBT Flint Partners, LLC v. Return Path, Inc.*,
    654 F.3d 1353 (Fed. Cir. 2011)................................................................................11

*Cellular Commc'ns. Equip. LLC v. HTC Corp.*,
    2015 WL 1048890 (E.D. Tex. Mar. 9, 2015) ..........................................................15

*CollegeNet, Inc. v. ApplyYourself, Inc.*,
    418 F.3d 1225 (Fed. Cir. 2005)..................................................................................9

*ContentGuard Holdings, Inc. v. Amazon.com, Inc.*,
    2015 WL 1289321 (E.D. Tex. Mar. 20, 2015) ........................................................15

*Epistar Corp. v. ITC*,
    566 F.3d 1321 (Fed. Cir. 2009)..................................................................................6

*Epos Techs. Ltd. v. Pegasus Techs. Ltd.*,
    766 F.3d 1338 (Fed. Cir. 2014)................................................................................18

*Free Stream Media Corp. v. Alphonso Inc.*,
    2017 WL 1165578 (E.D. Tex. Mar. 29, 2017) ..........................................16, 17, 19

*Ishida Co., v. Taylor*,
    221 F.3d 1310 (Fed.Cir. 2000)................................................................3

*In re Katz Interactive Call Processing Patent Litig.*,
    639 F.3d 1303 (Fed. Cir. 2011)..........................................................4, 15

*Lampi Corp. v. Am. Power Prods., Inc.*,
    228 F.3d 1365 (Fed. Cir. 2000)............................................................10

*Microlinc, LLC v. Intel Corp. et al.*,
    2013 WL 2471551 (E.D. Tex. Jun. 7, 2013)..........................................14

*O2 Micro Int'l, Ltd. v. Beyond Innovation Tech., Ltd.*,
    521 F.3d 1351 (Fed. Cir. 2008).............................................................9

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003)............................................................14

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
    400 F.3d 901 (Fed. Cir. 2005)................................................................3

*Serrano v. Telular Corp.*,
    111 F.3d 1578 (Fed.Cir.1997)................................................................3

*Sipco, LLC v. Datamatic, Ltd.*,
    2011 WL 1742669 (E.D. Tex. May 6, 2011).........................................11

*Sound View Innovations, LLC v. Facebook, Inc.*,
    2017 WL 2221177 (D. Del. May 19, 2017)...........................................20

*Spine Sols., Inc. v. Medtronic Sofamor Danek USA, Inc.*,
    620 F.3d 1305 (Fed. Cir. 2010)..............................................................2

*Williamson v. Citrix Onine, LLC*,
    792 F.3d 1399(Fed. Cir. 2015)..............................................16, 19, 20

## Other Authorities

*Dkt.* 26 at 3 .............................................................................................5

*Dkt.* 26 at 18 ...........................................................................................5

*Dkt* 100 at 11-12.....................................................................................2

*Dkt* 100 at 45 .........................................................................................17

Defendants' approach to claim construction is predictable. For the most part, they urge the Court to limit claim elements to specific embodiments described in the specifications without identifying any clear disavowal of claim scope or limiting disclosure in the file history or the specification. Defendants repeatedly toss aside the plain and ordinary meaning of words applied consistently within the specification in an effort to improperly limit Maxell from enjoying and enforcing the full scope of its inventions. The Court should reject this approach.

## I.      U.S. PATENT NO. 5,396,443 ("THE '443 PATENT")

### "detecting means …"

Defendants' proposal is incorrect because it eliminates numerous examples of the claimed "detecting means" in dependent claims 13-19. These claims specify that the "detecting means is" one of various structures. *See, e.g.*, '443, cls. 13-18 (disclosing numerous examples including "electromagnetic induction system," "a capacitance system tablet," "a capacitive coupling system," "a pressure-sensitive resistance system tablet," and others). Because these claims limit the scope of claim 1, claim 1 necessarily includes these structures, which Defendants ignore.  Defendants' arguments also fail because they are built on a faulty premise: that the claims were amended to exclude "contact type" detecting systems. *See* Defs' Resp. Br. ("*Dkt.* 100") at 4. To arrive at this conclusion, Defendants mischaracterized the patentee's August 8, 1994 amendment. That amendment overcame the examiner's § 112 rejection based on the "such as" language previously found in the claims. *See* May 6, 1994 Office Action at 2 ("Throughout the claims the 'such as' phrases makes the claims indefinite."). Thus, the patentee amended the claims to address this issue, not to narrow the scope of the claims to "approach type."

## II.     U.S. PATENT NO. 6,754,440 ("THE '440 PATENT")

### "still pictures encoded …"

Huawei wants this Court to amend the claims by adding the underlined language: "still

pictures encoded <u>by the first encoding method and</u> by a second encoding method." *Dkt*. 100, 11-15. Huawei admits that the '440 Patent discloses generating still pictures that are encoded by a "second encoding method" (*e.g.*, JPEG) but also asserts—without identifying any clear disavowal of claim scope in the prosecution history or specification—that every time the claim recites "still pictures," applicant intended for the claim to require still pictures that were encoded by both a first **and** second encoding method. But this is contrary to the clear language of the claim that makes clear that "moving pictures [are] encoded by a first encoding method" ('440, 14:48-49) and "still pictures [are] encoded by a second encoding method" (*id.* at 14:43-57). Huawei then contends that because the Background of the '440 Patent describes a problem with the prior art being unable to display JPEG encoded still pictures, the claims should be limited to the proposed solution of this problem. *Dkt*. 100, 11-12. But statements about the difficulties and failures in the prior art, without more, do not act to disclaim claim scope.[1]

In support of its position, Huawei cites to the file history of related U.S. Patent No. 7,295,767. *Dkt*. 100, 13 (Ex. 6). This patent explicitly recites "still pictures encoded by the first encoding method <u>by which moving pictures are encoded</u>." Ex. 6, 15:12-13 (emphasis added).[2] Indeed, **other** patents with the same specification as the '440 Patent do include claims that explicitly require encoding still pictures with the "first encoding method" and encoding additional still pictures with "the second encoding method." Patent 7,457,529 ("Ex. 7"), claim 20; Patent 7,995,897 ("Ex. 8"), claim 1; Patent 6,424,795 ("Ex. 9"), claim 1; Patent 8,417,088 ("Ex. 10"), claim 1. This shows that when the applicant intended to claim multiple types of encoded still pictures, it included such recitations in the claim. It did not do so in the '440 Patent.

## III.     U.S. PATENT NO. 6,928,292 ("THE '292 PATENT")

---

[1] *See Spine Sols., Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1315 (Fed. Cir. 2010).
[2] Any emphasis provided herein to the case citations or patent disclosures has been added, whether or not so designated.

A. **"GPS receiver means …" and similar means-plus-function terms**

Huawei's approach with respect to these means terms is to identify only a block from a Figure of the '292 Patent and ignore the written description. "When looking to the specification for the structure of a § 112 ¶ 6 claim, [however] one must construe the claim in accordance with all the structures disclosed by the inventor." *See Playtex Prods., Inc. v. Procter & Gamble Co.,* 400 F.3d 901, 909 (Fed. Cir. 2005) (finding that the structure of "limiting means" is broader than the single embodiment depicted in the drawing).[3] Huawei's improper approach is underscored by its insistence that an "antenna" is not part of the GPS or cellular receiver means. *Dkt.* 100, 23-24. Huawei is incorrect because the '292 Patent explicitly recites that "GPS receiver 200 <u>executes the receive operations</u> . . .  which preferably include: receiving the GPS signals of high/medium frequencies out of the signals <u>received by **an antenna** 100</u>." '292, 3:24-32 (emphases added); *see also* '292, 4:65-5:2. Thus, the '292 Patent explicitly states that execution of the receive operation includes reception of signals received by an antenna. Yet Huawei identifies only boxes 200 and 300 of Fig. 1 as the corresponding structure for these means, excluding the antenna 100. Such an approach should be rejected.

B. **Indefiniteness:"GPS reliability calculation means …" and similar terms**

With respect to its indefiniteness arguments, Huawei and its expert take the position that GPS/cellular reliability means and cellular position calculation means are indefinite because the specification of the '292 Patent "does not disclose sufficient structures." *Dkt.* 100, 19-23. In its motion to dismiss, Huawei contradicts this by stating that means-plus-function recitations of the '292 Patent utilize "off-the-shelf generic GPS and cellular hardware" (*Dkt.* 26, 1) that "can be implemented in generic hardware" (*id.* at 12) and that "the '292 Patent employs conventional

---

[3] *See also Acco Brands, Inc. v. Am. Power Conversion Corp.*, 2003 WL 25782757, at *4 (E.D. Tex. July 16, 2003) (Additional rules apply when "the specification discloses multiple embodiments" (citing *Ishida Co., v. Taylor,* 221 F.3d 1310, 1316 (Fed.Cir. 2000) and  *Serrano v. Telular Corp.,* 111 F.3d 1578, 1583 (Fed.Cir.1997))).

GPS and cellular components for their routine functions … [such that] obtaining position estimates and the reliability of these estimates was background technology" (*Dkt.* 31, 3).[4] Thus, Huawei concedes that sufficient structure is disclosed because it is well established that functions like "processing," "receiving," and "storing" "can be achieved by any general purpose computer without specialized programming" and, in such cases, "it [is] not necessary to disclose more structure than the general purpose process that performs those functions." *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011). A "patentee need not explicitly disclose details of structures well known in the art; rather, the specification need only imply a structure that would be understood by those skilled in the art as performing the function recited in the means-plus-function limitation."[5] *See* Expert Decl. of Dr. Braasch ("Ex. 14") ¶¶ 34-36; *Kenall Mfg. Co. v. Genlyte Group LLC*, 439 F. Supp. 2d 854, 870 (N.D. Ill. 2006).

Notwithstanding, and as set forth previously by Maxell and its expert, the '292 Patent explicitly discloses specific algorithms to be followed by a processor to determine the reliability of the GPS-based position based on the number of GPS satellites that provide a signal and/or based on the Signal-to-Noise Ratio ("SNR") of the received signals. '292, 3:44-4:3; Ex. 1 at ¶ 42. The '292 Patent also explicitly discloses specific algorithms for determining the reliability of the cellular-based positions or for converting "number of satellites," "number of base stations," or "received signal quality" into reliability values. '292, 3:6-11; Ex. 1 at ¶ 49. These specific algorithms include using the number of GPS satellites or cellular base stations **as** the GPS/cellular reliability value; using the signal-to-noise ratio in decibels for signals received from the GPS satellites or cellular base stations **as** the GPS/cellular reliability value. *See id.* at 3:49-53; 3:60-63; 4:27-34.

---

[4]Maxell does not concede any of its prior positions set forth in its opposition. Maxell identifies sections from Huawei's prior briefs only to show the contradictory rulings that Huawei is seeking from this Court.
[5]*See Baker Hughes, Inc. v. Davis-Lynch, Inc.*, 31 F. App'x 650, 654 (Fed. Cir. 2002).

The '292 Patent further discloses specific algorithms for "calculating the mobile handset's position from the received cellular signal." '292, 4:4-16, 2:66-3:6, 1:24-29; Ex. 1 at ¶¶46-48. Indeed, even Huawei previously conceded that the '292 Patent discloses "calculating a handset's position based on GPS or cellular signals" (*Dkt.* 26 at 18) and that "obtaining position estimates and the reliability of those estimates was background technology" (*Dkt.* 26 at 3).

The disclosures provide the algorithms for a processor to implement the claimed means. Further, as explained by Dr. Braasch, the '292 Patent makes clear that the disclosed invention can be performed by "a single mobile handset," and a person of ordinary skill in the art would recognize that the disclosure of a mobile handset includes the disclosure of basic components such as a transceiver and/or one or more processors. Ex. 1 at ¶ 42. The '292 Patent also discloses a processor by disclosing steps of a flow chart (*e.g.*, Fig. 2), GPS-related processes, cellular-related processes, and by repeatedly stating "executes" or "execution" of operations, or "processing," which a person of ordinary skill in the art would understand to mean execution on a processor of the disclosed mobile handset. Ex. 1 at ¶ 48; *see also* '292, 2:51-66, 3:24-26 ("FIG. 1 represents an exemplary structure of a <u>mobile handset</u> that <u>executes</u> the position determination method according to the present invention), 3:33-34, 4:4-12. And "[i]t is certainly true that the sufficiency of the disclosure of algorithmic structure must be judged in light of what a person of ordinary skill in the art would understand the disclosure to impart."[6] Here, a person of ordinary skill in the art would understand that the disclosure is sufficient.

C.    <u>"combining" / "combined"</u>

Without identifying a single piece of intrinsic evidence that includes the word "merge," Huawei proposes limiting the claim terms. *Dkt.* 100, 17-18. Huawei makes the argument that its construction reflects the "core feature of the invention" and is in sync with the inventors'

---

[6] *See Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1337 (Fed. Cir. 2008).

intentions. *Id.* The case law on this is clear. When proposing an overly narrow construction that excludes disclosed embodiments, one needs more than selected disclosures in the specification. There must be a clear disavowal of claim scope. Huawei identifies none.[7] *See Epistar Corp. v. ITC*, 566 F.3d 1321, 1335 (Fed. Cir. 2009). Maxell's proposed construction accounts for the embodiments where the "GPS-based position calculation result 202" or the cellular based position calculation result 302 will have "no effect on further processing" because they can be assigned a reliability value of 0. '292, 3:64-4:3, 4:36-42; Ex.1 at ¶ 51. If there is no further effect on processing in the combining means, there is no merging of this value, but if the values are reliable there is a combining. Thus, Maxell's proposed construction is consistent with the disclosed embodiments and does not "eviscerate the patent's fundamental feature."

## IV.     U.S. PATENT NO. 7,203,517 ("THE '517 PATENT")

### A.     "waits a longer time until switching"

The meaning of this term is readily apparent because the term uses commonly understood words. Expert Decl. of Dr. Caloyannides ("Ex. 11") at ¶¶ 20-21. Huawei identifies a word from the specification ("fixed") and says that this word should limit the scope of the claim by importing "sets a longer period of time" into this term. Without identifying a clear disavowal, Huawei contends that the claim should be limited because its proposed construction is more in line with the "inventor's proposed solution." *Dkt.* 100, 24-26. When using the word "set" in the specification, however, the inventors made it clear that a time **may** be set ('517, 6:66-7:8), not that a time is **always** set in advance, which is what Huawei wants this claim to mean.[8]

---

[7] Maxell's statements identified by Huawei also do not provide support for narrowing this claim term because Maxell was explaining that the handset "**could**" merge two reliability measures in these instances. *Dkt.*100, 18.

[8] Further, there is no indication in the '517 Patent that "fixed time" means a time period that is always set in advance of switching, as Huawei contends. *Dkt.* 100, 26. A fixed time can simply mean a fixed period of time. So as part of construing this claim term, Huawei is now trying to narrowly define a term from the specification. But the claim does not recite "fixed time" or "sets." Thus, the Court should reject Huawei's proposal.

### B.      **"selection switching determination unit …"**

There is sufficient structure disclosed in the '517 Patent for this term. For example, the

'517 Patent explicitly discloses that the claimed invention can be implemented in, for example,

"notebook type personal computer, a portable telephone, a PDA, [and/or] a car navigation

device." '517, 3:5-10. Further, the '517 Patent indicates that a "terminal data control processing

unit 103, which may be based on a <u>CPU</u>, a <u>microcomputer IC</u> or the like, is <u>responsible for the</u>

<u>processing associated</u>." '517, 3:23-31. By repeatedly referring to the processing unit 103, the

'517 Patent makes clear that all of the operations, including switching interfaces, in this terminal

are being implemented under the control of unit 103, *i.e.*, CPU or microcomputer. *See e.g.*, *id.* at

3:31-60; 5:25-46; 8:1-9; 8:53-67; *see also* Ex. 11 at ¶¶ 27-28. In view of these disclosures, a

person of ordinary skill in the art would understand that one or more processors will be used to

implement the structure of the claimed "selection switching determination unit." Ex. 11 at ¶¶ 25-

28. When considered as a whole—as opposed to the piecemeal Huawei approach—a person of

ordinary skill in the art would recognize that the '517 Patent provides sufficient descriptions of

one or more algorithms. *See, e.g.*, '517, Figs 4, 6, 9, & 10; Ex. 11 at ¶ 29. Huawei's sole

argument is predicated on the fact that the '517 Patent does not disclose "the key function:

waiting a longer time until switching." *Dkt.* 100, 27. This is not correct. For example, the '517

Patent explains:

> On the other hand, when the mobile <u>communication device 100 is relatively instable in</u>
> <u>communication when it is moving</u>, the physical interface switching **wait time may be set**
> **to be long**. In this way, it is possible to prevent useless switching from one physical
> interface to another and to switch to an appropriate physical interface.

*Id.* at 6:62-7:8 (emphasis added). This section of the '517 Patent explicitly discloses that when a

particular physical interface becomes unavailable, the terminal device 100 should wait for a

period of time to see if the physical interface becomes available. Ex. 11 at ¶ 31. Further, this

passage explains that this time period of waiting depends on the movement of the device, such that if the device is moving, the physical interface should wait longer. *Id.*

Additionally, the '517 Patent explains with respect to Fig. 4 that if the mobile device is moving at a slow speed (*e.g.*, at rest) and using the portable telephone interface it will switch to LAN, but if the device is moving at a higher speed than at rest and if it is on the portable telephone interface it will wait a longer time to switch, *i.e.*, stay on the portable telephone interface instead of switching to LAN. *Id.* at 6:32-68; Ex. 11 at ¶ 33. This is because of different "Rest-State" and "Moving-State" priorities identified in Fig. 4(b).[9] Accordingly, when considered as a whole, the disclosure of the '517 Patent provides sufficient disclosure for this term and Huawei's piecemeal approach should be rejected.

## V.      U.S. PATENT NO. 7,671,901 ("THE '901 PATENT")

### "when any change occurs …"

Huawei does not propose a construction that would be helpful to the jury but proposes a claim amendment—substituting "in response to" for "when"—without any intrinsic support. Huawei's discussion of the specification actually supports Maxell's position. For example, Huawei relies on this passage of the specification to interject in response to: "**When** the Scene Change Detection 1552 unit does detect a change in the video signal, it generates Interrupt 151 for CPU 7 [which,] . . . updates the correction data" and "**when** Scene Change Detection 1552 unit does not detect a change in the video signal, then CPU 7 does not update the correction data." *Dkt*. 100, 29. But this passage just shows that the '901 Patent specification and claims both use "when" not in response to. '901, 7:54-64, 8:18-27. Huawei does not identify any prosecution

---

[9] Similar examples are also provided with respect to Figures 8, 9, and 10. *See, e.g.*, '517, 8:58-9:18 (when moving in a train at a fast speed the device will wait longer to switch from LAN because it will "continuously utilize the wireless LAN" when "information stored in the memory unit 109"); *see also* 9:54-10:9 (waiting a longer time to switch when the device is moving and when the available network is not previously stored in the memory versus when the available network was previously stored in the memory); Ex. 11 at ¶¶ 32-34.

history estoppel or disavowal of claim scope that would change the word "when" in the claim phrase to "in response to," and the cases it uses are inapplicable.[10] That is why the Court should adopt Maxell's proposed construction of plain and ordinary meaning.[11]

## VI.    U.S. PATENT NO. 7,509,139 ("THE '139 PATENT")

### A.    "characterizing quantities …"

Huawei commits the "cardinal sin" of claim construction by trying to import group scores and proposes a construction that renders certain claim language redundant or contradictory. "In examining the specification for proper context" it is improper to "at any time import limitations from the specification into the claims." *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005). None of the sections of the '139 Patent cited by Huawei even mention the term "characterizing quantities," let alone limit characterizing quantities to group scores. '139, 4:61-5:3, 5:19-27, 5:49-52, 6:3-6, Figs. 3A-3C, and Fig. 4; *see also Dkt.* 100, 5-6. In at least two instances, the sentences below or after such citations contradict Huawei's position. '139, 4:58-62 & 6:6-10 (making clear that the characterizing quantities can be different from group scores because they can be received powers, SNR, or bit rate that can **later** be used to calculate group scores). Huawei even admits that, "in one example, a 'bit rate is used as a characterizing quantity,'" (*Dkt.*100, 8) but without identifying any disavowal of claim scope, Huawei decides to exclude these disclosures. "[W]hen a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined the term by implication." *See, e.g.*, *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d

---

[10] Huawei's sole support, *Am Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318 (Fed. Cir. 2011), is distinguishable. In *Am Calcar*, the district court did not construe the word "when" to mean "in response to," as Huawei proposes here. Instead, the claims in *Am Calcar* used both phrases, "when" and "in response to," and the Court construed both phrases in the same way based on the language of the claims requiring a cause-and-effect relationship. *Id.* at 1339.

[11] *See* Maxell's Op. Br. at 28; *see also O2 Micro Int'l, Ltd. v. Beyond Innovation Tech., Ltd.*, 521 F.3d 1351, 1362–63 (Fed. Cir. 2008).

1258 (Fed. Cir. 2001). The '139 Patent describes several examples of characterizing quantities and does not use it to have a single meaning of group scores. Therefore, Huawei contradicts case law it cited by trying to limit this claim term to a particular meaning that Huawei wants.

Further, Huawei's proposed construction contradicts and/or makes redundant certain claim language and dependent claims. For example, dependent claim 12 explicitly recites that "received power or an SNR value" are characterizing quantities. '139, 11:18-20. Huawei wants the Court to ignore the fact that dependent claim 12 explicitly requires characterizing quantities to be something other than group scores. Dependent claims are narrower than the claims from which they depend, logic would dictate that the claimed "characterizing quantities" in the independent claims would be broad enough to encompass all of the examples including group scores, SNR, and received power.[12] The scope of dependent claims 2-5 of the '139 Patent also support a broader construction than that proposed by Huawei because each of these claims explicitly recite that the terminal receives received power, bit rates, and SNR from different base stations and **then** adds them up to determine the characterizing quantities. '139, 9:64-10:43. These claims necessitate that claim 1 not be limited to the calculation of group scores.[13]

Huawei alleges that the claim should be limited because the '139 Patent discloses the disadvantages of prior art that selected a base station without using a group score and that when describing the '139 Patent Maxell also discussed using group characteristics. *Dkt.* 100, 5-6. But claims of the '139 Patent already account for these aspects and distinguish from prior art by reciting that an index of communication quality is obtained for base stations "being classified into a plurality of groups" and calculating characterizing quantities for "each of the groups." '139, 9:54-59. Thus, when applicant intended to limit the claim scope to the "group" aspect of

[12] *See Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1376 (Fed. Cir. 2000).
[13] *See Bradford Co. v. Conteyor N. Am., Inc.*, 603 F.3d 1262, 1271 (Fed. Cir. 2010).

the disclosures, it did. But the claim was not limited only to calculating group scores.

**B.      "a storage unit …"**

This claim can be corrected by the simple insertion of "is stored" at the end of the claim term. Maxell has sought this correction at the USPTO. *See* Certificate of Correction ("CoC") filed October 25, 2017 ("Ex. 16"). "[I]n a patent infringement suit, a district court may correct an obvious error in a patent claim."[14] Accordingly, to the extent that the USPTO has not entered the above-referenced CoC, Maxell requests this Court to correct the error in claim 11 as the omission is a minor typographical error that would be apparent to a person of ordinary skill in the art.[15] *See* Expert Decl. of Dr. Vojcic ("Ex. 7") at ¶ 37. Huawei and its expert, however, assert that such a correction cannot be entered by the Court because two corrections are possible, which are: (1) the addition of "is stored"; or (2) the addition of "is stored in RAM." *Dkt.* 100, 9. As explained by Dr. Vojcic, however, this is a "non-sensical" argument for at least the following reasons. Ex.7 at ¶ 36. First, adding "is stored" would encompass the embodiment in the specification that discloses RAM. Ex. 7 at ¶ 34. Huawei or Dr. Akl has not provided any evidence that would limit the scope of the claim to the RAM embodiment. *Id.* Second, claim 11 is an apparatus claim and applicant indicated its intent to broadly encompass different types of memory by using "storage unit." '139, 11:6. If applicant wanted to limit the claim to RAM, it would have recited as much instead of broadly reciting "storage unit." Ex. 7 at ¶ 36. The correction is being made to the functional recitation of the claim, and a person of ordinary skill in the art would not consider adding "in RAM" to the functional part of the claim because it is clear that the structure is already defined by "storage unit," and the latter part of the claim term is simply describing

---

[14] *See CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1358 (Fed. Cir. 2011).

[15] A minor typographical error does not necessarily render a claim indefinite as long as a person of ordinary skill in the art would have understood what the claim meant in view of the specification. *See Sipco, LLC v. Datamatic, Ltd.*, 2011 WL 1742669, at *7-8 (E.D. Tex. May 6, 2011). Here a person of ordinary skill in the art would have understood that the function of a storage unit is to **store**. Ex. 7 at ¶ 32. Therefore, the meaning of the claim would have been clear even with the typographical error.

information that **is stored** in the already claimed storage unit. *Id.* at ¶ 36. Thus, only one

correction is apparent and such a correction is not subject to reasonable debate.

## VII.   U.S. PATENT NO. 6,856,760 ("THE '760 PATENT")

### **"first encoding method"**

Similar to the dispute between the parties with respect to the "still pictures" claim term of

the '440 Patent (that has the same specification as the '760 Patent), Maxell contends that the

term "first encoding method" would be readily understood and requires no construction. There is

no ambiguity in the claim that would limit the first encoding method to be a moving picture

encoding method. Huawei relies on prosecution history that actually hurts Huawei's position. For

example, during prosecution of the '760 Patent, applicant explicitly stated that "Applicant's

clarified Claims 1 and 2 **don't** have a 'moving image' capability." *Dkt.* 100-23, 12. But Huawei

insists on adding an aspect of "moving picture." Further, the chart from the file history of the

'760 Patent—that Huawei includes in its brief to limit claim 1 to MPEG encoding—is related to

both "Claims 1 and 2," and applicant rightly identified "MPEG" in this chart because claim 2 of

the '760 Patent explicitly recites "MPEG standard." *Id.* at 3 & 13.[16]

## VIII.   U.S. PATENT NO. 7,116,438 ("THE '438 PATENT")

### **"input entered by a user"**

Huawei admits that "a user can enter many inputs" in the '438 Patent. *Dkt.* 100, 31. But

without identifying any clear disavowal of claim scope, Huawei wants this Court to limit this

claim based on an example in the specification. Huawei's proposal is also contrary to the

language of the claims. The first limitation of claim 1 recites "an input unit for receiving an input

entered by a user." As Huawei correctly notes, "as required *later* in the claim," "said first short-

---

[16] Moreover, Huawei's proposed construction would render dependent claims 2, 5, 8, 11, and 14 superfluous
because the dependent claims already recite MPEG. '760, claims 2, 5, 8, 11 & 14.

distance communication unit using said input, carries out an authentication process for allowance to use said display apparatus." '438, 10:11, 10:18-20. Huawei's proposal thus narrows "an input entered by a user" to require a step recited in a *later* limitation of claim 1. Doing so would render the latter limitation redundant and superfluous.[17]

## IX.     U.S. PATENT NO. 6,816,491 ("THE '491 PATENT")

### A.     "controller means …"

ZTE's proposal for an "external" CPU fails to explain what the CPU is external to. Under ZTE's proposal, the claim language could encompass a CPU that is external to the audio decoder apparatus itself. But as shown in Figures 1, 6, and 10-13, the patent describes a CPU 50 that is external to an audio decoder (20) yet still part of a multiplexed audio data decoder apparatus. '491, FIG. 1; *see also* '491, 4:35-43 ("The multiplexed audio data decoder apparatus according to the present embodiment comprises … an audio decoder 20, [and] an external CPU 50…" (emphasis added)). The Court should not accept ZTE's proposal, which could be interpreted to include a CPU that is external to the audio decoder apparatus itself, rather than simply external to the audio decoder. Accordingly, ZTE's proposal should be rejected.

### B.     "a demultiplexer …"

ZTE's indefiniteness argument is based on ZTE's confusion over what the demultiplexer inputs the audio data sequence into, in other words, where the demultiplexer outputs the audio data sequence. But ZTE itself resolves its artificial ambiguity with its alternative proposal: that the demultiplexer, for example, "outputs one data sequence … to the input of a frame sync."

Moreover, the claim need not specify a precise location for the demultiplexer's output in order for a person of ordinary skill in the art to understand its scope. The claim specifies the operation of the demultiplexer—sending an audio data sequence to another input— and a person

---

[17] *See Beachcombers, Int'l, Inc. v. WildeWood Creative Prods., Inc.*, 31 F.3d 1154 (Fed. Cir. 1994).

of ordinary skill in the art would understand the scope of this claim with reasonable certainty. Maher Decl. ("Ex. 13") at ¶¶ 25, 28-32. Thus, this term is not indefinite.[18]

## X.   U.S. PATENT NO. 6,748,317 ("THE '317 PATENT")

### A.   "walking navigation"

Negative limitations are "generally disfavored."[19] The '317 Patent's background section describes the problems with "conventional" navigation systems of the time: for example, they were too large for a walker to carry. '317, 1:19-21, 34-35. The inventors then explained that conventional 1990s navigation systems were unsuitable for use in walking navigation "as is." *Id.* at 1:36-38. In order to justify its addition of its negative limitation, ZTE would rewrite this simple sentence as "navigation systems used for driving form no part of the claimed invention." But this is not what the patent says. Nor is this sentence "an express disclaimer of car navigation systems," as ZTE would have it be. *Dkt.* 100, 35. The inventors of the '317 Patent were not excluding any system that is "usable in an object car that is running on a road"; they were simply identifying a problem in the prior art. *See* Ex. 14 at ¶¶ 39-46.

### B.   "said device connected to …"

The '317 Patent does not need to disclose an algorithm for the functions of "outputting" and "receiving" information. When a recited function can be performed by a general purpose computer, the specification need not disclose an algorithm for performing the claimed function. *Katz*, 639 F.3d at 1316. Functions like "processing," "receiving," and "storing" "can be achieved by any general purpose computer without specialized programming" and, in such cases, "it [is] not necessary to disclose more structure than the general purpose processor that performs those

---

[18] ZTE's alternative construction highlights yet another example of Defendants' attempt to read a preferred embodiment into the claims. ZTE argues that the specification "requires that the demultiplexer is inputted [sic] to the Frame Sync." *Dkt.* 100, 34. But ZTE provides no intrinsic evidence to support its position. *Id.* Indeed, nothing suggests that this exemplary embodiment should be projected onto this claim term. ZTE's alternative proposal fails.
[19] *See Microlinc, LLC v. Intel Corp. et al.,* 2013 WL 2471551, at *16-18 (E.D. Tex. Jun. 7, 2013) (citing *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1332-33 (Fed. Cir. 2003)).

functions." *Id.*[20] The claimed general-purpose functions for this term ("outputting" and "receiving") do not require a disclosed algorithm and can be performed by any processor without specialized programming. Ex. 14 at ¶¶ 50-51. Neither ZTE nor its expert conclude otherwise and in fact concede that "the functions at issue" are "outputting, receiving data." *Dkt.* 100, 36 (citing Andrews Decl. at ¶ 49). The general-purpose CPU described in the '317 Patent (9:42-43) is sufficient for performing these functions. Ex. 14 at ¶¶ 51-53.

## XI.   U.S. PATENT NO. 8,736,729 ("THE '729 PATENT")

### A.   "an image sensing device …"

Rather than address Maxell and its expert's positions that this term denotes structures that convert incident light into an electric signal (Pl.'s Op. Br., Ex. 4 at ¶¶ 35-37), ZTE merely avers that the addition of the words *with a light receiving sensor* transforms an insufficiently structured limitation into one with sufficient structure. *Dkt.* 100, 37. But a person of ordinary skill in the art would associate "image sensing device" with a class of structures regardless of whether the words *with a light receiving sensor* are part of the claim. ZTE's flawed reasoning not only ignores Dr. Madisetti's unrebutted testimony, it also disregards the description of the image sensing device in the patent itself, for example, at 4:36-65, 12:50-13:15, FIG. 2, FIG. 10.[21] The "image sensing device" here is no different from the "client device" in *Free Stream Media*—both terms describe how the respective device operates to achieve the inventions' objectives. *See Free Stream Media Corp. v. Alphonso Inc.*, 2017 WL 1165578, at *25 (E.D. Tex. Mar. 29, 2017). As

---

[20] *See also ContentGuard Holdings, Inc. v. Amazon.com, Inc.*, 2015 WL 1289321, at *44 (E.D. Tex. Mar. 20, 2015)  (finding a general-purpose computer a corresponding structure when "[t]he claimed function of 'processing a request from the means for requesting' does not include anything beyond merely generic 'processing'"); *Cellular Commc'ns. Equip. LLC v. HTC Corp.*, 2015 WL 1048890, at *5 (E.D.Tex. Mar. 9, 2015).

[21] ZTE's criticisms of Maxell's plain-meaning proposal also fall flat. While ZTE sets up the specter of a potential future dispute over the plain meaning of this term, ZTE has not identified any current dispute for this Court to resolve. *See* Defs.' Resp. Br. at 37-38. Indeed, if the mere possibility of a future disagreement about the plain meaning could compel a court to adopt a different construction, a "plain meaning" claim construction would never be appropriate. This is of course not the case, and ZTE's argument fails.

with the patent in *Free Stream*, the '729 Patent's specification describes the "image sensing device" and its operation in detail ('729, 4:36-65, FIG. 2) and the use of additional words (here, *image sensing*) in conjunction with the word *device* "places an additional functional constraint on a structure otherwise adequately defined." *See Free Stream*, 2017 WL 1165578, at *25.[22]

**B.**     **"an image instability detector"/ "amount of image-instability…"**

ZTE argues that this term should be interpreted as a MPF limitation and no longer argues that this term is indefinite. ZTE's response largely focuses on whether the patent sufficiently describes how the image instability is calculated. But this inquiry has no bearing on whether the "image instability detector" connotes a sufficiently definite structure or class of structures.

Dr. Madisetti explained that the skilled artisan "would understand that 'instability'. . . would refer to the movement of the camera, as measured by a gyro sensor, accelerometer, or similar device." Pl.'s Op. Br., Ex. 4 at ¶ 48 (describing instability "relating to vertical and horizontal shifts in effective pixel area . . . due to vertical and horizontal movement of the camera"). Anyone who has used a digital camera in a moving vehicle can appreciate the need to correct instability. "Detector" describes a sufficiently definite class of structures, and "image instability" in this context would be readily understood by a person of ordinary skill in the art. Accordingly, this term is not a MPF term and should be construed as Maxell proposes. ZTE's arguments for the term "an amount of image-instability of the camera" fail for the same reasons.

**C.**     **"to change a position of the second effective set of pixels …"**

ZTE offers no specific support for its proposal, nor does it address any of the arguments for this term in Maxell's opening brief. *Dkt.* 100, 41.

---

[22] ZTE also misstates the law. The *Williamson* standard is not, as ZTE articulates it, whether the claim "contain[s] sufficient structure to do the function [cited by the claim]," *Dkt.* 100, 37; rather, the proper standard is whether the limitation denotes a sufficiently definite structure or class of structures. *See Williamson v. Citrix Onine, LLC*, 792 F.3d 1399, 1350(Fed. Cir. 2015). Maxell's opening brief and supporting expert testimony establish that the "image sensing device" does just that.

### D. "a signal processing unit configured to form image signals"

Defendants' brief fails to address this term. Maxell's proposal should be adopted.

### E. "a display unit …"

ZTE's argument for the "display unit" term is nearly identical to its argument for the "image sensing device." *Compare Dkt.* 100, 41-42 *with Dkt.* 100, 37-38.[23] Thus, ZTE's arguments here suffer from the same flaws. ZTE merely alleges that the addition of "with a display screen" transforms a limitation into one with sufficient structure. *Id.* at 41-42. But a person of ordinary skill in the art would associate "display unit" with a class of structures, as Dr. Madisetti explained (Pl.'s Op. Br., Ex. 4 (Madisetti Decl.) at ¶¶ 51-54), regardless of whether these additional words are part of the claim. The term "display unit" denotes sufficiently definite structure.

## XII. U.S. PATENT NO. 6,408,193 ("THE '193 PATENT")

### A. "A cellular telephone adapted to be used in a CDMA system, comprising"

ZTE's statement that "Plaintiff agrees that the preambles were amended during prosecution to overcome the prior art" is false. *Dkt.* 100, 45. Maxell pointed out in its opening brief that the claims were distinguished "based on the claim limitations themselves, not the preambles." Pl.'s Op. Br. at 52 (emphasis added).

ZTE's characterization of the '193 Patent's prosecution history is equally incorrect. The sole basis for ZTE's argument is a January 2002 amendment during the patent's prosecution history. But ZTE's response omits that the inventors amended not just the claims' preambles, but also their bodies. For example, the body of claim 1 was amended to add the limitation, "an open-loop power control is performed and then a closed-loop power control is performed according to

---

[23] Indeed, ZTE even misstates the alleged function of the "display unit" as "image sensing." *See id.* at 41 ("claim 1 of the '493 patent includes the requisite structure for image sensing…").

said power control signal so as to control the transmitted power to converge into a range required by said cell-site station" and that the gain and bias of the amplifiers are controlled "using a set of bias and gain data" stored in memory. *Dkt.* 100-18 at 13. The amendments to the bodies of the claims added limitations directed to power control signals, open-loop power control followed by closed-loop power control, and correlated bias and gain data. *Id.* at 12-14.

It was on these bases that the inventors distinguished their invention from the prior art. While the inventors mentioned that the prior art failed to disclose "a cellular phone adapted for use in a CDMA system," they put this statement into context by distinguishing the art on the basis of reducing current consumption and defining a relationship between bias and gain data— the same limitations that were added to the body of the claims. The inventors explained "there is no requirement or objective, according to McGirr or Miyake, to reduce current consumption" and that "neither reference discloses to store correlated bias and gain data, or a function defining a relation therebetween, in memory." *Id.* at 8-9. Thus, the inventors distinguished the '193 Patent's claims based on the claim limitations themselves, not the preambles.

**B.      "variable amplitude amplifier"**

Here again, ZTE is simply seeking to limit the claims to a preferred embodiment. ZTE argues that this term should be narrowed to a specific arrangement "because the embodiment of Figure 1 is the only embodiment that fits within the scope of the claims." *Dkt.* 100, 45. ZTE's argument is premised upon yet another legal error. Courts must take care to avoid reading an embodiment—even when it is the <u>only</u> embodiment—into the claims. *See Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1341 (Fed. Cir. 2014). Yet this is exactly what ZTE has done for this term. Its proposal must be rejected.

**XIII.   U.S. PATENT NO. 6,329,794 ("THE '794 PATENT")**

**"function/component devices"**

These terms are not means plus function terms. ZTE's arguments for the "function device" terms misapprehend *Williamson*. Contrary to ZTE's reading, *Williamson* does not hold that the use of the word *device* automatically invokes § 112, ¶ 6. In fact, post-*Williamson* courts have determined that "device," in conjunction a discussion of how the device operates, can denote sufficiently definite structure. *See, e.g.*, *Free Stream*, 2017 WL 1165578, at *25.

Here, the function/component devices operate by consuming power and receiving a power consumption reduction instruction based on relative priority. The claims themselves also describe the function/component devices as being "equipped with independent functions" (in the case of function devices) and as "performing different functions in the device" (in the case of component devices). '794, claims. 1, 6. The claim language also states that these devices receive power. *See, e.g., id.* at cl. 1. The actual <u>functions</u> performed by the function devices are inconsequential—it is their operation that informs a person of ordinary skill in the art of the claim scope. *See Free Stream*, 2017 WL 1165578, at *25. That operation is clear, and ZTE has not argued otherwise.

The specification would inform a person of ordinary skill in the art about these terms' meaning and structure. Kiaei Decl. ("Ex. 15") at ¶¶ 43-49. The inventors chose the only language suitable for their concept of managing power consumption by the functions in an information processing device. *Id.* at ¶¶ 44-45. To have selected different words would have been to restrict the application of the inventors' novel power management scheme. *Id.* at ¶ 44. Thus, these terms are not MPF limitations.

Further, the '794 Patent discloses structure for these terms. ZTE would have this Court disregard the specification in giving meaning to the claims. For example, the '794 Patent describes audio communication and videophone functions as exemplary function devices. '794,

1:31-32. A person of ordinary skill in the art would recognize the structures that would perform these functions and would understand that these disclosures denote a sufficiently definite class of structures. Kiaei Decl. at ¶¶ 46-49, 56. ZTE itself admits that the '794 Patent discloses structure for the function/component devices. In a footnote, ZTE offers that "[t]he only accused <u>structure</u> … are [sic] CPU and memory." *Dkt.* 100, 50 n.16. While ZTE dismisses this clear example of structure by claiming that the CPU and memory are structures for "common" function devices, ZTE overlooks that a "common function device" is simply a type of "function device."[24] Ex. 15 at ¶¶ 56-57. Thus, the '794 Patent undisputedly discloses structure (*e.g.*, a CPU and memory) corresponding to a function device. ZTE's indefiniteness argument thus fails.

## XIV.   U.S. PATENT NO. 8,098,695 ("THE '695 PATENT")

### "a controller for receiving …"

According to ZTE, the presence or absence of the word *means* should make no difference in determining whether a term is a MPF limitation. *Dkt.* 100, 52. But this is not the law. ZTE has overlooked that, even after *Williamson*, there remains a presumption (albeit not a "heavy" one) that a claim term lacking the word *means* will not be interpreted as a MPF term. *Williamson*, 792 F.3d at 1348. "Controller" in the context of the '695 Patent is one example of a term that connotes sufficient structure, and the cases Maxell cites in its opening brief support this conclusion. *See, e.g.*, *Sound View Innovations, LLC v. Facebook, Inc.*, 2017 WL 2221177, at *5 (D. Del. May 19, 2017).[25] ZTE fails to explain why that case is supposedly "inapplicable" or why it was "wrongly decided." Accordingly, *Sound View* remains a sound decision.

---

[24] Indeed, claim 8 of the '794 Patent makes clear that a "common function device" is a type of "function device": "a function device common to a plurality of independent functions, <u>said common function device</u> being …."

[25] In *Sound View*—the only case cited by any party that considers this question—Judge Andrews wrote that, although *controller* "may be defined with functional terms," that fact "does not make it means-plus-function." *Id.*

Dated: October 30, 2017

*/s/ Jamie B. Beaber*
Geoff Culbertson
Kelly Tidwell
**Patton, Tidwell & Culbertson, LLP**
2800 Texas Boulevard (75503)
Post Office Box 5398
Texarkana, TX 75505-5398
Telephone: (903) 792-7080
Facsimile: (903) 792-8233
gpc@texarkanalaw.com
kbt@texarkanalaw.com

Jamie B. Beaber
Alan M. Grimaldi
Kfir B. Levy
James A. Fussell, III
Baldine B. Paul
Tiffany A. Miller
Saqib Siddiqui
Bryan Nese
**Mayer Brown LLP**
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300
jbeaber@mayerbrown.com
agrimaldi@mayerbrown.com
klevy@mayerbrown.com
jfussell@mayerbrown.com
bpaul@mayerbrown.com
tmiller@mayerbrown.com
ssiddiqui@mayerbrown.com
bnese@mayerbrown.com

Amanda K. Streff
**Mayer Brown LLP**
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
astreff@mayerbrown.com

*Counsel for Plaintiff Maxell, Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served this 30th day of October, 2017, with a copy of this document via the Court's CM/ECF system.

*/s/ Jamie B. Beaber*
Jamie B. Beaber